**No. 26-50318**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

**MCCULLY-CHAPMAN EXPLORATION, INCORPORATED,**
*Plaintiff-Appellant/Cross-Appellee,*

*v.*

**OVINTIV USA, INCORPORATED,**

*Defendant-Appellee/Cross-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Midland/Odessa Division

No. 7:14-CV-18

# BRIEF OF APPELLANT/CROSS-APPELLEE MCCULLY-CHAPMAN EXPLORATION, INCORPORATED


**McGinnis Lochridge LLP**
Austin W. Brister
Marcus V. Eason
M. Alejandra Salas
609 Main Street, Suite 2800
Houston, Texas 77002
(713) 615-8500

**Beck Redden LLP**
Russell S. Post
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

**Counsel for Appellant/Cross-Appellee McCully-Chapman Exploration, Incorporated**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff-Appellant/Cross-Appellee**: McCully-Chapman Exploration, Inc., whose parent company is Spearpoint Resources Company. Both entities are incorporated in the State of Texas and have their principal place of business in the State of Texas.

**Defendant-Appellee/Cross-Appellant**: Ovintiv USA, Inc. is a wholly owned subsidiary of Alenco, Inc., which is a wholly owned subsidiary of Ovintiv, Inc. Each of the foregoing entities has its principal place of business in Denver, Colorado, and each are organized under the laws of the State of Delaware.

**Counsel For Appellant/Cross-Appellee**:

Austin W. Brister
Marcus V. Eason
M. Alejandra Salas
MCGINNIS LOCHRIDGE LLP
609 Main Street, Suite 2800
Houston, Texas 77002
abrister@mcginnislaw.com
meason@mcginnislaw.com
asalas@mcginnislaw.com
(713) 615-8500
(713) 615-8585 - FAX

Russell S. Post
BECK REDDEN LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
rpost@beckredden.com
(713) 951-6292
(713) 951-3720 - FAX

**Counsel for Appellee/Cross-Appellant**:

Christopher M. Hogan
Samantha Thompson
James A. Schuelke
Cody T. Rutowski
HOGAN THOMPSON SCHUELKE, L.L.P.
1001 Fannin St., Suite 4775
Houston, Texas 77002
chogan@hoganthompson.com
sthompson@hoganthompson.com
jschuelke@hoganthompson.com
crutowski@hoganthompson.com
(713) 671-5630

By: /s/ *Austin W. Brister*
Austin W. Brister

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would assist the Court. This appeal presents a novel question of Texas oil and gas law arising from a model joint operating agreement ("JOA") published by the American Association of Professional Landmen ("AAPL"): whether a segment of a horizontal well that crosses lands subject to the JOA is a "well on the Contract Area," making that segment subject to the terms of the JOA. The district court's affirmative answer departs from the Texas authority construing that form in different but related circumstances, and the consequences will reach thousands of operators and non-operators who are working under legacy JOAs across the state. Oral argument would assist the Court in working through the model form's structure, the applicable principles of Texas law, the record on the 17 horizontal wells at issue, and the alternative of certifying the key questions to the Texas Supreme Court.

## TABLE OF CONTENTS

**PAGE**

Certificate of Interested Persons ..... 2

Statement Regarding Oral Argument ..... 4

Table of Contents ..... 5

Table of Authorities ..... 9

Jurisdictional Statement ..... 13

Issues Presented ..... 14

Introduction ..... 15

Statement of the Case ..... 18

A. Factual Background ..... 18

1. The 1982 JOA. ..... 18

2. For decades, the only operations under the JOA were vertical wells located entirely inside Section 46. ..... 18

3. In 2019-21, Ovintiv drilled 17 multi-section horizontal wells from surface locations on other sections, primarily developing lands the JOA never mentions ..... 19

4. Before drilling, Ovintiv's own title attorney recommended a new JOA covering the whole drilling unit, but Ovintiv ignored his advice. ..... 20

5. Ovintiv's 2019 and 2021 proposals proposed entire wells and invoked "appropriate non-consent penalties outlined in the JOAs," but neither attached the JOA. ..... 21

6. The 2019 proposal included three Wolfcamp wells below the JOA's depth limit, which Ovintiv concedes are outside the Contract Area. ..... 21

7. McCully's consultant recommended non-consent based on economic risk without ever seeing the JOA. ..... 22

8. Ovintiv's proposals calculated ownership interests derived from entire-wellbore allocations, which Ovintiv later refused to recognize. 22

9. From 2019 until spring 2023, Ovintiv performed none of the JOA's operator obligations that would be distinguishable from cotenancy operator obligations. 23

10. In spring 2023, when McCully first learned that Ovintiv was charging non-consent penalties, it promptly demanded payment as a cotenant, but Ovintiv refused—except as to the Wolfcamp wells. 23

B. Course of Proceedings and Disposition Below. 24

Summary of Argument 27

Standard of Review 29

Argument 30

I. Because the JOA and Its Non-Consent Penalties Do Not Govern the Neal Wells, Background Rules of Cotenancy Govern. 30

A. Basic principles of Texas contract interpretation apply to the JOA. 30

B. Because the Neal Wells are not "on the Contract Area," they are not governed by the JOA. 31

1. The JOA is limited to a "well on the Contract Area," meaning all the lands described in Exhibit A and nothing else. 31

2. A "well" is an integrated whole, not a partial segment. 32

3. A well is "on" the Contract Area only if it is within the limits or bounds of the area. 33

4. Applying these principles, as a matter of Texas law, wells that exceed the Contract Area are not "on the Contract Area." 34

5. The AAPL's drafting history confirms this conclusion. ....37

6. This interpretation harmonizes all provisions of the JOA. ....37

7. Because the Neal Wells are not "on the Contract Area," Ovintiv cannot charge non-consent penalties. ....39

8. In the alternative, even under the district court's reading, Ovintiv cannot charge non-consent penalties because it never proposed a Section 46 segment operation. ....40

C. The district court's justifications for its partial-segment reading of the JOA are legally erroneous. ....42

1. The district court rewrote the JOA. ....42

2. The district court misconstrued Texas precedent. ....43

a) The court's attempted distinction of *Hill* was flawed. ....44

b) The court's reliance on *Crawley* was flawed. ....46

c) The court's reading of *Springer Ranch* was flawed. ....46

3. The district court's partial-segment reading cannot be harmonized with the rest of the JOA. ....47

D. Allowing a JOA to apply to partial segments of horizontal wells threatens perverse consequences for all parties to legacy JOAs. ....51

E. Reliance on the default rules of cotenancy is not only legally correct but also fair and equitable. ....52

F. If there is any doubt, the JOA interpretation question should be certified to the Texas Supreme Court. ....54

II. McCully Is Not Estopped From Asserting Its Cotenancy Rights. ....55

A. McCully took no inconsistent position, as its actions were consistent with those of a cotenant. ....56

B. McCully did not acquiesce in the JOA only applying to a segment of a well because Ovintiv's proposals were for "the entire well." ....................59

C. Because Texas cotenancy law afforded McCully the same rights, McCully accepted no benefits under the JOA. ....................61

D. Applying century old Texas cotenancy law is not unconscionable because it fully reimburses Ovintiv's actual costs. ....................62

E. The Wolfcamp wells conclusively disprove quasi-estoppel. ....................65

F. Quasi-estoppel cannot supply forward-looking penalty rights the JOA itself does not confer. ....................66

III. Because the JOA Does Not Govern the Neal Wells, the Case Should be Remanded for an Accounting and Related Remedies. ....................68

Conclusion and Relief....................68

## <u>TABLE OF AUTHORITIES</u>

**CASE** **PAGE(S)**

*Anderson Energy Corp. v. Dominion Okla. Tex. Expl. & Prod., Inc.*,
469 S.W.3d 280 (Tex.App.—San Antonio 2015, no pet.) ....................15, 34, 44

*Bank of Am., N.A. v. Prize Energy Res., L.P.*,
510 S.W.3d 497 (Tex.App.—San Antonio 2014, pet. denied)..........................60

*Bell v. Chesapeake Expl., L.L.C.*,
No. 04-18-00129-CV, 2019 WL 1139584 (Tex.App.—San Antonio Mar. 13, 2019, pet. denied)...........................................................32, 33

*BP Am. Prod. Co. v. Marshall*,
342 S.W.3d 59 (Tex. 2011).........................................................................33

*BPX Operating Co. v. Strickhausen*,
629 S.W.3d 189 (Tex.2021)..........................................................................61

*Burnham v. Hardy Oil Co.*,
147 S.W. 330 (Tex.Civ.App.—San Antonio 1912), *aff'd*, 195 S.W. 1139 (Tex.1917)...................................................................15, 53, 57

*Capio Funding, LLC v. Rural/Metro Operating Co., LLC*,
35 F.4th 353 (5th Cir. 2022) ........................................................................50

*Cone v. Fagadau Energy Corp.*,
68 S.W.3d 147 (Tex.App.—Eastland 2002, pet. denied) .................................52

*Cox v. Davison*,
397 S.W.2d 200 (Tex.1965)..........................................................................61

*Crawley Petroleum Corp. v. Gastar Exploration Inc.*,
No. CIV-17-1365-SLP, 2020 WL 2545327 (W.D. Okla. May 19, 2020) ......................................................................................25, 46

*Devon Energy Prod. Co. v. Sheppard*,
668 S.W.3d 332 (Tex.2023).................................................................30, 37, 48

*In re Eagleridge Operating LLC*,
642 S.W.3d 518 (Tex.2022) (orig. proceeding) ..................................53, 61, 62

*El Paso Prod. Co. v. Valence Operating Co.*,
112 S.W.3d 616 (Tex.App.—Houston [1st Dist.] 2003, pet. denied) ................40

*Flint Hills Res. LP v. Jag Energy, Inc.*,
559 F.3d 373 (5th Cir. 2009) ....................................................................29

*Frazier v. Wynn*,
472 S.W.2d 750 (Tex.1971)........................................................................55

*French v. Occidental Permian Ltd.*,
440 S.W.3d 1 (Tex.2014).....................................................................37, 51

*Hartford Fire Ins. Co. v. City of Mont Belvieu*,
611 F.3d 289 (5th Cir. 2010) ..................................................29, 56, 63

*Hill v. Heritage Resources, Inc.*,
964 S.W.2d 89 (Tex.App.—El Paso 1997, pet. denied)..................35, 40, 44, 45

*Jatera Corp. v. US Bank Nat'l Ass'n*,
917 F.3d 831 (5th Cir. 2019) ...............................................................46, 54

*Lopez v. Munoz, Hockema & Reed, L.L.P.*,
22 S.W.3d 857 (Tex.2000).................................................................55, 61, 62

*Mieco LLC v. Targa Gas Mktg. LLC*,
183 F.4th 410 (5th Cir. 2026) ...................................................................54

*Montez v. S. San Antonio Indep. Sch. Dist.*,
817 F.2d 1124 (5th Cir. 1987) ..................................................................67

*Nettye Engler Energy, LP v. BlueStone Natural Resources II, LLC*,
639 S.W.3d 682 (Tex.2022)...............................................................31, 43

*Parrott v. Int'l Bancshares Corp.*,
167 F.4th 728 (5th Cir. 2026) ..................................................................30

*Rankin v. Naftalis*,
557 S.W.2d 940 (Tex.1977)...............................................................34, 44

*Samson Expl., LLC v. T.S. Reed Properties, Inc.*,
521 S.W.3d 766 (Tex.2017)........................................................................57

*Springer Ranch, Ltd. v. Jones*,
421 S.W.3d 273 (Tex.App.—San Antonio 2013, no pet.) ....................32, 33, 47

*Stable Energy, L.P. v. Newberry*,
999 S.W.2d 538 (Tex.App.—Austin 1999, pet. denied) ..................................58

*Stinnett v. Colorado Interstate Gas Co.*,
227 F.3d 247 (5th Cir. 2000) ........................................................................29

*Sun Oil Co. v. Madeley*,
626 S.W.2d 726 (Tex.1981)...........................................................................66

*Tenneco Inc. v. Enterprise Prods. Co.*,
925 S.W.2d 640 (Tex.1996).....................................................31, 38, 43

*Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Tex., LLC*,
363 S.W.3d 192 (Tex. 2012) .........................................................................52

*Truly v. Austin*,
744 S.W.2d 934 (Tex. 1988) .........................................................................64

*United States Fire Ins. Co. v. Unified Life Ins. Co.*,
147 F.4th 583 (5th Cir. 2025) .......................................................................31

*Van Dyke v. Navigator Group*,
668 S.W.3d 353 (Tex. 2023) .........................................................................34

*Wenske v. Ealy*,
521 S.W.3d 791 (Tex.2017)...........................................................................51

**STATUTES**

28 U.S.C. § 1332(a) ...........................................................................................13

2 Kuntz, Law of Oil and Gas §19A.6 .............................................................35

Okla. Stat. tit. 52, §87.1(e)................................................................................46

Tex. Tax Code § 32.07(a) ..................................................................................61

**RULES**

5th Cir. Rule 28.2.6...........................................................................................54

**OTHER AUTHORITIES**


Black's Law Dictionary (12th ed. 2024) ....................................................................32

Terry Cross,
*Acquiring Aging Oil & Gas Assets: Grading the Gems and Marking the Landmines Underlying the Value Assumptions*, 2024 No. 6 FNREL-INST 2 (AAPL/FNREL Advanced Landman's Institute, Nov. 2024) ....................................................................36, 54

Gary B. Conine & Alex Ritchie,
Property Provisions of the Joint Operating Agreement: An Update for the New 2015 Form JOA, 50 Tex. Tech L. Rev. 489 (2018)....................................................................35

Gary B. Conine,
The Joint Operating Agreement: A Legal Analysis §3.2[E] (2024) ..................35

Andrew B. Derman,
Joint Operating Agreement: Working Manual (1986) ......................................36

2 Kuntz,
Law of Oil and Gas §19A.6 ....................................................................35

3 Smith & Weaver,
Texas Law of Oil and Gas ....................................................................35, 36

Jeff Weems,
*New AAPL JOA Form 610-2015*, Landman, Vol. 62, No. 6 (2016)....................................................................37

## Jurisdictional Statement

The district court had diversity jurisdiction because McCully-Chapman Exploration, Inc. is a citizen of Texas, ROA.1624, Ovintiv USA, Inc. is a citizen of Colorado and Delaware, ROA.1624, and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a).

This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on March 21, 2026. ROA.2337. McCully filed its notice of appeal on April 20, 2026. ROA.2338.

## ISSUES PRESENTED

1. As a matter of contract interpretation, did the district court err by ruling that a segment of a horizontal well is a "well on the Contract Area" for purposes of a model-form joint operating agreement, even though the entire horizontal well vastly exceeds the boundaries of the Contract Area? And even if a segment could be such a well, did the court err by allowing Ovintiv to charge non-consent penalties for a segment it never proposed?

2. Did the district court err by holding that quasi-estoppel binds McCully to the JOA, when McCully's conduct was consistent with its rights as a cotenant, McCully never acquiesced in applying the JOA to a segment of a well, McCully received no benefit the JOA conferred, nothing is unconscionable about applying the cotenancy default rule, and quasi-estoppel cannot create penalty rights the JOA does not confer?

3. If the liability judgment is reversed, should McCully's remedial claims be reinstated and the case remanded for the deferred damages phase?

## INTRODUCTION

A mineral cotenant in Texas, as an operator, may develop the minerals based on its own unilateral timeline and internal economic justification without the consent of its cotenants. If it does so, the non-participating cotenant pays nothing out of pocket while its minerals are developed and drained. The operator recovers the non-participating cotenant's proportionate share of actual costs out of the non-participating cotenant's share of production before accounting to it for anything. Texas courts have treated that balance as the fair default rule for over a century. *Burnham v. Hardy Oil Co.*, 147 S.W. 330, 335 (Tex.App.—San Antonio 1912), *aff'd*, 195 S.W. 1139 (Tex.1917).

A joint operating agreement (JOA) is the contract by which mineral owners may displace that default rule for defined lands. *Anderson Energy Corp. v. Dominion Okla. Tex. Expl. & Prod., Inc.*, 469 S.W.3d 280, 290 (Tex.App.—San Antonio 2015, no pet.). A JOA designates an operator, creates proposal and election procedures for any development activities on the lands subject to the JOA, sets percentages of ownership of production and responsibility for costs, and—of particular importance to this case—provides non-consent penalties for parties that elect not to participate in a proposal. To incentivize development, the penalties allow participating parties to recover multiples of their costs (typically 200–400%) before sharing proceeds with non-participating parties—varying the 100% recoupment rule of cotenancy.

For generations, the American Association of Professional Landmen (AAPL) has provided model JOAs that are widely used in the industry. One such model is the AAPL's 1977 form. That JOA defines its "Contract Area" as "all" the lands the parties intend to develop and operate under the agreement. Countless of these "legacy" JOAs remain in force across Texas.

Modern horizontal wells often run for miles, crossing several sections of land that lack common ownership. Generally in Texas, when such a well is drilled across multiple tracts with co-tenancy, it is called an "allocation well."




*Horizontal well originating on Tract 1, laterally traversing Tracts 2 and 3*

Allocation wells may cross tracts covered by a legacy JOA's Contract Area, like Tract 2 in this graphic. Questions arise when an operator drills a well that exceeds the JOA's Contract Area. Such a question is at the heart of this appeal.

In 2019–2021, Ovintiv USA, Inc. (Ovintiv) drilled over 17 horizontal wells across multiple tracts in which it owned an interest. All the horizontal wells were greater than two miles in lateral length. McCully-Chapman Exploration, Inc. (McCully) owned an interest in just one of those tracts, a one mile section subject to the 1977 model form JOA.

Ovintiv could have negotiated a new JOA covering the whole horizontal well; Ovintiv's own title attorney recommended this solution before Ovintiv drilled, ROA.3355-3356, and it was endorsed by Ovintiv's JOA expert as a "best practice" at trial. ROA.2882. Alternatively, Ovintiv could have bargained to amend the old JOA to cover the entire horizontal well. Otherwise, Ovintiv could accept the default rule of co-tenancy and recover 100% of its drilling costs before paying its cotenants.

But Ovintiv drilled the wells without resorting to either of these alternatives. And when it did, Ovintiv took the position that the legacy JOA and its non-consent penalties applied to the segment of the well crossing the JOA's Contract Area, leaving McCully with nothing for its mineral interests in any well that never pays out those penalties.

With no other solution, McCully filed this suit, contending that the legacy JOA does not apply to only part of the well and thus its rights are governed by the default rule of co-tenancy for the entire well. The resolution of that question will have dramatic implications for thousands of parties to legacy JOAs across Texas.

## <u>Statement of the Case</u>

### A. <u>Factual Background.</u>

### 1. <u>The 1982 JOA.</u>

The JOA at issue is dated May 1, 1982, executed by Saxon Oil Company as operator and Axel Johnson Exploration and Production Company, and written on the AAPL's 1977 model form. ROA.1630. Ovintiv is a successor to Saxon and McCully is a successor to Axel Johnson. ROA.1630. The JOA Contract Area covers several listed prospects; Section 46 is the *only* one in which both parties own interests and the only one the wells at issue here touch. ROA.2932-2933.

Section 46 appears as part of Saxon's "North Hazel 46 Prospect (TX-731)." That prospect is defined by both (i) surface geography and (ii) depth. Its Contract Area covers Section 46, Block 40, T5S, T&P RR Co. Survey, A-1280, Upton County, Texas, and those depths from the surface to the base of the Dean formation. ROA.2932, 1630. The Dean formation sits above the Wolfcamp formation, so wells drilled down to the Wolfcamp formation are outside the JOA's vertically defined Contract Area. ROA.2702-2703, 2723-2724.

### 2. <u>For decades, the only operations under the JOA were vertical wells located entirely inside Section 46.</u>

Saxon planned and drilled only vertical wells. ROA.2541-2542, 2825. Four vertical wells were drilled under the North Hazel 46 prospect in the 1980s and they produced for decades. ROA.1627, 1630.

Until Ovintiv proposed the Neal Horizontal Wells on September 17, 2019—the wells at issue in this case—no party ever proposed a well extending beyond the boundaries of the Contract Area (as defined in the JOA's Exhibit A). ROA.1627, 1629-1630, 1632.

**3. <u>In 2019-21, Ovintiv drilled 17 multi-section horizontal wells from surface locations on other sections, primarily developing lands the JOA never mentions.</u>**

Ovintiv drilled over 17 multi-section horizontal wells (the "Neal Wells") between 2019 and 2021. ROA.1629. The wells are drilled from Sections 34 and 39 and produce primarily from Sections 2, 34, and 39, and most of their productive laterals lie outside Section 46. f1630. McCully owns no interest in Sections 2, 34, or 39. ROA.1630.

*Exemplar Neal Wells traversing the JOA Contract Area (Section 46)*




No section of the JOA mentions Sections 2, 34, or 39, nor do they mention any drilling program or prospect that would include those lands traversed by the Neal Wells (other than Section 46). ROA.2913–2938, 1630.

**4. Before drilling, Ovintiv's own title attorney recommended a new JOA covering the whole drilling unit, but Ovintiv ignored his advice.**

Before it drilled the Neal Wells, Ovintiv commissioned a title opinion. ROA.2896 (245:8–19). The title opinion for the wells originating from Section 34 recommended that "[p]rior to commencing operations, you should enter into an operating agreement with the outstanding leasehold working interest owners within the drilling unit" (referring to the multi-section area designated for each well's production). ROA.3355-3356. That title opinion listed McCully as a "Non-JOA Party" and advised Ovintiv of the default rule—that such an interest owner "is not entitled to proceeds of production from the well in question until such time that the owners of the working interest who carry the burden . . . have recouped 100% of the cost of drilling, completing, equipping, and operating the well in question." ROA. 3355-3356.

Ovintiv ignored the title opinion it had commissioned. At trial, Ovintiv's land manager conceded that there was no JOA with a Contract Area that included all of the lands where the wells were drilled and traverse, and that Ovintiv did not negotiate a new JOA. ROA.2896 (250:4-9, 252:5-9). Instead, Ovintiv drilled the Neal Wells without consulting McCully or relying on McCully's participation; indeed, it began drilling several wells before ever receiving McCully's first ballot responding to Ovintiv's proposal to drill the Neal Wells. ROA.1629-1631.

**5. <u>Ovintiv's 2019 and 2021 proposals proposed entire wells and invoked "appropriate non-consent penalties outlined in the JOAs," but neither attached the JOA.</u>**

On September 17, 2019, Ovintiv sent McCully a ballot packet that included a well ballot, plats (maps of each proposed well), and authorizations for expenditure, covering 11 horizontal wells. ROA.1630, 3897, 4740. On June 23, 2021, it sent another packet for seven more wells. ROA.1631, 4020, 4799. Both packets proposed the drilling and completion of each well in its entirety, not a segment of a well. Ovintiv's own JOA expert confirmed it: Ovintiv "proposed the entire well." ROA.2864.

The 2019 cover letter stated: "If you choose not to participate, your interest will be subject to the appropriate non-consent penalties outlined in the JOAs." ROA.3898. The 2021 letter said the same, referring to a single "JOA." ROA.4021. But neither letter attached any JOA or further described the scope of the JOA.

The election pages contained no reference to any JOA. They listed the wells with two checkboxes per row, "Elect to Participate" or "Elect to Non-Consent," above a signature line. ROA.3984–3987, 5030–5032.

McCully checked "Non-Consent." ROA.1631, 3986, 5032.

**6. <u>The 2019 proposal included three Wolfcamp wells below the JOA's depth limit, which Ovintiv concedes are outside the Contract Area.</u>**

Three of the 11 proposed wells in the 2019 packet were in the Wolfcamp formation, which is beneath the JOA's stated depth. ROA.1631, 3897. Ovintiv's

land manager agreed those wells are "not covered under the initial JOA," ROA.2702-2703, and Ovintiv stipulated that McCully's ballot response of checking "Non-Consent" did not bring the Wolfcamp wells under the JOA. ROA.1631.

### 7. <u>McCully's consultant recommended non-consent based on economic risk without ever seeing the JOA.</u>

An independent geologist engaged by McCully evaluated the proposals on a financial basis and advised that McCully "shouldn't participate in these wells." ROA.2653, 2659-2661, 2669-2670, 2691-2693. He never reviewed the JOA. ROA.2661. To his knowledge, no one at McCully even had a copy of the JOA when the ballots were signed. ROA.2661, 2688-2689. McCully followed his advice. ROA.1631.

### 8. <u>Ovintiv's proposals calculated ownership interests derived from entire-wellbore allocations, which Ovintiv later refused to recognize.</u>

Both proposals calculated decimal interests—the fractional ownership shares used to allocate costs and revenues—by allocating a share of full-wellbore costs. ROA.3897-3899, 4020-4022. Thus, the decimal interests and costs Ovintiv attributed to McCully were for a share of the entire wellbore, not a segment.

At trial, Ovintiv's land manager conceded that the decimal interests Ovintiv is still paying McCully on were "now inaccurate," but Ovintiv was "waiting until trial litigation was over" to change them. ROA.2725-2726.

**9. From 2019 until spring 2023, Ovintiv performed none of the JOA's operator obligations that would be distinguishable from cotenancy operator obligations.**

For years, Ovintiv did nothing outwardly to apply the JOA to the Neal Wells. Instead of performing the operator's obligations under the JOA, it treated McCully like a cotenant:

- It credited McCully with ownership decimals derived from its title records instead of the percentages fixed by the JOA. ROA.2917-2918, 4387, 2702-2703, 2725-2726, 1625, 1628.[1]
- It sent no payout statements. ROA.2920, 2546-2547.
- It provided no itemized equipment listings. ROA.2917, 2564.
- It commingled costs across all sections rather than segregating costs for the Contract Area because doing so "would take accounting time" and that "we have not done" it. ROA.2923, 2719.

Apart from the initial proposals and ballots, Ovintiv ignored any obligations under the JOA and exchanged no further communications with McCully. ROA.1631.

**10. In spring 2023, when McCully first learned that Ovintiv was charging non-consent penalties, it promptly demanded payment as a cotenant, but Ovintiv refused—except as to the Wolfcamp wells.**

McCully's ownership changed hands in 2022. In spring 2023, McCully—after reviewing the well files and seeing no payout statements—requested them and learned Ovintiv was applying the JOA to just the portions of each wellbore crossing

[1] JOA Exhibit A lists 12.6% for McCully's predecessor; McCully succeeded to half, a 6.3% interest the JOA fixes across the Contract Area; its loss provisions bar any "readjustment of interests."

Section 46 and charging McCully non-consent penalties. Those penalties were calculated from an allocated share of total costs commingled across every section each well developed. ROA.2546-2549, 2719. McCully promptly asserted its rights as a cotenant, which Ovintiv refused to recognize (except it agreed that the Wolfcamp wells were outside the scope of the JOA. ROA.2552-2553, 2555-2556, 2702-2703).[2]

Under Article VI.B.2 of the JOA, a non-consenting party's share is withheld until the participating parties recover 300% of their drilling and completion costs, 400% of downhole equipment costs, 200% of surface equipment costs, and 100% of operating costs. ROA.2920, 2602-2604. Whether the Neal Wells will ever produce those multiples is another matter. Ovintiv's own counsel conceded at closing that only "a couple" have paid out and that, "[c]andidly, some of them won't make it[.]" ROA.2468-2469. For those wells, the practical effect of Ovintiv's interpretation of the JOA is that McCully will not receive a dime for its interest.

### B. **Course of Proceedings and Disposition Below.**

McCully sued Ovintiv for a declaration that the JOA does not apply to only part of the Neal Wells and requested a cotenancy accounting and other remedies based on the inapplicability of the JOA. ROA.188-200. The parties agreed to defer quantification of damages until after the liability determination. ROA.1719.

---

[2] Because the Wolfcamp wells were beneath the depth limitation in the JOA, Ovintiv agreed to treat those wells under ordinary cotenancy accounting. ROA.1631, 2702-2703.

Both sides moved for summary judgment, agreeing the JOA is unambiguous, but the district court denied both motions. ROA.1725, 1764.

The case was tried to the bench over two days. Near the end of the bench trial, it became apparent that the district court was more focused on perceived "fairness" than the plain language of the JOA. After McCully's counsel argued that the JOA could not be stretched to cover the Neal Wells, the court asked: "Is that fair though? Is that equitable?" McCully's counsel explained that Texas' default cotenancy law is fair, and that it would actually be unfair to extend an agreement beyond its scope. ROA.2435. At closing, the court raised the doctrine of quasi-estoppel from the bench and suggested that McCully might be estopped from contesting the applicability of the JOA. ROA.2478-2479.

The district court's findings of fact and conclusions of law followed. ROA.2308-2336. The court held that the JOA applies to wells "to the extent they develop and produce from the Contract Area," so the JOA and its penalties govern the segments of the Neal Wells crossing Section 46. ROA.2323, ROA.2273-2274.

No Texas court had ever adopted such a reading of the model JOA; the court drew it from an unpublished Oklahoma federal opinion applying that state's force-pooling statute. ROA.2323 (citing *Crawley Petroleum Corp. v. Gastar Exploration Inc.*, No. CIV-17-1365-SLP, 2020 WL 2545327 (W.D. Okla. May 19, 2020)).

McCully objected to this reading, in part, because it would render numerous provisions of the JOA inoperative or meaningless. The district court dismissed that concern because those issues were not "implicated by the dispute before the Court." ROA.2321-2322, 2326-2327.

In the alternative, the court held that McCully's returned non-consent ballots, followed by years of silence between the parties, made its opposition to the partial JOA application "unconscionable." ROA.2333-2334. Yet it rejected Ovintiv's waiver and ratification defenses because Ovintiv had not shown McCully engaged in conduct "unequivocally" inconsistent with asserting its rights as a cotenant. ROA.2335.

Because it had ruled that the JOA partially governs the Neal Wells, the court denied McCully's remedial counts predicated on the inapplicability of the JOA and entered judgment for Ovintiv. ROA.2331-2333, 2337.

## SUMMARY OF ARGUMENT

I. The JOA does not allow proposals for wells outside its Contract Area, and each of the Neal Wells indisputably exceeds that boundary. A horizontal well with only one segment contained within the JOA's defined Contract Area is not a "well on the Contract Area." A segment of a horizontal well is not an entire "well," any more than the middle step is a "staircase."

The structure of the JOA confirms this conclusion. Its operator-removal, subsequent-operations, equipment, access, cost-segregation, title-examination, and abandonment provisions would be meaningless if the JOA applied only to a segment of a well. Yet the district court sidestepped the incoherence of its interpretation.

Binding Texas precedent treats a JOA's Contract Area as its outer boundary and holds that a well that exceeds that boundary is not subject to the JOA *at all*. Applying that settled Texas precedent to these undisputed facts requires that the judgment be reversed.

The district court reached the opposite result only by adding words the parties never wrote, holding that the JOA applies to each well "to the extent" it develops and produces from the Contract Area. No Texas authority supports that reading and it violates basic canons of contract construction. Even under that reading, moreover, the penalties fail. The JOA penalizes only a party that declines the operation proposed to it, and Ovintiv proposed entire wells—never a Section 46 segment.

If the Court harbors any doubts, it should certify this question of Texas law to the Texas Supreme Court. The decision below undermines the reliance interests of thousands of parties to legacy JOAs; only the Texas Supreme Court could sanction such a dramatic departure.

II. Quasi-estoppel cannot save the judgment. McCully received no benefit distinct from cotenancy; the parties' actions toward one another in the years after the ballots were returned were the same as if the default rules of cotenancy applied. Also, McCully's ballots answered proposals for entire wells and, as such, could take no position on the partial-segment application Ovintiv first disclosed after McCully requested payout statements in 2023. Until that time, McCully lacked knowledge of all material facts regarding Ovintiv's position. The years of silence favor McCully, because Ovintiv performed no JOA obligation in those years.

The three Wolfcamp wells are instructive. McCully's non-consent ballots covered those wells, yet Ovintiv admits that the JOA does not govern them because they exceed the boundaries of the Contract Area. If McCully is not estopped from contesting the application of the JOA to the Wolfcamp wells, the same must be true for other wells included on the same ballots and contested at the same time.

There is nothing unconscionable about invoking the default rule of cotenancy, which allows Ovintiv to recoup 100% of its costs before McCully receives a dollar. The district court's application of quasi-estoppel to these facts was legally erroneous.

III. Because the judgment should be reversed, the case should be remanded for the damages phase that never occurred. The Court should render judgment that the JOA does not govern the Neal Wells and remand for the deferred accounting and any other appropriate remedies.

## **<u>Standard of Review</u>**

Following a bench trial, findings of fact are reviewed for clear error and conclusions of law are reviewed *de novo*. *See Flint Hills Res. LP v. Jag Energy, Inc.*, 559 F.3d 373, 375 (5th Cir. 2009). The interpretation of an unambiguous contract is a question of law to be reviewed *de novo*. *Stinnett v. Colorado Interstate Gas Co.*, 227 F.3d 247, 254 (5th Cir. 2000). Factual determinations related to quasi-estoppel are reviewed "by testing the sufficiency of the evidence," *id.* at 258, but whether undisputed facts satisfy the legal test for quasi-estoppel is a question of law to be reviewed *de novo*. *Hartford Fire Ins. Co. v. City of Mont Belvieu*, 611 F.3d 289, 298 (5th Cir. 2010).

# ARGUMENT

## I. BECAUSE THE JOA AND ITS NON-CONSENT PENALTIES DO NOT GOVERN THE NEAL WELLS, BACKGROUND RULES OF COTENANCY GOVERN.

The 1982 JOA reaches no further than its Contract Area: Section 46 alone, from the surface down to the base of the Dean formation. A well exceeding that boundary is not governed by the JOA *at all*. Every one of the 17 Neal Wells exceeds that maximum boundary. The majority of each Neal Well develops and produces from lands the JOA never mentions, and as a result they are governed by the default rules of cotenancy.

The ruling that the Neal Wells trigger the JOA "to the extent" those wells develop and produce from the Contract Area, ROA.2323, is incorrect under the text and structure of the JOA, contrary to Texas precedents, and threatens retroactive and future consequences for thousands of parties to legacy JOAs.

### A. Basic principles of Texas contract interpretation apply to the JOA.

A JOA is a contract, construed like any other. Texas courts ascertain the parties' intent from the writing alone, give words their plain and ordinary meaning, and "strive to harmonize and give effect to all the [contract] provisions so that none will be rendered meaningless," bearing in mind "'the particular business activity sought to be served.'" *Devon Energy Prod. Co. v. Sheppard*, 668 S.W.3d 332, 343 (Tex.2023) (quoted citation omitted); *see also Parrott v. Int'l Bancshares Corp.*, 167 F.4th 728, 741 (5th Cir. 2026) (citing Texas rules of contract construction).

In doing so, courts "will not rewrite agreements to insert provisions parties could have included." *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex.1996). Nor may courts "rewrite or add to the instrument under the guise of interpretation." *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 694-95 (Tex.2022); *see also United States Fire Ins. Co. v. Unified Life Ins. Co.*, 147 F.4th 583, 591 (5th Cir. 2025) ("Texas courts focus on the language the parties chose and 'may neither rewrite the parties' contract nor add to its language' for the sake of achieving preferred results.") (quoted citation omitted)). This judgment offends all those principles.

### B. Because the Neal Wells are not "on the Contract Area," they are not governed by the JOA.

#### 1. The JOA is limited to a "well on the Contract Area," meaning all the lands described in Exhibit A and nothing else.

The non-consent penalty at the heart of this case appears in Article VI.B of the AAPL's 1977 model JOA. As relevant here, Article VI.B governs a proposal to "drill any well on the Contract Area." ROA.2920.

Article I.D defines the "Contract Area" as "*all* of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement," which are described in Exhibit A. ROA.2916 (emphasis added).

Exhibit A is divided among Saxon's three subject 1981 drilling programs. Saxon's 1981-1 drilling program includes Saxon's North Hazel 46 Prospect, limited in depth to the base of the Dean formation. ROA.2932-2933.

Exhibit A does not describe Sections 2, 34, and 39. Ovintiv concedes that the JOA is not an agreement to develop these sections. ROA.2861-2862. Yet that is what the Neal Wells do; they develop Sections 2, 34, and 39. None of the Neal Wells is a "well on the Contract Area" under the plain language of the JOA.

### 2. <u>A "well" is an integrated whole, not a partial segment.</u>

A "well" is "a shaft or hole bored or sunk in the earth," the physical hole itself. *Springer Ranch, Ltd. v. Jones*, 421 S.W.3d 273, 281 (Tex.App.—San Antonio 2013, no pet.); *see also Well*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("[a] hole or shaft sunk into the earth to obtain a fluid, such as water, oil, or natural gas").

When a contract uses the term "well," therefore, it refers to the entire well as "one integrated whole." *Bell v. Chesapeake Energy Corp*, No. 04-18-00129-CV, 2019 WL 1139584, at *14 (Tex.App.—San Antonio Mar. 13, 2019, pet. denied). The term does not refer to "a series of 'take point' wells." *Id*.

This usage is consistent throughout the model JOA. The JOA refers to a "well" and its "drilling unit" in the singular, without qualification, in every provision that uses the words. ROA.2913-2938. The district court correctly acknowledged that the JOA "uses the term 'well' repeatedly, without modifiers." ROA.2312.

As such, the segments of the Neal Wells within Section 46 are not "wells." Every Neal Well has a vertical section drilled on Section 34 or 39, a curve, and a horizontal lateral (only part of which crosses Section 46). ROA.1630. A standalone Section 46 segment has no surface hole, no wellhead, and no path for fluids to reach the surface. A subsurface segment of a lateral is a component of a well, but it is not itself a "well." If the drafters of the JOA had wanted to cover segments of a well, they "could easily have said so. They did not." *Bell*, 2019 WL 1139584, at *14.

### 3. <u>A well is "on" the Contract Area only if it is within the limits or bounds of the area.</u>

The word "on" is a versatile preposition. In the context of the JOA, it means "the limits or bounds of" a place, such as in the sense that oil is "on" one's property. *Springer Ranch*, 421 S.W.3d at 282 (collecting dictionary definitions and also citing *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 63 (Tex.2011) (referring to "a well on the Marshall lease")).

In this JOA, "on" bears its usual meaning of "within the limits or bounds." Exhibit A describes the Contract Area's limits in three dimensions using surface geography and depth, ROA.2932-2933, Article IV requires an examination of title to the "drillsite" before any well may be drilled "on the Contract Area," ROA.2917, and Article VI.D requires the operator to furnish daily information "taken from any well drilled on the Contract Area." ROA.2922. Those words assume a well whose drilling and operations happen only within the limits or bounds of the Contract Area.

Indeed, for four decades, the only wells anyone drilled or proposed under this JOA sat entirely within those limits. *See* p. 18-19, *supra*. The JOA's plain meaning does not change over time; "a text retains the same meaning today that it had when it was drafted." *Van Dyke v. Navigator Group*, 668 S.W.3d 353, 359 (Tex.2023). Thus, a well is "on the Contract Area" when it sits entirely within the area's limits. The Neal Wells do not.

#### 4. **Applying these principles, as a matter of Texas law, wells that exceed the Contract Area are not "on the Contract Area."**

Consistent with the ordinary meaning of the language used in the form JOA, the Texas Supreme Court has held that the lands described in a JOA mark its limits. *See Rankin v. Naftalis*, 557 S.W.2d 940, 946 (Tex.1977) (duties owed under a JOA "do not extend to operations by one of the parties on other and different lands"). "The key to the meaning of the Contract Area is Exhibit A," and "Exhibit A's function is to specifically describe the 'lands, oil and gas leasehold interests and oil and gas interests' which the parties intended to develop and operate under the JOA for oil and gas purposes." *Anderson Energy*, 469 S.W.3d at 291.

To put it simply, interests described in Exhibit A are covered by the JOA; interests outside it are not. *See id.* at 291-92. Because the Neal Wells sprawl across several sections of land that are not within the Contract Area, they are not subject to this JOA as a matter of settled Texas law.

The controlling precedent is *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89 (Tex.App.—El Paso 1997, pet. denied). *Hill* held that a JOA's Contract Area "define[s] the outer or maximum boundaries" of the agreement, and that treating the Contract Area instead as mere minimum criteria "trivializes the import of the defined contract area and subjects the non-operators to the whim of the operator." *Id.* at 113.

*Hill*'s facts were remarkably similar to this case. The JOA there was written on the same era's AAPL model form, and its Exhibit A defined a three-dimensional Contract Area that was described geographically and by depth down to 20,000 feet. The operator drilled a well to roughly 22,000 feet. Because the well exceeded the defined Contract Area, the court held that the JOA did not cover the well at all and its non-consent penalties could not be charged. *Id.* at 102-03, 113-115.

Notably, the *Hill* court could have held the JOA partially governed the well "to the extent" of those portions within the contract area depths, but it did not do so. Instead, it held the JOA did not cover the well *at all. Id.* at 113.

Leading treatises state the same rule. *See* 3 Smith & Weaver, TEXAS LAW OF OIL AND GAS §17.5 (2026); 2 Kuntz, LAW OF OIL AND GAS §19A.6; Gary B. Conine, THE JOINT OPERATING AGREEMENT: A LEGAL ANALYSIS §3.2[E] (2024); Gary B. Conine & Alex Ritchie, *Property Provisions of the Joint Operating Agreement: An Update for the New 2015 Form JOA*, 50 TEX. TECH L. REV. 489, 493 (2018).

Accordingly, treatises and industry publications endorse the *Hill* principle that a well exceeding the boundaries of the Contract Area is not subject to the JOA. Proposed operations "must fall within the geographic boundaries and depth described by Exhibit A, which defines the Contract Area; otherwise, the provisions governing subsequent operations are inapplicable." 3 Smith & Weaver, *supra*, §17.3[E]. Derman's working manual gave the same warning around the same time this JOA was executed: "[A] Contract Area that is too small may cause difficulties where the exploration or development program includes acreage that is not within the Contract Area. If a lessee or a mineral owner refuses to expand the Contract Area or execute another JOA which encompasses this additional acreage, the party desirous of drilling has neither the benefit of a procedure that governs the proposal of a well nor the benefit of the non-consent penalty provision." Andrew B. Derman, *Joint Operating Agreement: Working Manual* (1986).

Anticipating this very issue, an AAPL publication in 2024 warned that a well that "starts or ends on the Contract Area but is not entirely on the Contract Area is presumably not 'on the Contract Area,'" and "a dissenting working interest owner will likely challenge any cross-boundary well proposal as being invalid, a 'nothing' under Article VI.B." Terry Cross, *Acquiring Aging Oil & Gas Assets: Grading the Gems and Marking the Landmines Underlying the Value Assumptions*, 2024 No. 6 FNREL-INST 2 (AAPL/FNREL Advanced Landman's Institute, Nov. 2024).

Such settled constructions of standard industry forms carry particular weight: this JOA is an AAPL model form, "standard throughout the oil and gas industry," and "[c]areful adherence" to judicial interpretations of such forms "is important to industry stability." *French v. Occidental Permian Ltd.*, 440 S.W.3d 1, 8 (Tex.2014). Accordingly, the *Hill* principle is the authoritative interpretation of legacy JOAs.

**5. <u>The AAPL's drafting history confirms this conclusion.</u>**

The AAPL's own drafting history confirms that *Hill* governs legacy JOAs. When the AAPL revised its form JOA in 2015, it modified the language in question. Rather than referring to "any well on the Contract Area," the 2015 form refers to "any well under this agreement." ROA.4512. This revision "acknowledges the emergence and frequency of situations in which operations ... extend to leases and interests outside of the contract area, such as operations involving production sharing agreements and allocation wells." Jeff Weems, *New AAPL JOA Form 610-2015*, LANDMAN, Vol. 62, No. 6, at 47 (2016). This change confirms that an allocation well that exceeds the Contract Area is not "on the Contract Area" of a legacy JOA.

**6. <u>This interpretation harmonizes all provisions of the JOA.</u>**

Because courts must "strive to harmonize and give effect to all the [contract] provisions so that none will be rendered meaningless," *Devon*, 668 S.W.3d at 343, this Court must construe the JOA *as a whole* to determine whether one segment of a horizontal well that exceeds the Contract Area is a "well on the Contract Area."

Article VI.B.1 requires a well proposal specifying the work to be performed, the location, the proposed depth, the objective formation, and the estimated cost of "the operation"; the parties then decide whether to participate in drilling the well; and for those who elect not to participate, Article VI.B.2's penalty recoups a multiple of that operation's costs. ROA.2920-2921. Each step in that chain relies on a "well," whole and singular. The non-consent penalty attaches to "such well," ROA.2921, and it would make no sense to apply any of those provisions to a mere well segment.

The JOA contains no procedure for proposing, operating, or accounting for a wellbore segment. *Id*. The district court's reading requires inserting "portion of a" before each reference to "well" throughout the form, which Texas law forbids. *Tenneco*, 925 S.W.2d at 646.

Further, Article VI.B.1's proposal right is reciprocal: "any party" to the JOA may propose a well on the Contract Area. ROA.2920. But McCully could never have used it to propose these multi-section wells, because McCully owns no interest in and is a stranger to Sections 2, 34, or 39. ROA.1630. Likewise, aside from Ovintiv, the other parties to those agreements could not have proposed multi-section wells on Section 46. At trial, Ovintiv's expert admitted he had not reviewed the other JOAs and did not know if they were even compatible with this JOA. ROA.2872-2873, ROA.2876.

A “portion-of-the-wells” approach is incompatible with the JOA as a whole. Ownership rights outside the Contract Area cannot alter any party’s rights under an agreement that stops at the Contract Area. McCully holds no rights under any neighboring tract’s JOA, and it owns no property rights in those neighboring tracts. Likewise, the neighboring parties have no way to issue proposals or elections under neighboring JOAs, no procedural mechanisms or protections, and no ability to perform work on segments beneath their land without surface access.

In short, the JOA’s proposal and election procedures cannot operate on mere wellbore segments, confirming that the Neal Wells are not “on the Contract Area.” Any other reading deprives McCully (and parties in the same position) of the rights they bargained for in exchange for giving up the default rule of cotenancy.

#### 7. Because the Neal Wells are not “on the Contract Area,” Ovintiv cannot charge non-consent penalties.

Applying these interpretive principles to the undisputed facts, the Neal Wells are not subject to the legacy JOA. The district court legally erred in ruling otherwise.

Just as in *Hill*, the Contract Area here is described as a geographical boundary and a depth boundary in a single sentence: “Section 46 […], limited in depth to the base of the Dean formation.” ROA.2932. *Hill* establishes that a well beneath the depth limit is not governed by the JOA, and the same is true of a well that exceeds its borders. Exceeding the *sides* of a three-dimensional box must have the same legal effect as exceeding its *floor*.

Accordingly, since the Neal Wells exceed the Contract Area, the JOA and its non-consent penalty provisions cannot apply. *Hill*, 964 S.W.2d at 113. By contrast, under Ovintiv's interpretation, its expert agreed that so long as any fragment of a wellbore produces from Section 46, the well meets the JOA's "minimum criteria" and triggers its non-consent penalties. ROA.2868-2869. That is the precise position *Hill* rejected, and the district court committed a pure error of law by adopting it.

#### 8. **In the alternative, even under the district court's reading, Ovintiv cannot charge non-consent penalties because it never proposed a Section 46 segment operation.**

Even if the Court accepted the district court's reading, the judgment is flawed. Under the JOA, a non-consent penalty is the price of declining a proper proposal. Article VI.B.2 imposes the penalty on a party that, after "receiving such notice as provided in Article VI.B.1," "elects not to participate in the proposed operation." ROA.2920-2921. Without that notice, there is no penalty. A non-operator's failure to consent in the absence of a proper proposal "cannot result in the imposition of any of the contractual penalties because the obligation to give timely notice of consent is triggered *only* by the required notice of proposed operations." *El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W.3d 616, 623 (Tex.App.—Houston [1st Dist.] 2003, pet. denied) (emphasis in original). Put another way, a non-consent penalty cannot attach to an operation that was never properly proposed in the first place.

Under the district court's interpretation, the only "operation" the JOA governs is the segment of each Neal Well inside Section 46. ROA.2323. *But Ovintiv never proposed such an operation*. It proposed entire wells crossing three or four sections, and it asked McCully to elect whether to participate in each entire well. ROA.3897, 4020. Ovintiv's own expert agreed that Ovintiv "proposed the entire well." ROA.2864. Tellingly, Ovintiv never stated what the Section 46 segment would cost, although every proposal must state "the estimated cost of the operation." ROA.2920. Its land manager testified that separating those costs "would take accounting time" and "we have not done that." ROA.2923, 2719.

What, then, did McCully decline? Not a Section 46 segment operation, because Ovintiv never proposed it. McCully declined to participate in the entire well proposals that, even on the district court's reading, lie mostly outside the JOA. ROA.1630. Article VI.B.1 puts the burden on the proposing party to specify the "operation" being proposed, and other parties have no right to elect on mere portions of a proposal. Because Ovintiv never proposed just the segment within Section 46, McCully never elected on a segment, and no segment-based penalty ever attached. For this independent reason, the district court's judgment should be reversed.

### C. The district court's justifications for its partial-segment reading of the JOA are legally erroneous.

#### 1. The district court rewrote the JOA.

Although no provision of the JOA says it covers parts of wells "to the extent" they cross the Contract Area, the district court held that the "plain text" of the JOA dictates that reading. ROA.2322. But the three provisions the court cited as support (the Preamble, Article V.A, and Article VII) simply govern the conduct and cost of operations on the Contract Area—and all three describe a contractual world in which the covered activity happens entirely within the boundaries of the Contract Area. ROA.2916, 2918, 2923-2924.

The phrase "to the extent" was introduced by the district court, not the JOA. The court said that the JOA "does not apply to wells that do not produce from the Contract Area," so "[i]t follows that the JOA applies to wells to the extent they develop and produce from the Contract Area." ROA.2323. But that does *not* follow; on the contrary, it is a logical fallacy. The major premise in the court's syllogism is equally compatible with the conclusion that the JOA only applies to wells that are located entirely within the boundaries of the Contract Area—and as explained above, that reading is the only one that fits the ordinary meaning of the text, the structure and context of the JOA as a whole, and the existing Texas precedent.

The court found that "at least part of those wells are 'on'" the Contract Area, and that the in-section portion of each well is "technically 'on the Contract Area.'" ROA.2312, 2323-2324. That factual observation is accurate but immaterial. By its terms, Article VI.B.1 applies to a "well" on the Contract Area; it does not apply to "part of those wells," "portions of horizontal wells," or "the operative portion of the wells." ROA.2312, 2323-2324. The court rewrote the JOA "under the guise of interpretation." *Nettye Engler*, 639 S.W.3d at 694-95; *see also Tenneco*, 925 S.W.2d at 646 (Texas courts "will not rewrite agreements to insert provisions parties could have included").

The court charged McCully with rewriting the contract by adding words like "solely within." ROA.2324. On the contrary, "well" means the entire integrated hole, "on" means within the limits or bounds of the area, and *Hill* authoritatively construes the Contract Area under this legacy JOA to require a well to be entirely within the boundaries defined by Exhibit A. McCully's interpretation does not rewrite the text but gives the text its ordinary meaning in accordance with the structure and context of the JOA and existing precedent. ROA.2222-2226.

### 2. **The district court misconstrued Texas precedent.**

Laboring to justify its atextual and unprecedented interpretation of the JOA, the district court mistakenly distinguished *Hill*, relied on an Oklahoma case to decide a question of Texas law, and distorted a third Texas case beyond recognition.

### a) **The court's attempted distinction of *Hill* was flawed.**

The district court attempted to distinguish *Hill* on the basis that it involved an "explicit, negotiated depth boundary," ROA.2323, while this JOA has "no express vertical depth limitation and no express horizontal boundary requirement" but only "general language." ROA.2323-2324. Not so. Consider the property descriptions side-by-side:

| *Hill* | *McCully* |
|---|---|
| "All of Section 22, Block C-23, PSL Survey, Winkler County, Texas," limited "[t]o a depth of 20,000' or to a depth sufficient to thoroughly test the Fusselman formation, whichever is the lesser depth." 964 S.W.2d at 113. | "Section 46, Block 40, T5S, T&P RR Co. Survey, Upton County, Texas, limited in depth to the base of the Dean formation." ROA.2932-2933 |

These descriptions are written the same way on the same AAPL model form. Both describe an express depth limitation and an express geographical boundary. *Hill* is indistinguishable.

In addition, the district court offered no reasoned justification for treating a vertical limit differently than a geographic limit. The court never explained why a depth description is a "boundary," but a geographical description is not. When JOA parties describe their three-dimensional Contract Area, they are defining all the boundaries of their agreement. *See Rankin*, 557 S.W.2d at 946; *Anderson Energy*, 469 S.W.3d at 291-92. No text, no precedent, and no neutral principle support treating vertical and geographic boundaries differently.

The district court next said McCully can invoke *Hill* only by assuming that "on the Contract Area" means entirely within it. ROA.2323-2324. But in construing "on the Contract Area," *Hill* held that the lands and depths described in a legacy JOA "define the outer or maximum boundaries covered by a J.O.A." 964 S.W.2d at 113. McCully is not assuming anything but simply applying the *Hill* principle.

The district court reasoned that McCully's reading of "on the Contract Area" would require a clause excluding wells located partially outside the Contract Area. ROA.2324. But the JOA in *Hill* contained no such clause; its Exhibit A described geographical boundaries and depth limits, which were sufficient to exclude a well that partially exceeded those limits. The district court simply refused to follow *Hill*.

Finally, the district court criticized the consequences of McCully's reading, claiming it would cause the JOA to "cease[] to apply altogether" to wells with a lateral segment exceeding the Contract Area. ROA.2322. But that consequence is precisely what *Hill* held. The JOA continues to govern wells "on the Contract Area," but under the *Hill* principle, horizontal wells that exceed the Contract Area are not "on the Contract Area." They either default to cotenant status or require a new JOA. That result is not absurd; it is a JOA working exactly as written.

McCully agrees with the district court that this JOA can govern a horizontal well if it is drilled entirely within Section 46. ROA.2324-2325. The *Hill* principle governs how far this JOA reaches, not what drilling technology it allows.

**b) The court's reliance on *Crawley* was flawed.**

Rather than following the authoritative Texas case—as a federal court sitting in diversity must do—the district court relied instead on an unpublished federal case applying Oklahoma law. ROA.2323 (discussing *Crawley*, 2020 WL 2545327). That case concerned whether interests governed by a JOA could be force-pooled under an Oklahoma statute that exempts owners who "agreed to pool their interests." Okla. Stat. tit. 52, §87.1(e). Texas has no comparable statute, and the Neal Wells do not involve force-pooling. The Oklahoma statute has nothing to do with this case.

No Texas court has cited *Crawley* in the more than five years since it issued, and an unpublished out-of-state federal district court opinion cannot displace *Hill*. In diversity cases, the Court "'defer[s] to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Jatera Corp. v. US Bank Nat'l Ass'n*, 917 F.3d 831, 835 (5th Cir. 2019) (quoted citation omitted). Under that principle, *Hill* is controlling and *Crawley* is immaterial.

**c) The court's reading of *Springer Ranch* was flawed.**

Finally, the district court read the San Antonio Court of Appeals' decision in *Springer Ranch* as imposing a mechanical rule that a horizontal well is "on" every tract it crosses. ROA.2322-2323. That reading flips *Springer Ranch* on its head, inferring a mechanical rule from a case that did not even raise the issue.

*Springer Ranch* involved a royalty-allocation agreement among two ranches owning royalties on lands drained by a single well, not an agreement between working interest owners. 421 S.W.3d at 277. It was agreed that the entire well for which royalties were owed sat inside the lands covered by the agreement; the well started under one ranch and ended under the other. *Id.* at 277-78. The only question was which ranch got paid, and the court answered that both did. *Id.* at 284, 289.

To be sure, the court said "on" in the context of oil and gas wells often means "within the limits or bounds of" something. *Id*. at 282. But that definition did not help either ranch, because the whole well was within the bounds of the royalty owner sharing agreement. Unlike *Springer Ranch*, there is no allocation or royalty owner sharing agreement encompassing the entire well, the Neal Wells are not fully within the boundaries of the lands described in the JOA, and the parties dispute whether the JOA applies—so the meaning of "on" matters here in a way it did not in that case. If "on" means "within the limits or bounds," then McCully's reading must prevail.

### 3. <u>The district court's partial-segment reading cannot be harmonized with the rest of the JOA.</u>

A non-operator that signs a JOA receives certain rights in exchange for giving up its default rights as a cotenant; it agrees to conditions like non-consent penalties in exchange for other protections an ordinary cotenant does not have. For these wells, the district court's reading of the JOA imposes the non-consent penalties but disables the protections McCully is supposed to receive in exchange.

Unlike McCully's interpretation, which harmonizes all provisions of the JOA, the district court's attempt to apply the JOA to partial well segments violates the rule that courts must "strive to harmonize and give effect to all the [contract] provisions so that none will be rendered meaningless," *Devon Energy*, 668 S.W.3d at 343. None of the JOA's provisions can be contorted to govern a subsurface fragment of a horizontal well. Consider the following:

- The operator-removal provisions cannot work because the Railroad Commission recognizes one operator per well, and no one can remove the operator from the middle segment of a wellbore. Ovintiv's land manager and its expert both agreed. ROA.2720-2721, 2874. Nor can the JOA parties plug only their segment; the well cannot be plugged "without everyone's consent," including owners outside Section 46. ROA.2751.

- The subsequent-operations rights cannot work because, as Ovintiv's expert admitted, such operations would have to be proposed to all parties who participated in the initial well, not just those in Section 46. ROA.2874-2875. And no Section 46 party could rework, deepen, or plug back only the Section 46 segment without impacting the other lands. ROA.2920.

- The equipment-ownership provisions cannot operate on a segment because the equipment sits on Sections 34 and 39, outside the Contract Area. ROA.2566, 2709.

- The access-and-observation rights cannot be exercised because the operations are conducted miles away from the Contract Area and the covered fragments lie more than a mile underground. ROA.2572-2573.

- The abandonment provisions cannot work because the abandoning party's assignment must "encompass the 'drilling unit' upon which the well is located," ROA.2922-2923, and for a Neal Well that unit lies mostly beyond the Contract Area among owners the JOA does not bind.

The list goes on and on.

The title-examination requirements are illustrative. “No well shall be drilled on the Contract Area” until title to “the drillsite or drilling unit” has been examined, and “each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit,” must furnish its title materials. ROA.2917. Here, each Neal Well drillsite sits on Section 34 or 39 (which were contributed by no party to this JOA), and each drilling unit includes the multiple sections the well crosses, so the condition the JOA attaches to every well drilled on the Contract Area cannot be performed. No JOA covered the entire drilling unit, which explains why Ovintiv’s title attorney recommended a new JOA with all the working interest owners. ROA.3355-3356.

These problems are not theoretical. One breakdown has already happened. The JOA makes each party liable “only for its proportionate share of the costs of developing and operating the Contract Area,” ROA.2923, yet Ovintiv admittedly is “not segregating the costs that are incurred just within each section” and is instead “bundling it all together.” ROA.2719. In practice, Ovintiv is ignoring the JOA—except to charge its non-consent penalties against McCully’s share of production.

In short, the district court’s reading renders meaningless and unworkable every protection and power the JOA gives to non-operators. The only provision the district court made sure would work on these Neal Wells was Ovintiv’s ability to apply JOA non-consent penalties. ROA.2326-2327.

The district court gave three excuses for these problems, but none is valid. First, the court said the disabled provisions have "undisputed application to wells producing entirely from within the Contract Area." ROA.2326-2327. But these provisions must apply to *all* wells subject to the JOA, not just some. The court announced that a provision can be rendered meaningless only by an interpretation "that results in the provision never having effect." ROA.2326. But it cited no case, and ironically, the same paragraph cited a case in which a district court was reversed for construing a term "divorced . . . from the contract's architecture." *Capio Funding, L.L.C. v. Rural/Metro Operating Co., L.L.C.*, 35 F.4th 353, 356-57 (5th Cir. 2022).

Second, the district court said McCully "failed to show" the other provisions were rendered inoperable by its reading of the JOA. ROA.2327. That is incorrect. As the foregoing record citations illustrate, Ovintiv's own witnesses admitted that the JOA's provisions cannot operate on a partial wellbore segment. Additionally, Ovintiv admitted it has not segregated costs for the Contract Area because doing so "would take accounting time" and "we have not done" it. ROA.2923, 2719.

Third, and most troubling, the district court simply looked the other way. According to the court, the disabled provisions are not "actually implicated by the dispute before the Court," so it "does not endeavor to answer" how they would work if the JOA were applied to partial segments of a horizontal well. ROA.2321-2322, 2326-2327. That is not harmonization deferred; it is harmonization denied.

Virtually every Texas Supreme Court decision about contract interpretation admonishes courts to construe contracts in context and to harmonize all their terms so none is left meaningless. Courts have no license to look away from the consequences of their construction; the point of harmonizing a contract's provisions is to prevent problems in the next case. Perversely, the district court's reading leaves thousands of parties to legacy JOAs doomed to litigate the very problems it creates. The district court's refusal to even consider how its interpretation would undermine fundamental protections under the JOA was a legal error. *French*, 440 S.W.3d at 8; *Wenske v. Ealy*, 521 S.W.3d 791, 798 (Tex.2017).

### D. **Allowing a JOA to apply to partial segments of horizontal wells threatens perverse consequences for all parties to legacy JOAs.**

Correcting the district court's legal error is not only important to these parties; its consequences reach allocation wells across Texas whose laterals cross through and beyond the contract areas of legacy JOAs. Allocation wells are customarily built on record title, with costs and production allocated by owners' "relative ownership in the minerals traversed by the wells." ROA.2312. When it applies, a JOA allocates costs and production by contract instead. Under Article III.B, costs are borne and production is owned by the parties "as their interests are shown in Exhibit 'A.'" ROA.2917. Those contractual interests can differ from record title, and a party may hold a contractual interest under a JOA without having any record title interest.

Under the district court's ruling, a legacy JOA governs any lateral segment that crosses its contract area—so the JOA's contractual interests, not record title, would control that segment. Decks built on record title, and relied on for years, would have to be rebuilt to account for contractual interests instead. Operators that never sent proposals under such legacy JOAs (because they never anticipated that a legacy JOA could apply to a lateral segment) could not charge non-consent penalties, yet might find themselves owing revenue to parties whom they never believed to have JOA contractual interests in a mere segment. Thus, this decision implicates the reliance interests of non-operators and operators alike because it destabilizes settled property rights, which are essential to "freedom itself." *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Tex., LLC*, 363 S.W.3d 192, 204 (Tex.2012).

### E. <u>Reliance on the default rules of cotenancy is not only legally correct but also fair and equitable.</u>

There is a simple, legally sound, and fair solution to this case: cotenant status. As a cotenant, Ovintiv had a right to drill the Neal Wells without McCully's consent. A JOA's proposal provisions do not alter the default rules that allow each cotenant to develop without the consent of other cotenants; instead, JOA proposal and consent procedures are used "only for accounting purposes." *Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147, 157-58 (Tex.App.—Eastland 2002, pet. denied). Reversal will simply mean that longstanding Texas cotenancy accounting governs the Neal Wells instead of the JOA's penalty accounting.

The district court perceived something untoward about the law of cotenancy, raising fairness concerns at the end of trial and construing the JOA to reach a result it found equitable. ROA.2435, 2478-2479, 2333-2334. While choosing equity over text was a legal error, in truth, the equities favor McCully.

First, the default rules of cotenancy have been settled for more than a century. Participating cotenants recover 100% of the costs before non-participating cotenants receive anything. *Burnham*, 147 S.W. at 334-35; *In re Eagleridge Operating, LLC*, 642 S.W.3d 518, 521-22 (Tex.2022). Those default rules fairly balance the interests of all cotenants.

Second, if Ovintiv wanted the opportunity to charge non-consent penalties, there was a fair way to do so. Its own title attorney recommended that Ovintiv obtain a new JOA covering the Neal Wells, warning that otherwise it would only recoup 100% of its costs rather than a JOA's non-consent penalty. ROA.2735-2737, 3355-3356. Likewise, Ovintiv's JOA expert agreed that landmen facing allocation wells "should be going out and negotiating JOAs that cover the whole wellbore." ROA.2882. Ovintiv declined to follow that fair course of action. Instead, it gambled that it could apply the legacy JOA, producing and selling McCully's hydrocarbons and recouping its costs not once but three times over, likely depriving McCully of any financial return. It is Ovintiv's gamble that was unjust, not McCully's insistence on Texas' default cotenancy law.

### F. **<u>If there is any doubt, the JOA interpretation question should be certified to the Texas Supreme Court.</u>**

This case presents a pure question of state law arising on model-form language that governs thousands of legacy JOAs across Texas—which predated the advent of modern horizontal drilling. When considering the application of single JOAs to the problems posed by multi-section wells, one practitioner predicted cases like this one: "[t]he JOA forms were not constructed for these contortions and there will be inevitable collisions." Cross, *supra*.

As already explained, *Hill* and the ordinary meaning of the phrase "on the Contract Area" resolves this case. The Court has sufficient data from the state courts to make an accurate *Erie* guess. *See Jatera Corp.*, 917 F.3d at 835. But if this Court does not think the answer is apparent, the district court's reliance on an unpublished Oklahoma decision confirms the need for an answer from the Texas Supreme Court. As Ovintiv's counsel said, "[t]he eyes of the industry are on this case." ROA.2523.

Thus, to the extent that this Court has any doubt about the district court's error, it should certify that question to the Texas Supreme Court. 5th Cir. Rule 28.2.6; *Mieco L.L.C. v. Targa Gas Mktg. L.L.C.*, 183 F.4th 410, 415 (5th Cir. 2026) (certifying question concerning interpretation of a "standard form contract that . . . 'governs the entire natural gas industry in Texas'" given "the importance of the issues" and that the decision would "affect settled expectations").

## II. <u>MCCULLY IS NOT ESTOPPED FROM ASSERTING ITS COTENANCY RIGHTS.</u>

As an alternative basis for judgment, the district court applied quasi-estoppel to bar McCully from contesting the applicability of the JOA. ROA.2333-2334.

Ovintiv did not raise quasi-estoppel at trial. Its opening statement referred only to the affirmative defense of ratification, ROA.2524, and its closing argument reiterated that "[w]e use the term ratification primarily to describe this." ROA.2463. Indeed, its proposed pretrial findings of fact and conclusions of law referred solely to ratification, ROA.2147, and never mentioned quasi-estoppel. But at closing, the district court observed that Ovintiv lacked "any authority that's more on point to what we have here," ROA.2464, and asked counsel to address quasi-estoppel. ROA.2478-2481. Ultimately, the court denied the ratification defense but sustained the quasi-estoppel defense. ROA.2333-2335. That ruling was erroneous.

The quasi-estoppel defense applies only "when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex.2000). Crucially, "there can be no ratification or estoppel from acceptance of the benefits by a person who did not have knowledge of all material facts." *Frazier v. Wynn*, 472 S.W.2d 750, 753 (Tex.1971). Ovintiv had the burden of proof, but it established none of those elements. The facts are not disputed, and as a matter of law, they do not rise to level of quasi-estoppel.

In fact, the opposite is true: McCully took no inconsistent position, as at all times its actions were consistent with being a cotenant; McCully could not have acquiesced in Ovintiv's partial-well theory, which Ovintiv never disclosed when it sent the ballots; McCully accepted no benefits from Ovintiv's selective application of the JOA; and it would not be unconscionable for McCully to be treated as a cotenant under longstanding Texas cotenancy law.

### A. **McCully took no inconsistent position, as its actions were consistent with those of a cotenant.**

"[I]nconsistency can be determined as a matter of law." *Hartford Fire*, 611 F.3d at 298. The district court's own findings foreclose it. In rejecting Ovintiv's waiver defense, the court found that Ovintiv had not proved that McCully's conduct was "unequivocally inconsistent" with asserting its rights as a cotenant. ROA.2335. That finding cannot be squared with the court's conclusion that McCully would "reverse course" by asserting those same rights now. ROA.2334.

The district court focused on McCully's return of the well ballot, ROA.2334, which was attached to a cover letter that only said "appropriate non-consent penalties outlined in the JOAs" would apply without explaining what Ovintiv understood that phrase to mean. ROA.3897, 3984, 5030. Sending a well ballot in return was consistent with McCully's position that no "appropriate non-consent penalties" can be applied because the Neal Wells are not "on the Contract Area" of this JOA.

In other words, electing non-consent and declining to fund the proposal in the face of Ovintiv's intention to invoke any "appropriate non-consent penalties" was equally consistent with *either* agreeing that the JOA applies *or* denying that it applies and reserving the right to argue that any non-consent penalties are not "appropriate." The latter position, which McCully advocates in this case, "is not inconsistent with claiming an entitlement to more" than Ovintiv indicated it intended to pay McCully. *Samson Expl., LLC v. T.S. Reed Properties, Inc.*, 521 S.W.3d 766, 778 (Tex.2017).

The district court also cited the fact that McCully "remained silent for years" while Ovintiv developed the wells, "contributed no capital, assumed no drilling risk, and preserved the possibility of later sharing in the wells' success if development proved profitable." ROA.2334. But those acts are equally consistent with the rights and conduct of a cotenant, so as a matter of law, they cannot support quasi-estoppel. *See Samson*, 521 S.W.3d at 778. Every cotenant is free to "remain silent for years" while another cotenant takes "the risks and burdens of development." ROA.2334. For more than a century, that has been Texas law. *See Burnham*, 147 S.W. at 335. Under that law, every cotenant "contribute[s] no capital, assume[s] no drilling risk, and preserve[s] the possibility of later sharing in the wells' success if development prove[s] profitable." ROA.2334. Likewise, any cotenant that drills a well must pay "items associated with production," ROA.2334, subject to its right of reimbursement before other cotenants receive their share of the minerals.

In fact, the consistent actions of cotenancy run both ways, as during the entire period Ovintiv's conduct toward McCully was the same as that of any other cotenant. It sent no drilling reports or payout statements, provided no equipment listings, commingled costs across all sections of the wells, and never sent McCully any further communications regarding penalties, payout, or non-consent applications. ROA.2319, 4387, 2546-2547, 2564, 2719.

Moreover, after learning Ovintiv was not applying the JOA to the whole well, but just the segment within the Contract Area, McCully promptly objected that the non-consent penalties were not "appropriate" and demanded payment as a cotenant. ROA.2546-2549, 2560. Far from inconsistency, these undisputed facts prove that McCully engaged in no conduct inconsistent with its rights as a cotenant.

*Stable Energy*, the court's lead authority, illustrates a genuine inconsistency. ROA.2333-2334. There, the parties invoked a JOA's procedure to install a preferred operator and solicited approval "pursuant to" the JOA, took 100% of the proceeds, then denied being bound. *Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 548 (Tex.App.—Austin 1999, pet. denied). A party that wields a contract offensively to secure benefits under it is nothing like McCully passively declining to participate in someone else's well proposal.

**B. <u>McCully did not acquiesce in the JOA only applying to a segment of a well because Ovintiv's proposals were for "the entire well."</u>**

In addition, the district court concluded that McCully's non-consent ballots acquiesced in the position that the JOA governs only a portion of these wells. ROA.2334. It reasoned that the Neal Well proposals "expressly stat[ed] that a decision not to participate would subject [McCully's] interest to the JOA's non-consent penalties," and McCully remained silent while Ovintiv drilled. ROA.2334. This reasoning is flawed in several ways.

First, the Neal Well proposals referred to drilling entire multi-section wells; Ovintiv's own expert confirmed that Ovintiv "proposed the entire well." ROA.2864. They proposed decimal ownership interests across the entire wellbores and stated the anticipated costs of the entire wellbores. ROA.3897, 4020.

As such, any "acquiescence" from a failure to object to those proposals could only estop McCully from contesting the applicability of its JOA to the entire wells. But that is not the issue here; the issue is whether the JOA applies to partial segments of the wells "to the extent they develop and produce from the Contract Area." ROA.2323. The judgment holds that the JOA governs "portions of horizontal wells that fall within its Contract Area, which is Section 46" not entire wells. ROA.2323. There is no evidence that the partial well theory was disclosed to McCully when it returned its ballots, or that McCully agreed with or accepted *anything* in connection with such a theory, so it cannot be estopped from contesting that theory.

Second, it is incorrect to construe a mere non-consent ballot as acquiescing in the position that a JOA is applicable. A non-consent declines to fund an operation, but it does not confirm that the JOA invoked in the proposal covers the well.

Last, quasi-estoppel, whether it rests on acquiescence or receipt of a benefit, requires "knowledge of all material facts at the time of the conduct on which estoppel is based." *Bank of Am., N.A. v. Prize Energy Res., L.P.*, 510 S.W.3d 497, 511-12 (Tex.App.—San Antonio 2014, pet. denied). The district court found that McCully's consultant "did not review the JOA itself before making his recommendation." ROA.2318. No one at McCully had a copy of the JOA when the ballots were returned and the only person who evaluated the proposals never reviewed it. ROA.2661, 2688-2689. McCully knew only that whole wells were proposed and that penalties would only be imposed as "appropriate." There is no evidence that McCully knew Ovintiv would later take the position that the JOA applies only to partial well segments, as opposed to the whole wells, so McCully lacked knowledge of all material facts as a matter of law.

In sum, the most McCully's ballots could support is an estoppel to contest the JOA's application to entire wells—a theory the judgment does not adopt. On the theory that the judgment does adopt (that the JOA governs the wells "to the extent" their segments cross Section 46), there was no proposal, no disclosure, and no ballot. McCully could not have acquiesced in a position it was never asked to consider.

### C. **Because Texas cotenancy law afforded McCully the same rights, McCully accepted no benefits under the JOA.**

Although quasi-estoppel can rest on a party's acceptance of a benefit, *Lopez*, 22 S.W.3d at 864, McCully has accepted no benefits under the JOA. The "benefits" the district court identified (avoidance of all operating costs and the opportunity to participate in the wells' success if they proved profitable, ROA.2334), are simply the ordinary incidents of cotenancy.

The district court acknowledged the benefits of the common-law default rule, under which the producing cotenant must account to the nonparticipating cotenant "for its pro rata share of production, net of necessary and reasonable expenses incurred in producing and marketing the same." ROA.2332 (quoting *Eagleridge*, 642 S.W.3d at 521). In other words, if McCully had not returned the well ballots or objected to any manner of JOA application when returning the Neal Well proposals, the benefits the district court identified would be no different. McCully enjoys all those same benefits as a cotenant. Even the "items associated with production, including ad valorem taxes," ROA.2334, are McCully's obligations as a cotenant, and another cotenant who pays them is entitled to reimbursement. *Cox v. Davison*, 397 S.W.2d 200, 203 (Tex.1965); TEX. TAX CODE § 32.07(a). As a matter of law, therefore, McCully accepted no benefits under the JOA. *Cf. BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 200-01 (Tex.2021) (acceptance of royalties a lessor was owed either way did not evidence ratification).

Instead of conferring a benefit, any acquiescence in the JOA's application resulting from a non-participation ballot actually imposes a detriment on McCully. The JOA's non-consent provisions allow the participating parties to recoup "a pre-set multiple" of certain costs before a non-consenting party shares in the proceeds, to the tune of 200-400%. ROA.2310-2311, 2603-2604. Cotenancy law imposes no comparable penalty; the producing cotenant recoups 100% of its reasonable costs. *Eagleridge*, 642 S.W.3d at 521. Thus, McCully receives no benefit from application of the JOA to the Neal Wells—only the harm of being charged penalties up to 400%.

### D. <u>Applying century old Texas cotenancy law is not unconscionable because it fully reimburses Ovintiv's actual costs.</u>

Even if all the other elements could be satisfied, quasi-estoppel *still* would not apply unless it "would be unconscionable" for a party to change positions. *Lopez*, 22 S.W.3d at 864. The district court declared that allowing McCully to contest the applicability of the JOA "would be unconscionable," but it cited no legal authority, evidence, or rationale to justify that conclusion. ROA.2334. It was mistaken.

What the district court branded "unconscionable" is McCully's invocation of the cotenancy default rule under which McCully participates in profits from the wells after Ovintiv has recovered 100% of its costs (as opposed to the 200-400% penalty imposed by the JOA). ROA.2603-2604, 2310. As a matter of law, however, arguing that a party's rights and obligations should be subject to the default rules of over 100 years of Texas jurisprudence cannot be branded "unconscionable."

Nor is Ovintiv unfairly disadvantaged by the application of cotenancy law. Ovintiv's only claimed disadvantage is the loss of a windfall: *additional* income retained from the revenues generated by producing and selling McCully's minerals under the guise of JOA non-consent penalty multiples. *See* Part I, *supra*. The loss of a windfall, only justified by selectively applying penalties from a legacy JOA, cannot be "unconscionable."

The situation might be different if Ovintiv had drilled the Neal Wells in reliance on McCully's non-consent ballots. Although quasi-estoppel does not require detrimental reliance, "[i]t does, however, assume detriment and requires the inconsistency to be a cause of that detriment." *Hartford Fire*, 611 F.3d at 298 ("Reliance is therefore relevant where it speaks strongly to causation and unconscionability."). But that is not the case here.

It is undisputed that Ovintiv did not proceed with the Neal Wells in reliance on McCully's non-consent ballots, because it began drilling several Neal Wells before the first ballot was ever returned. ROA.1629, 1630-1631, 2309, 2314. Ovintiv's own title opinion warned that no JOA would cover McCully's interest in these wells and advised Ovintiv to enter a new JOA before drilling; Ovintiv never tried. ROA.2896 (250:4-9, 252:5-9), 3355-3356. Thus, McCully's denial of the applicability of the JOA produces "neither causation [of any detriment] nor unconscionability." *Hartford Fire*, 611 F.3d at 298.

The district court reasoned that it would be unconscionable for McCully to "deny that the JOA applied to the Neal Wells now that they have proved profitable." ROA.2334. But that premise is erroneous. The court found that all but two of the Neal Wells remain in penalty recoupment, ROA.2318-2319, and Ovintiv's counsel conceded that "some of them won't make it because some of them haven't even reached payout to 100 percent yet." ROA.2468-2469. Wells for which Ovintiv has not recovered its costs have not been "profitable" for anyone, and a non-operator that has not been paid on them cannot be said to be seeking to "profit" from them. McCully objected as soon as it learned of Ovintiv's inappropriate penalties in 2023, not after sorting good wells from bad. ROA.2546-2549. McCully's position is not "unconscionable" or contrary to any principles of equity.

On the contrary, it is Ovintiv's conduct that warrants the scrutiny of equity. *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex.1988) ("It is well-settled that a party seeking an equitable remedy must do equity and come to court with clean hands."). Before the first well proposal was ever issued, Ovintiv was aiming for total control: "if we picked up their non-consent *we'd be at 99%* WI in these wells." ROA.3880 (emphasis in original). Tellingly, when McCully later tried to resolve the dispute, Ovintiv answered, "why would I work this out with you? I've already taken your interests." ROA.2649-2650.

A penalty multiple exists to compensate the participating parties for the risk they bore under circumstances in which the JOA parties willingly bargained for that risk-reward calculus. Here, Ovintiv set up a strategy in advance to invoke a JOA its own title opinion said *does not apply* to these wells, knowing full well that McCully (and others like it) would not participate, to intentionally set up a claim for penalties. And for all the wells that Ovintiv's counsel conceded "won't make it," McCully will never receive any proceeds from Ovintiv selling McCully's hydrocarbons. ROA.2468-2469. Ovintiv will keep it all. Allowing that result in the name of equity, when the JOA is inapplicable, would be the real "unconscionable" outcome.

### E. **<u>The Wolfcamp wells conclusively disprove quasi-estoppel.</u>**

The Wolfcamp wells illustrate exactly why the quasi-estoppel defense fails. Ovintiv's original well ballots included those wells too; yet in 2023, when McCully also objected that the Wolfcamp wells are outside the Contract Area, Ovintiv did not pretend that McCully had acquiesced in the application of the JOA by returning the non-consent ballot. Ovintiv's own land negotiator conceded that the Wolfcamp wells are "not covered under the [] JOA" and their inclusion was an oversight. ROA.2702-2703. Thus, Ovintiv corrected McCully as to the Wolfcamp wells and treated McCully as a cotenant in those wells, charging McCully no additional penalties. ROA.1631, 4387, 2556-2557.

The parties dispute whether there is any difference between the Neal Wells and the Wolfcamp wells with respect to application of the JOA, *see* Part I.B.4, *supra*, but they are identical with respect to quasi-estoppel. If the same non-consent ballots and McCully's conduct did not estop McCully from denying the application of the JOA to the Wolfcamp wells, those same ballots cannot have a different legal effect on the Neal Wells. Thus, Ovintiv's actions with respect to the Wolfcamp wells concede that there is no acquiescence or unconscionability in updating McCully's status to cotenant when the JOA does not apply. Cotenancy accounting cannot only be equitable when applied to a well exceeding a Contract Area's vertical limitations, but then unconscionable when applied to a well that exceeds its lateral restrictions. The rules of equity are not so arbitrary.

### F. Quasi-estoppel cannot supply forward-looking penalty rights the JOA itself does not confer.

Finally, quasi-estoppel is "a defensive theory" that "does not create a contract right that does not otherwise exist." *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 734 (Tex.1981). In *Madeley*, lessors invoked estoppel to enforce an operator's practice of paying them proceeds the lease did not require. The Texas Supreme Court refused, holding that the operator's "conduct in paying lessors something to which they were not entitled under their lease agreement does not create a right in lessors to continue receiving such payments in perpetuity." *Id.* Likewise, quasi-estoppel cannot be used to impose a contract right going forward that the JOA does not otherwise confer.

Because it denies *both* forward-looking declaratory relief *and* an accounting, this judgment does exactly what *Madeley* forbids: the effect of the judgment is to confer on Ovintiv a penalty right going forward that no contract gives it. Just as a court cannot add terms to a contract under the guise of interpretation, it cannot add them under the guise of equity. This Court has enforced the *Sun Oil* principle before. *See Montez v. S. San Antonio Indep. Sch. Dist.*, 817 F.2d 1124, 1126 (5th Cir. 1987) ("Estoppel cannot be used to create a contract right where none exists . . ."). It should do so again here.

Neither Ovintiv nor the district court identified any case using quasi-estoppel to extend an agreement's scope going forward in this manner. Even *Stable Energy*, the court's lead authority, estopped parties only from "contend[ing] they were not bound by that same agreement" that governed them. ROA.2333. The district court's holding enlarges the doctrine rather than applying it.

***

In sum, the same fairness concerns that drove the district court's construction of the JOA drove this equitable quasi-estoppel holding, and it was mistaken in both. The default rule the court refused to enforce is the very balance that cotenancy law has treated as equitable for over a century. Insisting on that rule is not "inconsistent" with any position McCully has ever taken, and enforcing it is not "unconscionable." Instead, applying the default rule of cotenancy is the only fair and just outcome.

## III. Because the JOA Does Not Govern the Neal Wells, the Case Should be Remanded for an Accounting and Related Remedies.

The parties agreed to defer all damages quantification until the liability issues were resolved, expressly stating that the deferral "does not purport to dismiss, waive, or prejudice Plaintiff's damages claims." ROA.1719-1723, 14. The district court then denied McCully's payment claims, money had and received claim, equitable accounting claim, and claim for unpaid production proceeds based on its erroneous ruling that the JOA governs and its penalties were properly applied. ROA.2331-2333.

Accordingly, when the Court reverses the liability judgment, it should also reinstate those remedial claims and remand for further proceedings.

## Conclusion and Relief

For these reasons, McCully respectfully requests that the Court:

1. Reverse and render judgment that the 1982 JOA does not govern the Neal Wells, or at least that its penalties do not reach partial segments Ovintiv never proposed, so Ovintiv was not permitted to charge non-consent penalties against McCully's interest and Texas cotenancy accounting applies (or alternatively, certify the JOA question to the Texas Supreme Court);

2. Reverse the quasi-estoppel holding and render judgment for McCully on that theory;

3. Reinstate McCully's remedial claims and remand those claims for further proceedings; and

4. Grant McCully any other relief to which it is entitled.

Respectfully submitted,

*/s/ Austin W. Brister*
Austin W. Brister
Marcus V. Eason
McGinnis Lochridge LLP
609 Main Street, Suite 2800
Houston, Texas 77002
(713) 615-8500

M. Alejandra Salas
McGinnis Lochridge LLP
1111 W. 6th Street, Bldg. B, Suite 400
Austin, Texas 78703
(512) 495-6022

Russell S. Post
Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

***Counsel for Appellant/Cross-Appellee McCully-Chapman Exploration, Incorporated***

## CERTIFICATE OF SERVICE

I certify that on September 28, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, which will serve a copy on all counsel of record.

By: */s/ Austin W. Brister*
Austin W. Brister

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(A) because it contains 12,932 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2.
2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

By: */s/ Austin W. Brister*
Austin W. Brister