**No. 26-50318**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

**MCCULLY-CHAPMAN EXPLORATION, INCORPORATED,**
*Plaintiff-Appellant/Cross-Appellee,*

*v.*

**OVINTIV USA, INCORPORATED,**

*Defendant-Appellee/Cross-Appellant.*

---

On Appeal from the United States District Court
for the Western District of Texas, Midland/Odessa Division

No. 7:14-CV-18

---

# APPELLANT/CROSS-APPELLEE'S

# RECORD EXCERPTS

---


**McGinnis Lochridge LLP**
Austin W. Brister
Marcus V. Eason
M. Alejandra Salas
609 Main Street, Suite 2800
Houston, Texas 77002
(713) 615-8500

**Beck Redden LLP**
Russell S. Post
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

**Counsel for Appellant/Cross-Appellee**
**McCully-Chapman Exploration, Incorporated**

## TABLE OF CONTENTS


| Document | Record Citation | Tab |
|---|---|---|
| Docket Sheet | ROA.1-23 | 1 |
| Notices of Appeal | ROA.2338-2341 | 2 |
| Final Judgment | ROA.2337 | 3 |
| Findings of Fact and Conclusions of Law | ROA.2308-2336 | 4 |
| Joint Operating Agreement (Excerpts) | ROA.2914, 2916-2930, 2932-2933 | 5 |
| Stipulated Facts (Excerpts) | ROA.1629-1631 | 6 |
| 2019 Proposal and Ballot | ROA.3984-3986 | 7 |
| Trial Testimony Excerpts – Dorsey Roach (Ovintiv Expert) | ROA.2861-2862, 2864, 2868-2869, 2872-2876 | 8 |
| Trial Testimony Excerpts – Lindsey Greene | ROA.2702-2703, 2719, 2725-2726 | 9 |
| 2015 AAPL Form (Excerpt) | ROA.4512 | 10 |

Respectfully submitted,

*/s/ Austin W. Brister*

Austin W. Brister
Marcus V. Eason
McGinnis Lochridge LLP
609 Main Street, Suite 2800
Houston, Texas 77002
(713) 615-8500

M. Alejandra Salas
McGinnis Lochridge LLP
1111 W. 6th Street, Bldg. B, Suite 400
Austin, Texas 78703
(512) 495-6022

Russell S. Post
Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

***Counsel for Appellant/Cross-Appellee McCully-Chapman Exploration, Incorporated***

## CERTIFICATE OF SERVICE

I certify that on September 28, 2026, a copy of the foregoing Record Excerpts was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, which will serve a copy on all counsel of record.

*/s/Austin W. Brister*
Austin W. Brister

# TAB 1

APPEAL

# U.S. District Court [LIVE]
# Western District of Texas (Midland)
# CIVIL DOCKET FOR CASE #: 7:24-cv-00018-DC-RCG

McCully-Chapman Exploration, Inc. v. Ovintiv USA, Inc.
Assigned to: Judge David Counts
Referred to: Judge Ronald C. Griffin
Demand: $1,000,000
Case in other court: USCA 5th Circuit, 26-50318
Cause: 28:1332 Diversity-Contract Dispute

Date Filed: 01/19/2024
Date Terminated: 03/21/2026
Jury Demand: None
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**McCully-Chapman Exploration, Inc.** represented by

**Austin W. Brister**
McGinnis Lochridge
609 Main Street
Suite 2800
Houston, TX 77002
713-615-8523
Email: abrister@mcginnislaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Alejandra Salas**
McGinnis Lochridge LLP
1111 W. 6th St., Bldg B, Ste 400
Austin, TX 78703
512-495-6022
Email: asalas@mcginnislaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marcus V. Eason**
McGinnis Lochridge LLP
609 Main Street
Ste 2800
Houston, TX 77002
713-615-8529
Fax: 713-328-1807
Email: meason@mcginnislaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ashley N. Vega**
McGinnis Lochridge LLP
609 Main St., Ste. 2800
Houston
361-229-5688
Email: avega@mcginnislaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Ovintiv USA, Inc.** represented by

**Samantha Leigh Thompson**
Hogan Thompson Schuelke LLP
1001 Fannin Street, Suite 4775
Houston, TX 77002
713-671-5630
Email: sthompson@hoganthompson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cody Rutowski**
Hogan Thompson Schuelke LLP
1001 Fannin Street, Suite 4775
Houston, TX 77002
713-671-5630
Email: crutowski@hoganthompson.com
*ATTORNEY TO BE NOTICED*

**James Allan Schuelke**
Hogan Thompson Schuelke LLP
1001 Fannin, Ste 4775
Houston, TX 77002
713-859-9864
Email: jschuelke@hoganthompson.com
*ATTORNEY TO BE NOTICED*

**Melissa Hurter Esterholm**
Hogan Thompson Schuelke LLP
1001 Fannin Street
Ste 4775
Houston, TX 77002
713-671-5630
Email: mesterholm@hoganthompson.com
*TERMINATED: 04/10/2025*
*ATTORNEY TO BE NOTICED*

**Savannah Ezelle**
Hogan Thompson Schuelke LLP
1001 Fannin Street, Ste 4775
77002
Houston, TX 77002
713-671-5630
Fax: 713-671-5630
Email: sezelle@azalaw.com
*TERMINATED: 01/15/2026*
*ATTORNEY TO BE NOTICED*

**Christopher Michael Hogan**
Hogan Thompson LLP
1001 Fannin Street

Suite 4775
Houston, TX 77002
713-671-5630
Email: chogan@hoganthompson.com
*ATTORNEY TO BE NOTICED*

**Counter Plaintiff**

**Ovintiv USA, Inc.** represented by **Christopher Michael Hogan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samantha Leigh Thompson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cody Rutowski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Allan Schuelke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa Hurter Esterholm**
(See above for address)
*TERMINATED: 04/10/2025*
*ATTORNEY TO BE NOTICED*

**Savannah Ezelle**
(See above for address)
*TERMINATED: 01/15/2026*
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McCully-Chapman Exploration, Inc.** represented by **Austin W. Brister**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Alejandra Salas**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marcus V. Eason**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ashley N. Vega**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Plaintiff**

**Ovintiv USA, Inc.** represented by **Christopher Michael Hogan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samantha Leigh Thompson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cody Rutowski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Allan Schuelke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa Hurter Esterholm**
(See above for address)
*TERMINATED: 04/10/2025*
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McCully-Chapman Exploration, Inc.** represented by **Austin W. Brister**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Alejandra Salas**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marcus V. Eason**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ashley N. Vega**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Plaintiff**

**Ovintiv USA, Inc.** represented by **Christopher Michael Hogan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samantha Leigh Thompson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cody Rutowski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Allan Schuelke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa Hurter Esterholm**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McCully-Chapman Exploration, Inc.** represented by **Austin W. Brister**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Alejandra Salas**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marcus V. Eason**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ashley N. Vega**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/19/2024 | 1 | NOTICE OF REMOVAL by Ovintiv USA, Inc. (Filing fee $405 receipt number ATXWDC-18322229), filed by Ovintiv USA, Inc.. (Attachments: # 1 Exhibit A - Docket Sheet, # 2 Exhibit B - Plaintiff's Original Petition, # 3 Exhibit C - Defendant's Answer and Counterclaim, # 4 Exhibit D - List of Counsel, # 5 Exhibit E - Index of Documents, # 6 Exhibit F - Notice to State Court, # 7 Civil Cover Sheet Civil Cover Sheet, # 8 |

| | | |
|---|---|---|
| | | Supplement Supplement)(Hogan, Christopher) (Attachment 8 replaced on 1/23/2024) (kg). (Entered: 01/19/2024) |
| 01/19/2024 | | Case assigned to Judge David Counts and Judge Ronald C. Griffin. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (kg) (Entered: 01/19/2024) |
| 01/19/2024 | 2 | Pro Hac Vice Letter as to James A. Schuelke (kg) Modified on 1/23/2024 (kg). (Entered: 01/19/2024) |
| 01/22/2024 | 3 | ORDER TO AMEND PLEADINGS. Signed by Judge David Counts. (kg) (Entered: 01/22/2024) |
| 02/01/2024 | 4 | NOTICE of Attorney Appearance by Austin W. Brister on behalf of McCully-Chapman Exploration, Inc. (Brister, Austin) (Entered: 02/01/2024) |
| 02/01/2024 | 5 | AMENDED ANSWER to *Plaintiffs Original Petition* , COUNTERCLAIM against McCully-Chapman Exploration, Inc. by Ovintiv USA, Inc.. (Hogan, Christopher) (Entered: 02/01/2024) |
| 02/06/2024 | 6 | Order for Scheduling Recommendations/Proposed Scheduling Order. Scheduling recommendations/proposed scheduling order due to the Court within thirty (30) days from the date of this Order. Signed by Judge David Counts. (kg) (Entered: 02/06/2024) |
| 02/06/2024 | 7 | ORDER AND ADVISORY. Signed by Judge David Counts. (kg) (Entered: 02/06/2024) |
| 02/06/2024 | 8 | RULE 7 DISCLOSURE STATEMENT filed by Ovintiv USA, Inc. identifying Corporate Parent Ovintiv Inc., Corporate Parent Alenco, Inc. for Ovintiv USA, Inc.. (Hogan, Christopher) (Entered: 02/06/2024) |
| 02/13/2024 | 9 | NOTICE of Attorney Appearance by Ashley N. Vega on behalf of McCully-Chapman Exploration, Inc. (kg) (Entered: 02/13/2024) |
| 02/22/2024 | 10 | MOTION to Dismiss *Defendant's Counterclaim Pursuant to Federal Rule 12(b)(6)* by McCully-Chapman Exploration, Inc... Motions referred to Judge Ronald C. Griffin. (Brister, Austin) (Entered: 02/22/2024) |
| 02/29/2024 | 11 | Rule 26(f) Discovery Report/Case Management Plan by Ovintiv USA, Inc.. (Hogan, Christopher) (Entered: 02/29/2024) |
| 03/06/2024 | 12 | RULE 7 DISCLOSURE STATEMENT filed by McCully-Chapman Exploration, Inc. identifying Corporate Parent Spearpoint Resources Company for McCully-Chapman Exploration, Inc.. (Salas, M.) (Entered: 03/06/2024) |
| 03/06/2024 | 13 | NON-CONSENT to Trial by US Magistrate Judge by Ovintiv USA, Inc.. (Hogan, Christopher) (Entered: 03/06/2024) |
| 03/07/2024 | 14 | Scheduling Recommendations *by Ovintiv USA, Inc. and* by McCully-Chapman Exploration, Inc.. (Salas, M.) (Entered: 03/07/2024) |
| 03/07/2024 | 15 | NON-CONSENT to Trial by US Magistrate Judge by McCully-Chapman Exploration, Inc.. (Salas, M.) (Entered: 03/07/2024) |
| 03/07/2024 | 16 | AMENDED ANSWER to *Plaintiffs Original Petition* , COUNTERCLAIM against McCully-Chapman Exploration, Inc. by Ovintiv USA, Inc.. (Hogan, Christopher) (Entered: 03/07/2024) |

| | | |
|---|---|---|
| 03/08/2024 | 17 | SCHEDULING ORDER: Pretrial Conference set for **3/13/2025 01:30 PM** in Midland before Judge David Counts, Jury Selection/Trial set for **4/7/2025 08:00 AM** in Midland before Judge David Counts, Amended Pleadings due by **7/12/2024**, Discovery due by **10/25/2024**, Joinder of Parties due by **7/12/2024**, Motions due by **11/15/2024**. Signed by Judge David Counts. (kg) (Entered: 03/08/2024) |
| 03/11/2024 | 18 | ORDER GRANTING 10 Motion to Dismiss. Signed by Judge David Counts. (kg) (Entered: 03/11/2024) |
| 04/18/2024 | 19 | NOTICE of Attorney Appearance by James Allan Schuelke on behalf of Ovintiv USA, Inc. . Attorney James Allan Schuelke added to party Ovintiv USA, Inc. (pty:dft), Attorney James Allan Schuelke added to party Ovintiv USA, Inc. (pty:cc), Attorney James Allan Schuelke added to party Ovintiv USA, Inc. (pty:cc), Attorney James Allan Schuelke added to party Ovintiv USA, Inc. (pty:cc) (Schuelke, James) (Entered: 04/18/2024) |
| 04/18/2024 | 20 | NOTICE of Attorney Appearance by Cody Rutowski on behalf of Ovintiv USA, Inc. . Attorney Cody Rutowski added to party Ovintiv USA, Inc. (pty:dft), Attorney Cody Rutowski added to party Ovintiv USA, Inc. (pty:cc), Attorney Cody Rutowski added to party Ovintiv USA, Inc. (pty:cc), Attorney Cody Rutowski added to party Ovintiv USA, Inc. (pty:cc) (Rutowski, Cody) (Entered: 04/18/2024) |
| 06/05/2024 | 21 | JOINT MOTION FOR ENTRY OF CONFIDENTIALITY AND PROTECTIVE ORDER by McCully-Chapman Exploration, Inc. (Salas, M.) Modified on 6/7/2024 (kg). (Entered: 06/05/2024) |
| 06/05/2024 | 22 | Proposed Order *Confidentiality and Protective Order* to 21 Proposed Protective Order by McCully-Chapman Exploration, Inc.. (Salas, M.) (Entered: 06/05/2024) |
| 06/07/2024 | 23 | CONFIDENTIALITY AND PROTECTIVE ORDER. Signed by Judge David Counts. (kg) (Entered: 06/07/2024) |
| 06/25/2024 | 24 | Joint MOTION to Extend Scheduling Order Deadlines *(Joint Motion to Modify Scheduling Order)* by McCully-Chapman Exploration, Inc.. (Attachments: # 1 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Brister, Austin) (Entered: 06/25/2024) |
| 06/26/2024 | 25 | ORDER GRANTING JOINT 24 MOTION TO MODIFY SCHEDULING ORDER Discovery due by **12/20/2024**, Motions due by **1/17/2025**. Signed by Judge David Counts. (kg) (Entered: 06/26/2024) |
| 06/26/2024 | 26 | ORDER RESETTING FINAL PRETRIAL HEARING (Pretrial Conference REset for **5/16/2025 10:30 AM** in Midland before Judge David Counts). Signed by Judge David Counts. (kg) (Entered: 06/26/2024) |
| 06/26/2024 | 27 | ORDER RESETTING JURY SELECTION/TRIAL (Jury Selection/Trial REset for **6/2/2025 08:00 AM** in Midland before Judge David Counts). Signed by Judge David Counts. (kg) (Entered: 06/26/2024) |
| 07/12/2024 | 28 | Unopposed MOTION for Leave to File Plaintiff's First Amended Complaint by McCully-Chapman Exploration, Inc.. (Attachments: # 1 Exhibit A-First Amended Complaint, # 2 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Brister, Austin) (Entered: 07/12/2024) |
| 07/15/2024 | | Text Order GRANTING 28 Plaintiff's Unopposed Motion for Leave to File Amended Complaint. It is ORDERED that the Plaintiff's Unopposed Motion for Leave to File Amended Complaint is GRANTED. The Court directs the Clerk of Court to docket |

| | | |
|---|---|---|
| | | Plaintiff's First Amended Complaint attached to the instant Unopposed Motion as Exhibit A. It is so ORDERED. Entered by Judge Ronald C. Griffin. (This is a text-only entry generated by the court. There is no document associated with this entry.) (db) (Entered: 07/15/2024) |
| 07/15/2024 | 29 | FIRST AMENDED COMPLAINT against Ovintiv USA, Inc., filed by McCully-Chapman Exploration, Inc..(kg) (Entered: 07/16/2024) |
| 07/29/2024 | 30 | Unopposed MOTION for Extension of Time to File Answer re 29 Amended Complaint by Ovintiv USA, Inc.. (Attachments: # 1 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Thompson, Samantha) (Entered: 07/29/2024) |
| 07/29/2024 | 31 | ANSWER to 29 Amended Complaint by Ovintiv USA, Inc..(Thompson, Samantha) (Entered: 07/29/2024) |
| 07/30/2024 | | Text Order GRANTING 30 Defendant's Unopposed Motion for Extension of Time to Answer or Otherwise Respond to Plaintiff's First Amended Complaint. It is ORDERED that the deadline for Defendant Ovintiv USA, Inc. to respond to Plaintiff's First Amended Complaint is EXTENDED by seven days to August 5, 2024. It is so ORDERED. Entered by Judge Ronald C. Griffin. (This is a text-only entry generated by the court. There is no document associated with this entry.) (db) (Entered: 07/30/2024) |
| 07/30/2024 | | Set/Reset Deadlines: Ovintiv USA, Inc. answer due **8/5/2024**. (kg) (Entered: 07/30/2024) |
| 09/11/2024 | 32 | MOTION for Judgment on the Pleadings by Ovintiv USA, Inc.. (Attachments: # 1 Exhibit 1, # 2 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Hogan, Christopher) (Entered: 09/11/2024) |
| 09/17/2024 | 33 | NOTICE of Attorney Appearance by Melissa Hurter Esterholm on behalf of Ovintiv USA, Inc. . Attorney Melissa Hurter Esterholm added to party Ovintiv USA, Inc. (pty:dft), Attorney Melissa Hurter Esterholm added to party Ovintiv USA, Inc. (pty:cc), Attorney Melissa Hurter Esterholm added to party Ovintiv USA, Inc. (pty:cc), Attorney Melissa Hurter Esterholm added to party Ovintiv USA, Inc. (pty:cc) (Esterholm, Melissa) (Entered: 09/17/2024) |
| 09/18/2024 | 34 | Unopposed MOTION for Extension of Time to File Response/Reply as to 32 MOTION for Judgment on the Pleadings by McCully-Chapman Exploration, Inc.. (Attachments: # 1 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Brister, Austin) (Entered: 09/18/2024) |
| 09/19/2024 | | Text Order GRANTING 34 Plaintiff's Unopposed Motion for Extension of Time to File Response to Defendant's Motion for Partial Judgment on the Pleadings. It is ORDERED that the deadline for McCully-Chapman Exploration, Inc., to file a response to Defendant's Motion for Partial Judgment on the Pleadings is EXTENDED to October 9, 2024. It is so ORDERED. Entered by Judge Ronald C. Griffin. (This is a text-only entry generated by the court. There is no document associated with this entry.) (db) (Entered: 09/19/2024) |
| 10/09/2024 | 35 | RESPONSE to Motion, filed by McCully-Chapman Exploration, Inc., re 32 MOTION for Judgment on the Pleadings filed by Ovintiv USA, Inc. (Attachments: # 1 Exhibit A)(Brister, Austin) (Entered: 10/09/2024) |
| 10/11/2024 | 36 | Unopposed MOTION for Extension of Time to File Response/Reply as to 32 MOTION for Judgment on the Pleadings by Ovintiv USA, Inc.. (Attachments: # 1 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Hogan, Christopher) (Entered: 10/11/2024) |

| | | |
|---|---|---|
| 10/15/2024 | | Text Order GRANTING 36 Defendant's Unopposed Motion for Extension of Time to File Reply to Response. It is ORDERED that the deadline for Defendant Ovintiv USA, Inc., to file Reply in Support of its Motion for Partial Judgment on the Pleadings is EXTENDED by seven days to October 23, 2024. It is so ORDERED. Entered by Judge Ronald C. Griffin. (This is a text-only entry generated by the court. There is no document associated with this entry.) (db) (Entered: 10/15/2024) |
| 10/23/2024 | 37 | REPLY to Response to Motion, filed by Ovintiv USA, Inc., re 32 MOTION for Judgment on the Pleadings filed by Ovintiv USA, Inc. (Hogan, Christopher) (Entered: 10/23/2024) |
| 10/25/2024 | 38 | Joint MOTION to Extend Scheduling Order Deadlines *(Joint Motion to Modify Scheduling Order)* by McCully-Chapman Exploration, Inc.. (Attachments: # 1 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Brister, Austin) (Entered: 10/25/2024) |
| 10/28/2024 | 39 | ORDER GRANTING 38 Motion to Extend Scheduling Order Deadlines Discovery due by **3/4/2025**, Motions due by **4/4/2025**. Signed by Judge David Counts. (kg) (Entered: 10/28/2024) |
| 10/28/2024 | 40 | ORDER RESETTING FINAL PRETRIAL HEARING, (Pretrial Conference REset for **8/8/2025 10:30 AM** in Midland before Judge David Counts). Signed by Judge David Counts. (kg) (Entered: 10/28/2024) |
| 10/28/2024 | 41 | ORDER RESETTING JURY SELECTION/TRIAL, (Jury Selection/Trial set for **9/2/2025 08:00 AM** in Midland before Judge David Counts). Signed by Judge David Counts. (kg) (Entered: 10/28/2024) |
| 10/31/2024 | 42 | Opposed MOTION for Leave to File Plaintiff's Sur-Reply to Defendant's Reply in Support of its Motion for Partial Judgment on the Pleadings by McCully-Chapman Exploration, Inc.. (Attachments: # 1 Exhibit A, # 2 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Brister, Austin) (Entered: 10/31/2024) |
| 11/07/2024 | 43 | RESPONSE to Motion, filed by Ovintiv USA, Inc., re 42 Opposed MOTION for Leave to File Plaintiff's Sur-Reply to Defendant's Reply in Support of its Motion for Partial Judgment on the Pleadings filed by Plaintiff McCully-Chapman Exploration, Inc. (Attachments: # 1 Proposed Order)(Hogan, Christopher) (Entered: 11/07/2024) |
| 11/19/2024 | 44 | Joint MOTION to Extend Scheduling Order Deadlines *(Joint Motion to Extend Deadlines to File Designation of Testifying Experts)* by McCully-Chapman Exploration, Inc.. (Attachments: # 1 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Brister, Austin) (Entered: 11/19/2024) |
| 11/20/2024 | | Text Order GRANTING 44 Parties' Joint Motion to Extend Scheduling Order Deadlines. It is ORDERED the Parties' Joint motion to Extend Scheduling Order Deadlines is GRANTED. The Scheduling Order is AMENDED as follows: All parties asserting claims for relief shall file their designation of testifying experts and shall serve on all parties, but not file, the materials required by Fed. R. Civ. P. 26(a)(2)(B) by 12/20/2024. Parties resisting claims for relief shall file their designation testifying experts and shall serve on all parties, but not file the materials required by Fed. R. Civ. P. 26(a)(2)(B) by 02/05/2025. All designations of additional rebuttal experts shall be designated within fourteen (14) days of receipt of the report of the opposing expert. The Court further ORDERS that all other deadlines remain the same. It is so ORDERED. Entered by Judge Ronald C. Griffin. (This is a text-only entry generated by the court. There is no document associated with this entry.) (db) (Entered: 11/20/2024) |
| 12/20/2024 | 45 | |

| | | |
|---|---|---|
| | | DESIGNATION OF EXPERT WITNESSES by McCully-Chapman Exploration, Inc.. (Brister, Austin) (Entered: 12/20/2024) |
| 02/05/2025 | 46 | DESIGNATION OF EXPERT WITNESSES by Ovintiv USA, Inc. . (Hogan, Christopher) (Entered: 02/05/2025) |
| 02/06/2025 | 47 | ORDER DENYING 42 Motion for Leave to File Sur-Reply. Signed by Judge Ronald C. Griffin. (ab1) (Entered: 02/06/2025) |
| 02/13/2025 | 48 | Unopposed MOTION for Extension of Time to File *Designation of Rebuttal Experts* by McCully-Chapman Exploration, Inc.. (Attachments: # 1 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Brister, Austin) (Entered: 02/13/2025) |
| 02/14/2025 | 49 | Second MOTION for Leave to File Plaintiff's Sur-Reply to Defendant's Reply in Support of its Motion for Partial Judgment on the Pleadings by McCully-Chapman Exploration, Inc.. (Attachments: # 1 Exhibit A, # 2 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Brister, Austin) (Entered: 02/14/2025) |
| 02/14/2025 | 50 | Unopposed Motion for leave to File Sealed Document. Referral Judge: Ronald C. Griffin. (Attachments: # 1 Exhibit A-Sealed Document, # 2 Proposed Order) (Brister, Austin) (Entered: 02/14/2025) |
| 02/18/2025 | | Text Order GRANTING 48 Order Granting Plaintiff's Unopposed Motion for Extension of Time to File Designation of Rebuttal Experts. It is ORDERED that the Plaintiff's Unopposed Motion to Extend Deadline to File Designation of Rebuttal Experts is GRANTED. The Court ORDERS that all designation of additional rebuttal experts shall be designated on or before Wednesday, February 26, 2025. Entered by Judge Ronald C. Griffin. (This is a text-only entry generated by the court. There is no document associated with this entry.) (db) Modified on 2/18/2025 per chambers (kg). (Entered: 02/18/2025) |
| 02/18/2025 | | Text Order GRANTING 50 Plaintiff's Unopposed Motion for Leave to File Sealed Exhibit. It is ORDERED that Plaintiff's Unopposed Motion for Leave to File Exhibit Under Seal is GRANTED. The Court directs the Clerk to file the exhibits attached to the instant Motion Under Seal. The Court further ORDERS that the instant motion be also placed under seal. Entered by Judge David Counts. (This is a text-only entry generated by the court. There is no document associated with this entry.) (db) (Entered: 02/18/2025) |
| 02/18/2025 | 51 | Sealed Motion filed. Referral Judge: Ronald C. Griffin. (Attachments: # 1 Exhibit A) (kg) (Entered: 02/18/2025) |
| 02/21/2025 | 52 | RESPONSE to Motion, filed by Ovintiv USA, Inc., re 49 Second MOTION for Leave to File Plaintiff's Sur-Reply to Defendant's Reply in Support of its Motion for Partial Judgment on the Pleadings filed by Plaintiff McCully-Chapman Exploration, Inc. (Attachments: # 1 Proposed Order)(Hogan, Christopher) (Entered: 02/21/2025) |
| 02/21/2025 | 53 | Unopposed Motion for leave to File Sealed Document. Referral Judge: Ronald C. Griffin. (Attachments: # 1 Exhibit SEALED DOCUMENT, # 2 Proposed Order) (Hogan, Christopher) (Entered: 02/21/2025) |
| 02/24/2025 | | Text Order GRANTING 53 Defendant's Unopposed Motion to Seal its Response to Plaintiff's Second Motion for Leave to File Sur-reply to Defendant's Reply in Support of its Motion for Partial Judgment. The Clerk is directed to file the Defendant's Response attached to the instant motion under seal. It is so ORDERED. Entered by Judge Ronald C. Griffin. (This is a text-only entry generated by the court. There is no document associated with this entry.) (db) (Entered: 02/24/2025) |

| | | |
|---|---|---|
| 02/24/2025 | 54 | Sealed Document filed (kg) (Entered: 02/24/2025) |
| 04/04/2025 | 55 | MOTION for Summary Judgment by Ovintiv USA, Inc.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit). Motions referred to Judge Ronald C. Griffin. (Hogan, Christopher) (Attachment 5 replaced on 4/21/2025) (kg). (Entered: 04/04/2025) |
| 04/04/2025 | 56 | Motion for leave to File Sealed Document. Referral Judge: Ronald C. Griffin. (Attachments: # 1 Exhibit SEALED DOCUMENT, # 2 Proposed Order) (Hogan, Christopher) (Entered: 04/04/2025) |
| 04/04/2025 | 57 | MOTION for Partial Summary Judgment by McCully-Chapman Exploration, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D (Under Seal), # 5 Exhibit E (Under Seal), # 6 Exhibit F (F5 and F11 Under Seal), # 7 Exhibit G, # 8 Exhibit H (Under Seal), # 9 Exhibit I). Motions referred to Judge Ronald C. Griffin. (Brister, Austin) (Entered: 04/04/2025) |
| 04/04/2025 | 58 | Unopposed Motion for leave to File Sealed Document. Referral Judge: Ronald C. Griffin. (Attachments: # 1 Exhibit D1-D22 (Sealed Document), # 2 Exhibit E (Sealed Document), # 3 Exhibit F5 (Sealed Document), # 4 Exhibit F11 (Sealed Document), # 5 Exhibit H (Sealed Document), # 6 Proposed Order) (Brister, Austin) (Entered: 04/04/2025) |
| 04/07/2025 | | Text Order GRANTING 56 Defendant's Motion for Leave to File Sealed Document It is ORDERED that the instant Motion and Defendant's Motion for Partial Summary Judgment attached as Exhibit A are maintained under SEAL. Entered by Judge Ronald C. Griffin. (This is a text-only entry generated by the court. There is no document associated with this entry.) (db) (Entered: 04/07/2025) |
| 04/07/2025 | | Text Order GRANTING 58 Plaintiff's Unopposed Motion for Leave to File Sealed Documents. It is ORDERED that the Plaintiff's Unopposed Motion for Leave to File Exhibits to Plaintiff's Motion for Partial Summary Judgment under SEAL is GRANTED. The Court directs the Clerk of the Court to file the exhibits attached to the instant Motion UNDER SEAL. Entered by Judge Ronald C. Griffin. (This is a text-only entry generated by the court. There is no document associated with this entry.) (db) (Entered: 04/07/2025) |
| 04/07/2025 | 59 | Sealed Motion filed. Referral Judge: Ronald C. Griffin. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17) (kg) (Entered: 04/07/2025) |
| 04/07/2025 | 60 | Sealed Exhibits filed (kg) (Entered: 04/07/2025) |
| 04/09/2025 | 61 | MOTION to Withdraw as Attorney by Ovintiv USA, Inc.. (Attachments: # 1 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Hogan, Christopher) (Entered: 04/09/2025) |
| 04/10/2025 | | Text Order GRANTING 61 Melissa H. Esterholm's Unopposed Motion to Withdraw as Counsel of Record for Ovintiv USA, Inc. It is ORDERED that Melissa H. Esterholm's Unopposed Motion to Withdraw as Counsel of Record for Ovintiv USA, Inc., is GRANTED. The Clerk of the Court is directed to terminate Ms. Esterholm from receiving future filings in this case. Entered by Judge Ronald C. Griffin. (This is a text-only entry generated by the court. There is no document associated with this entry.) (db) (Entered: 04/10/2025) |

| | | |
|---|---|---|
| 04/18/2025 | 62 | Joint MOTION for Extension of Time to File Response/Reply by Ovintiv USA, Inc.. (Attachments: # 1 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Hogan, Christopher) (Entered: 04/18/2025) |
| 04/18/2025 | 63 | RESPONSE to Motion, filed by Ovintiv USA, Inc., re 57 MOTION for Partial Summary Judgment filed by Plaintiff McCully-Chapman Exploration, Inc. (Attachments: # 1 Exhibit Greene Declaration, # 2 Exhibit Foran Deposition, # 3 Exhibit McCully-Chapman's Discovery Responses, # 4 Exhibit 2019 Election Letter-Ballot, # 5 Exhibit 2021 Well Proposals and McCully Signed Elections, # 6 Exhibit Gingell Deposition (Excerpts), # 7 Exhibit Email from Bullock to Krenek, # 8 Exhibit Email from Bullock to Krenek, # 9 Exhibit Saxon-Neal Lease, # 10 Exhibit Saxon-Sohio Lease, # 11 Exhibit Saxon-Sun Lease, # 12 Exhibit Brusenhan Form W-2 Filings, # 13 Exhibit Mecca-Neal Lease, # 14 Exhibit Mecca-Five Star Lease, # 15 Exhibit Mecca-Allar Lease, # 16 Exhibit Title Opinion (Excerpts), # 17 Exhibit Correction to Mecca-Neal Lease, # 18 Exhibit Correction to Mecca-Allar Lease, # 19 Exhibit Neal Verticals Well Proposal and Election Records, # 20 Exhibit Neal Verticals Form W-2 Filings, # 21 Exhibit Neal Verticals Division of Interest Records, # 22 Exhibit Email from Gingell to Greene and McMillan, # 23 Exhibit Railroad Commission Production Records for Neal Vertical Lease, # 24 Exhibit Huddleston Report (Excerpts), # 25 Exhibit Huddleston Workpaper (Excerpted and formatted))(Hogan, Christopher) (Entered: 04/18/2025) |
| 04/18/2025 | 64 | Response in Opposition to Motion, filed by McCully-Chapman Exploration, Inc., re 55 MOTION for Summary Judgment filed by Ovintiv USA, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Errata D (Under Seal), # 5 Exhibit E (Under Seal), # 6 Exhibit F (Under Seal), # 7 Exhibit G, # 8 Exhibit H (Under Seal), # 9 Exhibit I, # 10 Exhibit J (Under Seal), # 11 Exhibit K (Under Seal), # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P (Under Seal), # 17 Exhibit Q)(Brister, Austin) (Entered: 04/18/2025) |
| 04/18/2025 | 65 | Unopposed Motion for leave to File Sealed Document. Referral Judge: Ronald C. Griffin. (Attachments: # 1 Exhibit 1 (Sealed Document), # 2 Proposed Order) (Brister, Austin) (Entered: 04/18/2025) |
| 04/18/2025 | 66 | MOTION to Strike *Ovintiv's Summary Judgment Evidence* by McCully-Chapman Exploration, Inc.. (Attachments: # 1 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Brister, Austin) (Entered: 04/18/2025) |
| 04/21/2025 | | Text Order GRANTING 62 Parties' Joint Motion for Extension of Time to File Response. It is ORDERED Parties' replies in support of their respective Motions for Partial Summary Judgment (ECF Nos. 55, 57) shall be filed on or before Tuesday, April 29, 2025. Entered by Judge Ronald C. Griffin. (This is a text-only entry generated by the court. There is no document associated with this entry.) (db) (Entered: 04/21/2025) |
| 04/21/2025 | | Text Order GRANTING 65 Unopposed Motion for Leave to File Sealed Document. The Court DIRECTS the Clerk of Court to FILE the Unredacted Response and Exhibitsattached to the instant Motion as Exhibit 1 UNDER SEAL. Entered by Judge Ronald C. Griffin. (This is a text-only entry generated by the court. There is no document associated with this entry.) (db) (Entered: 04/21/2025) |
| 04/21/2025 | 67 | Sealed Document filed (slt) (Entered: 04/21/2025) |
| 04/29/2025 | 68 | MOTION to Strike *AND TO SUPPLEMENT MCCULLY-CHAPMAN EXPLORATION, INC.S SUMMARY JUDGMENT EVIDENCE* by Ovintiv USA, Inc.. (Attachments: # 1 Exhibit, # 2 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Hogan, Christopher) (Entered: 04/29/2025) |

| | | |
|---|---|---|
| 04/29/2025 | 69 | REPLY to Response to Motion, filed by Ovintiv USA, Inc., re 55 MOTION for Summary Judgment filed by Ovintiv USA, Inc. (Attachments: # 1 Supplement Attachment 1, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Hogan, Christopher) (Entered: 04/29/2025) |
| 04/29/2025 | 70 | RESPONSE in Support, filed by McCully-Chapman Exploration, Inc., re 57 MOTION for Partial Summary Judgment filed by Plaintiff McCully-Chapman Exploration, Inc. (Brister, Austin) (Entered: 04/29/2025) |
| 05/02/2025 | 71 | RESPONSE to Motion, filed by Ovintiv USA, Inc., re 66 MOTION to Strike *Ovintiv's Summary Judgment Evidence* filed by Plaintiff McCully-Chapman Exploration, Inc. (Attachments: # 1 Proposed Order)(Hogan, Christopher) (Entered: 05/02/2025) |
| 05/09/2025 | 72 | Reply in Support to Motion, filed by McCully-Chapman Exploration, Inc., re 66 MOTION to Strike *Ovintiv's Summary Judgment Evidence* filed by Plaintiff McCully-Chapman Exploration, Inc. (Brister, Austin) Modified on 5/9/2025 (kg). Modified on 5/12/2025 (kg). (Entered: 05/09/2025) |
| 05/13/2025 | 73 | RESPONSE to Motion, filed by McCully-Chapman Exploration, Inc., re 68 MOTION to Strike *AND TO SUPPLEMENT MCCULLY-CHAPMAN EXPLORATION, INC.S SUMMARY JUDGMENT EVIDENCE* filed by Ovintiv USA, Inc. (Brister, Austin) (Entered: 05/13/2025) |
| 05/20/2025 | 74 | REPLY to Response to Motion, filed by Ovintiv USA, Inc., re 68 MOTION to Strike *AND TO SUPPLEMENT MCCULLY-CHAPMAN EXPLORATION, INC.S SUMMARY JUDGMENT EVIDENCE* filed by Ovintiv USA, Inc. (Hogan, Christopher) (Entered: 05/20/2025) |
| 06/25/2025 | | Text Order DENYING 49 Second Motion for Leave to File Sur-Reply. It is so ORDERED. Entered by Judge Ronald C. Griffin. (This is a text-only entry generated by the court. There is no document associated with this entry.) (mflc) (Entered: 06/25/2025) |
| 06/25/2025 | | Text Order GRANTING 51 Unopposed Sealed Motion. It is so ORDERED. Entered by Judge Ronald C. Griffin. (This is a text-only entry generated by the court. There is no document associated with this entry.) (mflc) (Entered: 06/25/2025) |
| 06/25/2025 | 75 | REPORT AND RECOMMENDATIONS re 32 Motion for Judgment on the Pleadings filed by Ovintiv USA, Inc. Signed by Judge Ronald C. Griffin. (slt) (Entered: 06/26/2025) |
| 07/08/2025 | 76 | NOTICE *of Outcome of Mediation: Did Not Settle* by McCully-Chapman Exploration, Inc. (Brister, Austin) (Entered: 07/08/2025) |
| 07/09/2025 | 77 | RESPONSE *OBJECTIONS* to 75 Report and Recommendations by Ovintiv USA, Inc.. (Hogan, Christopher) (Entered: 07/09/2025) |
| 07/10/2025 | | DEFICIENCY NOTICE: re 77 Response: Please use event Objections to Report and Recommendations found under Other Filings > Other Documents. (kg) (Entered: 07/10/2025) |
| 07/10/2025 | 78 | OBJECTION to 75 Report and Recommendations by Ovintiv USA, Inc... (Hogan, Christopher) (Entered: 07/10/2025) |
| 07/14/2025 | 79 | ORDER SETTING BENCH TRIAL, (Bench Trial set for **9/2/2025 08:00 AM** in Midland before Judge David Counts). Signed by Judge David Counts. (kg) (Entered: 07/14/2025) |
| 07/22/2025 | 80 | ORDER DENYING PLAINTIFFS MOTION TO STRIKE. Signed by Judge David Counts. (kg) (Entered: 07/22/2025) |

| | | |
|---|---|---|
| 07/22/2025 | 81 | ORDER GRANTING 68 Motion to Strike. Signed by Judge David Counts. (kg) (Entered: 07/23/2025) |
| 07/23/2025 | 82 | RESPONSE to 78 Objection to Report and Recommendations by McCully-Chapman Exploration, Inc.. (Attachments: # 1 Exhibit Joint Operating Agreement)(Brister, Austin) (Entered: 07/23/2025) |
| 07/25/2025 | 83 | Joint MOTION to Extend Scheduling Order Deadlines by Ovintiv USA, Inc.. (Attachments: # 1 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Thompson, Samantha) (Entered: 07/25/2025) |
| 07/25/2025 | | Text Order GRANTING 83 Joint Motion to Extend Scheduling Order Deadlines. The new deadline for pretrial filings under Local Rule CV-16(f) is postponed until Tuesday, July 29, 2025. All other deadlines remain the same. Entered by Judge David Counts. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dhlc) (Entered: 07/25/2025) |
| 07/29/2025 | 84 | NOTICE of Attorney Appearance by Savannah Ezelle on behalf of Ovintiv USA, Inc. . Attorney Savannah Ezelle added to party Ovintiv USA, Inc. (pty:dft), Attorney Savannah Ezelle added to party Ovintiv USA, Inc. (pty:cc) (Ezelle, Savannah) (Entered: 07/29/2025) |
| 07/29/2025 | 85 | RESPONSE *REPLY IN SUPPORT OF* to 78 Objection to Report and Recommendations by Ovintiv USA, Inc.. (Hogan, Christopher) (Entered: 07/29/2025) |
| 07/29/2025 | 86 | Witness List by Ovintiv USA, Inc. . (Hogan, Christopher) (Entered: 07/29/2025) |
| 07/29/2025 | 87 | Pretrial Disclosures *DEPOSITION DESIGNATIONS* by Ovintiv USA, Inc.. (Hogan, Christopher) (Entered: 07/29/2025) |
| 07/29/2025 | 88 | Pretrial Disclosures *TRIAL ESTIMATE* by Ovintiv USA, Inc.. (Hogan, Christopher) (Entered: 07/29/2025) |
| 07/29/2025 | 89 | MOTION in Limine by Ovintiv USA, Inc.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit). Motions referred to Judge Ronald C. Griffin. (Hogan, Christopher) (Entered: 07/29/2025) |
| 07/29/2025 | 90 | Exhibit List by Ovintiv USA, Inc... (Attachments: # 1 Exhibit Exhibit List)(Hogan, Christopher) (Entered: 07/29/2025) |
| 07/29/2025 | 91 | Proposed Findings of Fact by Ovintiv USA, Inc. . (Hogan, Christopher) (Entered: 07/29/2025) |
| 07/29/2025 | 92 | Pretrial Disclosures *Plaintiff's Local Rule CV-16(f) Pretrial Disclosures* by McCully-Chapman Exploration, Inc.. (Attachments: # 1 Exhibit A, Stipulated Facts, # 2 Exhibit B, Exhibit List, # 3 Exhibit C, Witness List, # 4 Exhibit D, Page-Line Designations, # 5 Exhibit E, Proposed Findings of Fact and Conclusions of Law)(Brister, Austin) (Entered: 07/29/2025) |
| 07/30/2025 | 93 | Joint MOTION *TO DEFER CONSIDERATION OF DAMAGES* by Ovintiv USA, Inc.. (Attachments: # 1 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Hogan, Christopher) (Entered: 07/30/2025) |
| 07/30/2025 | | Text Order GRANTING 93 Joint Motion to Defer Consideration of Damages. Counsel for both Parties have met and conferred and believe that the issue of damages in the above-captioned case is best resolved after a determination on liability. The Court agrees and finds that deferring consideration of damages will assist in the efficient resolution of |

| | | |
|---|---|---|
| | | this case; streamline trial; conserve client resources; and promote judicial economy. This Court therefore ORDERS that, if briefing on damages in necessary, Plaintiff shall submit a brief on damages, including attorneys fees, within 30 DAYS of this Courts entry of Findings of Fact and Conclusions of Law. Defendant shall submit a response, if any, 14 DAYS thereafter, and Plaintiffs may reply within 7 DAYS after that. Entered by Judge David Counts. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dhlc) (Entered: 07/30/2025) |
| 08/01/2025 | 94 | ORDER SETTING FINAL PRETRIAL HEARING, (Pretrial Conference set for **8/19/2025 10:30 AM** in Midland before Judge David Counts). Signed by Judge David Counts. (kg) (Entered: 08/01/2025) |
| 08/05/2025 | 95 | ORDER DENYING OVINTIVS MOTION FOR PARTIAL SUMMARY JUDGMENT. Signed by Judge David Counts. (kg) (Entered: 08/05/2025) |
| 08/05/2025 | 96 | ORDER MOOTING 75 REPORT AND RECOMMENDATIONAND MOTION FOR JUDGMENT ON PLEADINGS. Signed by Judge David Counts. (kg) (Entered: 08/05/2025) |
| 08/05/2025 | 97 | Witness List by McCully-Chapman Exploration, Inc.. (Salas, M.) (Entered: 08/05/2025) |
| 08/05/2025 | 98 | Exhibit List *(First Amended)* by McCully-Chapman Exploration, Inc... (Salas, M.) (Entered: 08/05/2025) |
| 08/07/2025 | 99 | ORDER DENYING 57 Motion for Partial Summary Judgment. Signed by Judge David Counts. (kg) (Entered: 08/07/2025) |
| 08/12/2025 | 100 | Miscellaneous Objection *TO PLAINTIFFS FIRST AMENDED EXHIBIT LIST*. (Hogan, Christopher) (Entered: 08/12/2025) |
| 08/12/2025 | 101 | Miscellaneous Objection *TO PLAINTIFFS DEPOSITION DESIGNATIONS*. (Hogan, Christopher) (Entered: 08/12/2025) |
| 08/12/2025 | 102 | Supplemental MOTION in Limine .. Motions referred to Judge Ronald C. Griffin. (Hogan, Christopher) (Entered: 08/12/2025) |
| 08/12/2025 | 103 | Response in Opposition to Motion *in Limine* (Brister, Austin) (Entered: 08/12/2025) |
| 08/12/2025 | 104 | RESPONSE *OBJECTION TO PLAINTIFFS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MOTION TO DISMISS FOR LACK OF NECESSARY PARTIES*. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Hogan, Christopher) Modified event type on 8/20/2025 (slt). (Entered: 08/12/2025) |
| 08/12/2025 | 105 | Miscellaneous Objection *to Ovintivs Exhibit List*. (Brister, Austin) (Entered: 08/12/2025) |
| 08/12/2025 | 106 | Exhibit List *Second Amended*. (Brister, Austin) (Entered: 08/12/2025) |
| 08/18/2025 | 107 | Miscellaneous Objection *TO PLAINTIFF'S SECOND AMENDED EXHIBIT LIST*. (Hogan, Christopher) (Entered: 08/18/2025) |
| 08/18/2025 | 108 | Exhibit List *Revised Second Amended*. (Eason, Marcus) (Entered: 08/18/2025) |
| 08/18/2025 | 109 | Miscellaneous Objection *MCE's Revised Objections to Ovintiv's Exhibit List*. (Eason, Marcus) (Entered: 08/18/2025) |
| 08/18/2025 | 110 | RESPONSE *to Defendants Objection to Plaintiffs Proposed Findings of Fact and Conclusions of Law and Motion to Dismiss for Lack of Necessary Parties*. (Eason, Marcus) (Entered: 08/18/2025) |

| | | |
|---|---|---|
| 08/18/2025 | 111 | Response in Opposition to Motion *in Limine* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Eason, Marcus) (Entered: 08/18/2025) |
| 08/19/2025 | 112 | Minute Entry for proceedings held before Judge David Counts: Final Pretrial Hearing held on 8/19/2025 (Minute entry documents are not available electronically). (Court Reporter Tamara Ross)(slt) (Entered: 08/20/2025) |
| 08/20/2025 | 113 | ORDER GRANTING 89 Motion in Limine; GRANTING 102 Motion in Limine; GRANTING 104 Motion. Signed by Judge David Counts. (slt) (Entered: 08/20/2025) |
| 08/21/2025 | 114 | Witness List *First Amended*. (Hogan, Christopher) (Entered: 08/21/2025) |
| 08/21/2025 | 115 | Proposed Findings of Fact *First Amended*. (Hogan, Christopher) (Entered: 08/21/2025) |
| 08/25/2025 | 116 | Transcript filed of Proceedings held on 8/19/25, Proceedings Transcribed: Final Pretrial Conference. Court Reporter: Tamara Ross, Telephone number: 4326850346. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 9/15/2025, Redacted Transcript Deadline set for 9/25/2025, Release of Transcript Restriction set for 11/24/2025, (Ross, Tamara) (Entered: 08/25/2025) |
| 08/28/2025 | 117 | Opposed MOTION *to Modify Stipulated Facts or, Alternatively, Motion to Retract Certain Stipulations* by McCully-Chapman Exploration, Inc.. (Attachments: # 1 Exhibit A1, # 2 Exhibit A2, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F). Motions referred to Judge Ronald C. Griffin. (Salas, M.) (Entered: 08/28/2025) |
| 08/29/2025 | 118 | Unopposed Motion for leave to File Sealed Document. Referral Judge: Ronald C. Griffin. (Attachments: # 1 Proposed Order, # 2 Exhibit B SEALED DOCUMENT, # 3 Exhibit C SEALED DOCUMENT, # 4 Exhibit D SEALED DOCUMENT) (Brister, Austin) (Entered: 08/29/2025) |
| 09/01/2025 | 119 | RESPONSE to Motion, filed by Ovintiv USA, Inc., re 117 Opposed MOTION *to Modify Stipulated Facts or, Alternatively, Motion to Retract Certain Stipulations* filed by Plaintiff McCully-Chapman Exploration, Inc. (Hogan, Christopher) (Entered: 09/01/2025) |
| 09/01/2025 | 120 | Exhibit List *Amended* by Ovintiv USA, Inc... (Attachments: # 1 Exhibit Exhibit List)(Hogan, Christopher) (Entered: 09/01/2025) |
| 09/02/2025 | 121 | Minute Entry for proceedings held before Judge David Counts: Bench Trial begun on 9/2/2025 (Minute entry documents are not available electronically.), Bench Trial held on 9/2/2025 (Minute entry documents are not available electronically.). (Court Reporter Tamara Ross.)(kg) (Entered: 09/03/2025) |
| 09/02/2025 | | ORAL MOTION for Judgment as a Matter of Law by Ovintiv USA, Inc. Motions referred to Judge Ronald C. Griffin. (kg) (Entered: 09/03/2025) |
| 09/02/2025 | | ORAL ORDER DENYING ORAL Motion for Judgment as a Matter of Law. Signed by Judge David Counts. (kg) (Entered: 09/03/2025) |
| 09/02/2025 | 122 | Witness List by McCully-Chapman Exploration, Inc., Ovintiv USA, Inc.. (kg) (Entered: 09/04/2025) |
| 09/02/2025 | 123 | |

Exhibit List by McCully-Chapman Exploration, Inc. (kg) (Additional attachment(s) added on 9/4/2025: # 1 Joint Operating Agreement, dated May 1, 1982 (MC Exploration_000007-000032), # 2 L1 Oil and Gas Lease, R. Neal, B. Brusenhan, J. Neal, and Saxon Oil Co. dated March 19, 1980 (MC Exploration_000318-000322), # 3 L2 Oil and Gas Lease, Sohio Petroleum Co. and Saxon Oil Co.; dated January 27, 1982 (MC Exploration _ 000323-000331), # 4 L3 Oil and Gas Lease, Sun Exploration and Production Company to Saxon Oil Company; dated February 3, 1982 (MC Exploration_000475-000483), # 5 Assignment of Oil and Gas Leases, Saxon Oil Co. and Saxon Funds 1981; executed February 5, 1982, recorded as Doc. No. 80541 in Upton County, Texas (MC Exploration _000332-000333/Click_000079Click_000080), # 6 Designation of Oil Units and Release, R. Neal and 8/19/25 - Previously Case 7:24-cv-00018-DC-RCG Document 123 Filed 09/02/25 Page 1 of 16 Saxon Oil Co.; executed April 19, 1982 and effective March 19, 1982 (MC Exploration _ 000334-000335), # 7 Assignment of Oil and Gas Leases, Saxon Oil Co. and Saxon Funds 1981; executed July 9, 1982, recorded as Doc. No. 81184 in Upton County, Texas (MC Exploration_000336-000337/Click_000636Click_000 637, # 8 Corrected Assignment of Oil and Gas Leases, Saxon Oil Co. and Saxon Funds 1981; executed July 14, 1982, recorded as Doc. No. 81233 in Upton County, Texas (MC Exploration_000338-000339/Click_000638Click_000 639), # 9 Assignment of Oil and Gas Leases, Saxon Oil Co. and Axel Johnson Exploration; dated July 14, 1982 (MC Exploration _ 000340-000341), # 10 Affidavit of Corporate Change, executed December 18, 1990 and effective September 28, 1989 (MC Exploration _ 000342), # 11 Assignment, AJ Exploration Corp., E. Lea Crump, and M. Black; executed March 24, 1993 and effective August 31, 1992 (MC Exploration _ 000343), # 12 Assignment, M. Black and Black Family Partnership, LTD; executed August 4, 1994 and effective January 1, 1994 (MC Exploration _ 000344), # 13 Assignment, Bill of Sale and Conveyance, Black Family Partnership, Ltd and Crown Oil Partners, LP; executed June 6, 2003 and effective June 1, 2003 (MC Exploration _ 000345-000350), # 14 Assignment, Bill of Sale and Conveyance, Crown Oil Partners, LP and Crown Oil Partners II, LP; dated September 29, 2003, effective September 15, 2003 (MC Exploration _ 000351-000356), # 15 Assignment and Bill of Sale, Crown Oil Partners II, LP and Celero Energy LP; dated October 1, 2004 (MC Exploration _ 000357-000383), # 16 Assignment, Bill of Sale and Conveyance, Celero Energy LP and Whiting Oil and Gas Corporation; executed October 4, 2005 and effective July 1, 2005 (MC Exploration _ 000384-000404), # 17 Assignment, Conveyance and Bill of Sale, Whiting Oiland Gas Corp. and McCully Chapman Exploration, Inc.; executed October 26, 2007 and effective December 1, 2007 (MC Exploration _ 000405-000410), # 18 Assignment and Bill of Sale of Overriding Royalty Interest, McCully-Chapman Exploration and M. Chapman; executed December 14, 2007 and effective December 1, 2007. (MC Exploration _ 000411-000412), # 19 Correction of Assignment and Bill of Sale of Overriding Royalty Interest, McCully-Chapman Exploration and M. Chapman; executed February 21, 2008 and effective December 1, 2007 (MC Exploration _ 000413-000414), # 20 Amendment, Extension, Ratification and Revivor of Oil and Gas Leases effective July 24, 2018 (OVINTIV_172755-172771), # 21 Amendment, Extension, Ratification and Revivor of Oil and Gas Leases effective July 24, 2018 (OVINTIV_172789-172805), # 22 Wellbore Assignment and Bill of Sale, McCully Chapman Exploration, Inc. and Aulex LLC, executed January 3, 2022, effective February 1, 2022 (OVINTIV_194610-194613), # 23 Designation of Production Units and Partial Release of Oil and Gas Leases, Ovintiv USA Inc.; dated June 29, 2022 (MC Exploration_000529-000534), # 24 Brashier Crosby, Original Drilling Title Opinion, dated June 23, 2017 (OVINTIV_181982-182120), # 25 Abert Caraway, First Supplemental Drilling & Division Order Title Opinion, dated March 2, 2021 (OVINTIV_182121-182637), # 26 Brusenhan #2 RRC Well Information (Click_000872000883, # 27 Brusenhan #3 RRC Well Information

(Click_000884000890), # 28 Brusenhan #3 Groundwater Protection Determination (Form GW-2)(Click_000905), # 29 Brusenhan #3, Encana Oil & Gas Division Order to McCully-Chapman Exploration dated June 28, 2018 (OVINTIV_184233), # 30 Brusenhan #3, Encana Oil & Gas Division Order to McCully-Chapman Exploration, dated March 14, 2018 (OVINTIV_194541), # 31 Neal 34E 2HF As-Completed Plat (OVINTIV_064053), # 32 Neal 34E 2HF Plat Revised April 22, 2021 (Click_000786), # 33 Neal 34E 2HF Form W-2 Oil Well Potential Test Completion or Recompletion Report and Log (OVINTIV_169271-169274), # 34 Neal 34E 3HL As-Completed Plat (OVINTIV_064054), # 35 Neal 34E 3HL Plat Revised May 28, 2021 (Click_000787), # 36 Neal 34E 3HL Form W-2 Oil Well Potential Test Completion or Recompletion Report and Log (OVINTIV_169308-169311), # 37 Neal 34E 4HE As-Completed Plat (OVINTIV_064055), # 38 Neal 34E 4HE Plat Revised June 2, 2021 (Click_000788), # 39 Neal 34E 4HE Ovintiv Payout Statement (OVINTIV_000088), # 40 Neal 34E 4HE Allocation Calculations (Exhibit 49 to Lindsey Greene Deposition)) (kg). (Additional attachment(s) added on 9/18/2025: # 41 Neal 34E 4HE Allocation Calculations (Exhibit 48 to Lindsey Greene Deposition), # 42 Neal 34G 9HL As-Completed Plat (OVINTIV_064433), # 43 Neal 34G 9HL Plat Revised October 11, 2021 (Click_000819), # 44 Neal 34G 9HL Zoomed-In Plat (Click_001001), # 45 Neal 34X 14HE Revised Plat (OVINTIV_042257/Click_000824), # 46 Neal 34X 15H Plat Revised October 14, 2021 (Click_000825), # 47 Neal 39A 1HD As-Completed Plat (OVINTIV_024670), # 48 Neal 39A 1HD Plat Revised Sept. 24, 2019 (Click_000826), # 49 Neal 39A 1HD Ovintiv Payout Statement (OVINTIV_000060), # 50 Neal 39A 2HF As-Completed Plat (OVINTIV_024671), # 51 Neal 39A 2HF Plat Revised Sept. 24, 2019 (Click_000827), # 52 Neal 39A 2HF Ovintiv Payout Statement (OVINTIV_000059), # 53 Neal 39A 3HL As-Completed Plat (OVINTIV_024672), # 54 Neal 39A 3HL Plat Revised Sept. 24, 2019 (Click_000828), # 55 Neal 39A 4HJ As-Completed Plat (OVINTIV_024673), # 56 Neal 39A 4HJ Plat Revised Sept. 24, 2019 (Click_000829), # 57 Neal 39A 4HJ Ovintiv Payout Statement (OVINTIV_185972), # 58 Neal 39A N5HE As-Completed Plat (OVINTIV_024674), # 59 Neal 39A N5HE Plat Revised Dec. 3, 2019 (Click_000831), # 60 Neal 39A N5HE Ovintiv Payout Statement (OVINTIV_000100), # 61 Neal 39A N5HE Form W-2 Oil Well Potential Test, 8/19/25 - Previously Case 7:24-cv-00018-DC-RCG Document 123 Filed 09/02/25 Page 6 of 16 Completion or Recompletion Report, and Log (OVINTIV_170114-170117), # 62 Neal 39A 5HE Plat Revised November 5, 2019 (Click_00830), # 63 Neal 39A 5HE Form W-2 Oil Well Potential Test, Completion or Recompletion Report, and Log (OVINTIV_175090-175092), # 64 Neal 39B 6HC As-Completed Plat (OVINTIV_024536), # 65 Neal 39B 6HC Plat Revised Sept. 24, 2019 (Click_000832), # 66 Neal 39B 6HC Ovintiv Payout Statement (OVINTIV_000097), # 67 Neal 39B 7HF As-Completed Plat (OVINTIV_024535), # 68 Neal 39B 7HF Ovintiv Payout Statement (OVINTIV_078545), # 69 Neal 39B 8HM Plat Revised Sept. 24, 2019 (Click_000834), # 70 Neal 39B 9HJ As-Completed Plat (OVINTIV_024313), # 71 Neal 39B 9HJ Plat Revised Sept. 24, 2019 (Click_000835), # 72 Neal 39B 9HJ Ovintiv Payout Statement (OVINTIV_000093), # 73 Neal 39B 10HE As-Completed Plat (OVINTIV_024314), # 74 Neal 39B 10HE Plat Revised Sept. 24, 2019 8/19/25 - Previously admitted Case 7:24-cv-00018-DC-RCG Document 123 Filed 09/02/25 Page 7 of 16 (Click_000836)) (kg). (Additional attachment(s) added on 9/18/2025: # 75 Neal 39B 10HE Ovintiv Payout Statement (OVINTIV_000095), # 76 Neal 39C 11HF As-Completed Plat (OVINTIV_024315), # 77 Neal 39C 11HF Plat Revised Sept. 24, 2019 (Click_000837), # 78 Neal 39C 11HF Ovintiv Payout Statement (OVINTIV_000092), # 79 Neal 39C 12HL As-Completed Plat (OVINTIV_024316), # 80 Neal 39C 12HL Plat Revised Sept. 24, 2019 (Click_000838), # 81 Neal 34GG 12HM Plat Revised October 15, 2021 (Click_000822), # 82 Neal 39C 13HJ As-Completed Plat (OVINTIV_025093), # 83 Neal 39C 13HJ Plat Revised Sept. 24, 2019 (Click_000839), # 84 Neal 39C 13HJ Ovintiv Payout Statement (OVINTIV_000099), # 85 Neal 39C 14HE

As-Completed Plat (OVINTIV_024318), # 86 Neal 39C 14HE Plat Revised Sept. 24, 2019 (Click_000840), # 87 Neal 39C 14HE Ovintiv Payout Statement (OVINTIV_000087), # 88 Neal 34D 1HD Topography & Vegetation Plat Revised May 28, 2021 (OVINTIV_185078), # 89 Neal 34D 1HD Plat Revised March 24, 2021 (Click_000785), # 90 Neal 34E 5HD Revised Plat (Click_000814), # 91 Neal 34F 5HM Plat Revised October 3, 2021 (Click_000815), # 92 Section 46, Block 40 Map (Exhibit A The Subject Lands) (Click_000997), # 93 Neal 46 No. 7 Plats (Click_000807, Click_000810), # 94 Email from S. Vargas to L. Greene re Request for DOIs, dated June 17, 2019 (OVINTIV_184192-184193), # 95 Email re Potential Acquisition Opportunities, dated July 29, 2019 (OVINTIV_184203-184204), # 96 Email from O. McMillan to S. Vargas, J. Massie re P-17 Owner List, dated August 1, 2019 (OVINTIV_184211-184212), # 97 Email from O. McMillan to J. Croteau re Copy of SRV of P-17 Owner List, dated August 5, 2019 (OVINTIV_184213- 184214), # 98 Email re Neal 46E WI/NRI, dated August 14, 2019 (OVINTIV_184217-184218), # 99 Email from B. Lindeman to O. McMillan re Neal 46E WI/NRI, dated August 15, 2019 (OVINTIV_184219-184220), # 100 Email from D. McClellan to O. McMillan re Neal 46E WI/NRI, dated August 15, 2019 (OVINTIV_184223-184225), # 101 Email from S. Vargas to O. McMillan re Mcully-Chapman, dated August 21, 2019 (OVINTIV_184230), # 102 Email from S. Vargas to O. McMillan re McCully DO, dated August 21, 2019 (OVINTIV_184231-184240), # 103 Email from O. McMillan to L. Smith re Neal Elections, September 4, 2019 (OVINTIV_184252), # 104 Encanas Well Package Proposal, dated September 17, 2019 (OVINTIV_000831-000889), # 105 Email from L. Smith to O. McMillan re Neal 39A 3HL-Request to Change TVD, dated October 7, 2019 (OVINTIV_184273-184300), # 106 MC Explorations Executed Non-Consent, received September 25, 2019 and executed October 16, 2019 (MC Exploration _000626-000630), # 107 Email from G. Bullock to L. Krenek re Neal Wells, dated October 16, 2019 (MC Exploration _ 000632), # 108 Email from M. Bergero to O.McMillan re Neal 39/46 lease by lease title, dated March 10, 2020 (OVINTIV_184790), # 109 McCully Chapman Letter to Ovintiv re Brusenhan #3, dated August 21, 2020 (OVINTIV_184942-184946), # 110 McCully Chapman Letter to Ovintiv re Brusenhan #3, dated August 21, 2020 (OVINTIV_184950-184953), # 111 Email, O. McMillan, L. Greene, et al, re Brusenhan #3, dated August 31, 2020 (OVINTIV_184923- 184930), # 112 Email from C. Beaumier to O. McMillan re McCully Chapman Exploration LLC - Brusenhan #3, dated November 2, 2020 (OVINTIV_184935- 184940), # 113 Email from O. McMillan to L. Greene re McCully Chapman Exploration LLC - Brusenhan #3, dated November 2, 2020 (OVINTIV_184941-184946), # 114 Ovintivs Well Package Proposal Letter, dated June 23, 2021 (OVINTIV_088097-088100), # 115 Email from G. Bullock to L. Krenek re Neal Wells Proposal, dated July 20, 2021 (MC Exploration _000535), # 116 MC Explorations Executed NonConsent, received, June 29, 2021, executed July 21, 2021 (MC Exploration_000544-000546), # 117 Email from L. Greene to R. Hauck, B. Barret re RTD-Workbooks, dated July 14, 2021 (OVINTIV_185087- 185088), # 118 Email from L. Greene to O. McMillan re Mineral Land RTD-Neal P39 Wells, dated August 12, 2021 (OVINTIV_185102-185105), # 119 Email from L. Greene to M. Chavez re Workbook, dated October 21, 2021 OVINTIV_185598- 185599), # 120 Email from L. Greene to S. Maes, O. McMillan re Neal 34 Wells JOA, dated November 22, 2021 (OVINTIV_ 185606-185609), # 121 Email from S. Maes to L. Greene re Neal JOAs, dated November 18-22, 2021 (OVINTIV_185610- 185613)) (kg). (Additional attachment(s) added on 9/18/2025: # 122 Email from L. Greene re Neal DOI Spreadsheets, dated January 18, 2022 (OVINTIV_186317- 186318), # 123 Email from L. Greene to M. Chavez re Neal WI, dated January 26, 2022 (OVINTIV_185646-185647), # 124 Email from L. Krenek to B. Foran re Non-Consent Wells (MC Exploration_0001005-0001012), # 125 Email from J. Sellyei re Co-Tenant Report, dated April 29, 2022 (OVINTIV_185695-185698), # 126 Email from A. Jones to E. Burkhalter re New Non-Consent Wells, dated March 15, 2023

| | | |
|---|---|---|
| | | (MC Exploration_0001100-0001101), # 127 Email from L. McGlynn to L. Greene re Lunch Invite to Discuss Texas Non-Consent Wells, dated April 6, 2023 (OVINTIV_185877- 185894), # 128 Email from R. Gingell to W. McMillan and L. Greene, re Requested Legal Memo dated April 13, 2023 (MC Exploration_000033-000036), # 129 Email and Letter from B. Foran to O. McMillan re MC Exploration Interests Owed, dated May 8, 2023 (MC Exploration_000001-000006), # 130 Email Correspondence from L. Greene to O. McMillan re Spearpoint Documents, dated May 11, 2023 (OVINTIV_185928-185929), # 131 Email from M. Chavez to L. Glynn, M. Chavez re Neal Wells Payout Status, dated May 15, 2023 (OVINTIV_185935-185936), # 132 Email from L. Greene to L. Glynn, M. Chavez re Neal Wells Payout Status, dated May 15, 2023 (OVINTIV_185943-185945), # 133 Email from L. McGlynn to L. Greene re [po987RE: Neal Wells Payout Status, dated May 18, 2023 (OVINTIV_185956-185959), # 134 Email from L. Greene to M. Chavez re Neal Well Payout Change for Spearpoint, dated May 22, 2023 (OVINTIV_185964, # 135 Email from L. McGlynn to L. Greene re Neal Well Payout Change for Spearpoint, dated May 23, 2023 (OVINTIV_185965- 185969), # 136 Email from L. Greene to M. Chavez re : Neal Well Payout Change for Spearpoint, dated May 23, 2023 (OVINTIV_185970-185974), # 137 Email from L. Greene to O. McMillan re Spearpoint Email, dated May 23, 2023 (OVINTIV_185975-185998), # 138 Email from L. McGlynn to L. Greene re Neal Well Payout Change for Spearpoint, dated May 23, 2023 (OVINTIV_185999-186000), # 139 Email from L. Greene to B. Foran, R. Gingell, A. Jones re May 11 Meeting Follow-up, dated May 24, 2023 (OVINTIV_169834-169837), # 140 Email from L. Green to M. Bergeron re Neal 39B 9HJ and Neal 29A 4HJ Payouts, dated May 26, 2023 (OVINTIV_186001-186005), # 141 Spearpoint Letter re Title Chain of Ownership with Enclosures, dated August 3, 2023 (MC Exploration _ 000235-000317), # 142 J. Clicks Search Criteria (Click_000978-000991), # 143 Specific Lease Query; Brusenhan Lease Production and Disposition Nov. 2012-Nov. 2024. (Click_0001838-0001840), # 144 A.A.P.L. Form 610 -2015 Model Form Operating Agreement (Exhibit I to Plaintiffs Partial Motion for Summary Judgment, ECF 57-9), # 145 Article of Incorporation of Minor Resources, Inc. (Exhibit A to Response to Defendants Partial Motion for Summary Judgment, ECF 64-1), # 146 Article of Amendment to the Articles of Incorporation of Minor Resources, Inc. (Exhibit B to Response to Defendants Partial Motion for Summary Judgment, ECF 64-2), # 147 Section 46 Map (Exhibit 4 to Bill Foran Deposition), # 148 Printed Map (Exhibit 26 to Roger Gingell Deposition), # 149 Printed Map (Exhibit 28 to Roger Gingell Deposition), # 150 Blazing Saddles State B 314H Operating Agreement dated January 1, 2024 (MC Exploration_001358 MC Exploration_001431, # 151 Rio Lobo Operating Agreement dated January 1, 2024 (MC Exploration_001432MC Exploration_001522)) (kg). (Entered: 09/04/2025) |
| 09/02/2025 | 124 | Exhibit List by Ovintiv USA, Inc.(kg) (Additional attachment(s) added on 9/18/2025: # 1 May 1, 1982 Joint Operating Agreement, # 2 September 17, 2019 Well Proposal Letter with McCully's NonConsent Electio) (kg). (Additional attachment(s) added on 10/30/2025: # 3 September 17, 2019 Well Package Proposal to McCully, # 4 June 23, 2021 Well Proposal Letter with McCully's NonConsent Elections, # 5 October 16, 2019 Email from Bullock to Krenek, # 6 July 20, 2021 Email from Bullock to Krenek, # 7 Neal 39 Horizontal Well As-Proposed Survey Plats, # 8 Neal 34 Horizontal Well As-Proposed Survey Plats, # 9 August 11, 2022 Email from Krenek to Foran, # 10 August 25, 2022 Equity Purchase Agreement between Cheryl Mellenthin and Spearpoint Resources Company, # 11 June 23, 2021 Neal 34 Well Proposal Letter with McCully's Non-Consent Election, # 12 March 19, 1980 Oil and Gas Lease, # 13 January 27, 1982 Oil and Gas Lease, # 14 February 3, 1982 Oil and Gas Lease, # 15 April 19, 1982 Designation of Oil Units and Release, # 16 February 4, 2009 Release, # 17 April 17, 2013 Partial Release of Oil and Gas Lease, # 18 February 12, 2013 Partial Release of Oil and Gas Lease, # 19 |

August 28, 2010 Oil and Gas Lease Agreement, # 20 June 11, 2012 Oil, Gas and Associated Hydrocarbons Lease, # 21 September 10, 2010 Oil, Gas and Mineral Lease Paid-Up, # 22 November 20, 2012 Oil and Gas Lease, # 23 August 28, 2010 Correction to Oil and Gas Lease) (kg). (Additional attachment(s) added on 10/30/2025: # 24 September 10, 2010 Correction to Oil and Gas Lease, # 25 July 24, 2018 Amendment, Extension, Ratification and Revivor of Oil nad Gas Leases, # 26 July 24, 2018 Amendment, Extension, Ratification and Revivor of Oil nad Gas Leases, # 27 August 21, 2020 McCully Letter to Ovintiv Re: Brusenhan No.3 with 9/10/2020 and 10/22/2020 attachments, # 28 August 21, 2020 McCully Letter to Ovintiv Re: Brusenhan No. 3 with 1/19/2021 attachment, # 29 March 2, 2021 Albert Caraway letter to Ovintiv Re: Neal 34 Wells, # 30 Neal 34F 6 HD "As-Drilled" Survey, # 31 Neal 34X 14 HE "As-Drilled" Survey, # 32 Neal 34E 5HD Survey, # 33 Neal 34GG 12HM Survey, # 34 Neal 39A 5HE Survey, # 35 Neal 34F 6HD "As-Complete" Survey, # 36 Neal 34X 14HE "As-Complete" Survey, # 37 Neal 39A N5HE "As-Complete" Survey, # 38 Neal 34GG 12HE Survey, # 39 Authorization for Expenditure (NEAL 34F 6HD), # 40 Authorization for Expenditure (NEAL 34X 14HE), # 42 Authorization for Expenditure (NEAL 34F 7HJ), # 43 Authorization for Expenditure (NEAL 34E 4HE), # 44 October 21, 2021 RRC Permit to Drill, # 45 October 21, 2021 RRC Permit to Drill, # 46 December 6, 2019 RRC Permit to Drill, # 47 Horizontal W-2s, Combined, # 48 Authorization for Expenditure (Neal 39B 9HJ), # 49 April 13, 2023 Email from Gingell to McMillian, Greene, Jones, and Foran re: Requested Legal Memo, # 50 October 16, 2019 Email from Bullock to Krenek re: Neal 39A 1HD, et al., # 51 Authorization of Expenditure (Neal 39B 9HJ), # 52 Authorization of Expenditure (Neal 39C 11HF), # 53 Neal 39 Proposal Plats Combined, # 54 Neal 39A N5HE Survey, # 55 December 2, 2019 Encana Letter to RRC re: Form W-3A Request to Plug and Abandon Originally Set Surface Casing, # 56 Neal 34F 6HD Survey, # 57 Neal 34X 14HE Survey, # 58 December 2, 2019 Encana Letter to RRC, # 59 Neal Horizontal Well "As-Complete" Surveys, # 60 December 14, 1981 Brusenhan Forms W-2s and W-3, # 61 RRC Production Records for Brusenhan Lease, # 62 Enverus Well Card for Brusenhan No. 2, # 63 Brusenhan Well Status Reports, # 64 Brusenhan Proration Schedules, # 65 July 9, 2018 Email from Owen McMillian to Jessie@jnealproperties, # 66 April 10, 2013 AFE MEO_1303001) (kg). (Additional attachment(s) added on 10/30/2025: # 67 September 13, 2013 AFE MEO_1307001, # 68 September 13, 2013 Elections, # 69 April 14, 2014 ProPetro Report, # 70 November 21, 2013 AFE MEO_1310004, # 71 November 21, 2013 Elections, # 72 Neal 46 Production Spreadsheet, # 73 September 1, 2021 Pre-Spud Presentation: Neal 39 P34 I&J, # 74 Huddleston Workpaper, Spreadsheet, # 75 Railroad Commission 2012 Examiner's Report and Recommendation, # 76 "Notes for Spearpoint" Spreadsheet, # 77 Payment Summary and Details, # 78 Revenue Neal Request Spreadsheet, # 79 Well WI & NRI, # 80 Neal FINAL WI 01.2022, # 81 Interest Rollups) (kg). (Additional attachment(s) added on 10/30/2025: # 82 Interest Rollups, # 83 Interest Rollups, # 84 Interest Rollups, # 85 Interest Rollups, # 86 Interest Rollups, # 87 Interest Rollups, # 88 Interest Rollups, # 89 Interest Rollups, # 90 Interest Rollups, # 91 Interest Rollups, # 92 July 6, 2023 Division Order, # 93 March 15, 2023 Email from Jones to Burkhalter re: New NonConsent Wells, # 94 May 24, 2023 Email from Greene to Foran, Gingell, Jones re: May 11 Meeting, # 95 Gingell Letter to Greene and McMillan, # 96 June 10, 2015 RRC Letter to Encana, # 97 March 19, 2014, P-6, # 98 December 22, 1952 RRC Special Order, # 99 Encana End of Well Report (Neal 39A 5HE), # 100 Neal 34E 5HD "As-Complete" Survey, # 101 October 15, 2019 Email from Krenek to McMillan re: Encana Neal 39 Wells - Upton County Elections, # 102 March 2, 2022 Email from Greene to McGlynn re: Neal 39A 1HD - JOA 934664 Saxton, # 103 May 26, 2023 Email from Greene to Bergeron and Chavez re: Neal 39B 9HJ and Neal 29A 4HJ Payouts, # 104 November 3, 2020 Email from Peters to McMillan, Pacheco, and Greene re: Brusenhan 3, # 105 March 20, 2014 Request for Permission to Subdivide or Consolidate Oil Lease(s), # 106 July 28, 2012 AFE_1208001, # 107 May 8,

| | | |
|---|---|---|
| | | 2023 Email from Foran to McMillian, Greene, and Gingell re: McCully Chapman Interests, # 108 Plaintiff 's Objections and Responses to Defendant's Fourth Set of Discovery Requests, # 109 Well Revenue Spreadsheet, # 110 Compilation of Tax Certificates, # 111 Compilation of Tax Statements, # 112 Compilation of Check Transmittals, # 113 Compilation of Tax Receipts, # 114 Merit Advisors, 2015 Tax Report, # 115 Merit Advisors, 2016 Tax Report, # 116 Merit Advisors, 2018 Tax Report, # 117 Combined Payout Statements) (kg). (Entered: 09/04/2025) |
| 09/03/2025 | | Text Order DENYING 117 Motion to Amend Stipulations. This text order memorializes the Court's ruling on the Motion on the record at trial. Entered by Judge David Counts. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dhlc) (Entered: 09/03/2025) |
| 09/03/2025 | | Text Order DENYING AS MOOT 118 Motion for Leave to File Sealed Document. Because the underlying Motion was denied, the Court need not grant the request. Entered by Judge David Counts. (This is a text-only entry generated by the court. There is no document associated with this entry.) (dhlc) (Entered: 09/03/2025) |
| 09/03/2025 | 125 | Minute Entry for proceedings held before Judge David Counts: Bench Trial completed on 9/3/2025 (Minute entry documents are not available electronically.). (Court Reporter Tamara Ross.)(kg) (Entered: 09/04/2025) |
| 09/12/2025 | 126 | Transcript filed of Proceedings held on 9/2/25, Proceedings Transcribed: Bench Trial - Day 1. Court Reporter: Tamara Ross, Telephone number: 4326850346. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 10/3/2025, Redacted Transcript Deadline set for 10/14/2025, Release of Transcript Restriction set for 12/11/2025, (Ross, Tamara) (Entered: 09/12/2025) |
| 09/12/2025 | 127 | Transcript filed of Proceedings held on 9/3/25, Proceedings Transcribed: Bench Trial - Day 2. Court Reporter: Tamara Ross, Telephone number: 4326850346. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 10/3/2025, Redacted Transcript Deadline set for 10/14/2025, Release of Transcript Restriction set for 12/11/2025, (Ross, Tamara) (Entered: 09/12/2025) |
| 09/17/2025 | 128 | TRIAL BRIEF *POST-TRIAL BRIEFING* by Ovintiv USA, Inc.. (Hogan, Christopher) (Entered: 09/17/2025) |
| 09/25/2025 | 129 | BRIEF *Post-Trial* by McCully-Chapman Exploration, Inc.. (Brister, Austin) (Entered: 09/25/2025) |
| 10/03/2025 | 130 | Proposed Findings of Fact by McCully-Chapman Exploration, Inc.. (Brister, Austin) (Entered: 10/03/2025) |
| 10/03/2025 | 131 | Proposed Findings of Fact by Ovintiv USA, Inc. . (Hogan, Christopher) (Entered: 10/03/2025) |

| | | |
|---|---|---|
| 10/03/2025 | 132 | NOTICE *OF TRANSCRIPT REDACTION REQUEST* by Ovintiv USA, Inc. re 127 Transcript Filed,,, (Hogan, Christopher) (Entered: 10/03/2025) |
| 01/14/2026 | 133 | MOTION to Withdraw as Attorney by Ovintiv USA, Inc.. (Attachments: # 1 Proposed Order). Motions referred to Judge Ronald C. Griffin. (Ezelle, Savannah) (Entered: 01/14/2026) |
| 01/15/2026 | | Text Order GRANTING 133 Motion to Withdraw as Attorney. It is ORDERED that Savannah L. Ezelle is permitted to withdraw as counsel of record for Ovintiv USA, Inc. It is so ORDERED. Entered by Judge David Counts. (This is a text-only entry generated by the court. There is no document associated with this entry.) (db) (Entered: 01/15/2026) |
| 01/26/2026 | 134 | Redacted Transcript filed re: 126 Transcript. (Ross, Tamara) (Entered: 01/26/2026) |
| 03/18/2026 | 135 | FINDINGS OF FACT AND CONCLUSIONS OF LAW. Signed by Judge David Counts. (kg) (Entered: 03/19/2026) |
| 03/21/2026 | 136 | FINAL JUDGMENT in favor of Defendant against Plaintiff. Signed by Judge David Counts. (kg) (Entered: 03/23/2026) |
| 04/20/2026 | 137 | Appeal of Final Judgment 136 by McCully-Chapman Exploration, Inc.. ( Filing fee $ 605 receipt number ATXWDC-21797037) (Brister, Austin) (Entered: 04/20/2026) |
| 04/20/2026 | | NOTICE OF APPEAL following 137 Notice of Appeal (E-Filed) by McCully-Chapman Exploration, Inc.. Filing fee $ 605, receipt number ATXWDC-21797037. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out a (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (kg) (Entered: 04/21/2026) |
| 04/27/2026 | 138 | Appeal of Final Judgment 136 by Ovintiv USA, Inc.. ( Filing fee $ 605 receipt number ATXWDC-21838778) (Hogan, Christopher) (Entered: 04/27/2026) |
| 04/27/2026 | | NOTICE OF APPEAL following 138 Notice of Appeal (E-Filed) by Ovintiv USA, Inc.. Filing fee $ 605, receipt number ATXWDC-21838778. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out a (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (kg) (Entered: 04/28/2026) |
| 05/01/2026 | 139 | TRANSCRIPT REQUEST by McCully-Chapman Exploration, Inc. for dates of 09/02/2025 - 09/03/2025. Proceedings Transcribed: Yes. Court Reporter: Tamara D. Ross.. (Brister, Austin) (Entered: 05/01/2026) |
| 05/28/2026 | 140 | TRANSCRIPT REQUEST by Ovintiv USA, Inc. for dates of August 19, 2025; September 2, 2025; September 3, 2025. Proceedings Transcribed: Final Pretrial Conference; Trial Day 1; Trial Day 2. Court Reporter: Tamara D. Ross.. (Hogan, Christopher) (Entered: 05/28/2026) |

# TAB 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **MCCULLY-CHAPMAN EXPLORATION, INC.,** *Plaintiff,* | § § § | |
| **v.** | § § | **MO 7:24-CV-00018-DC** |
| **OVINTIV USA, INC.,** *Defendant.* | § § § | |

**NOTICE OF APPEAL**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff McCully-Chapman Exploration, Inc. (“Plaintiff” or “MC Exploration”) hereby gives notice that it appeals to the United States Court of Appeals for the Fifth Circuit from the Final Judgment entered on March 23, 2026 [ECF No. 136], and from all orders and rulings that merged into or are subsumed by that judgment, including but not limited to the Court’s Findings of Fact and Conclusions of Law entered on March 18, 2026 [ECF No. 135].

Dated: April 20, 2026

Respectfully submitted,

*/s/ Austin W. Brister*

Austin W. Brister
State Bar No. 24080804
Marcus V. Eason
State Bar No. 24092374
Ashley N. Vega
State Bar No. 24110478
MCGINNIS LOCHRIDGE LLP
609 Main Street, Suite 2800
Houston, Texas 77002
(713) 615-8500 (t)
(713) 615-8585 (f)
*abrister@mcginnislaw.com*
*meason@mcginnislaw.com*
*avega@mcginnislaw.com*

M. Alejandra Salas
State Bar No. 24110318
MCGINNIS LOCHRIDGE LLP
1111 W. 6th Street, Building B, Suite 400
Austin, Texas 78703
(512) 495-6022 (t)
(512) 505-6322 (f)
*asalas@mcginnislaw.com*

**ATTORNEYS FOR PLAINTIFF MCCULLY-CHAPMAN EXPLORATION, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this document has been served on all parties of record on April 20, 2026 in accordance with the Federal Rules of Civil Procedure.

*/s/ M. Alejandra Salas*
M. Alejandra Salas

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| MCCULLY – CHAPMAN EXPLORATION, INC.,<br>*Plaintiff*,<br><br>v.<br><br>OVINTIV USA, INC.,<br>*Defendant*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 7:24-CV-18-DC-RCG |

**NOTICE OF CONDITIONAL CROSS-APPEAL**

COMES NOW Defendant Ovintiv USA, Inc., and hereby gives notice of its conditional cross appeal of the Court's Findings of Fact and Conclusions of Law entered on March 18, 2026 [ECF No. 135], the resulting Final Judgment entered on March 21, 2026 [ECF No. 136], and any other orders and rulings that merged into or are subsumed by that judgment to the extent adverse to Ovintiv, including without limitation the Court's ruling regarding Ovintiv's affirmative defense of ratification.

Said appeal is made to the United States Court of Appeals for the Fifth Circuit. Plaintiff McCully-Chapman Exploration, Inc. previously filed its Notice of Appeal on April 20, 2026 [ECF No. 137]. This Notice is timely under Federal Rule of Appellate Procedure 4(a)(3).

Dated: April 27, 2026

Respectfully submitted,

**HOGAN THOMPSON SCHUELKE LLP**

By: */s/ Christopher M. Hogan*
Christopher M. Hogan
Texas Bar No. 24065434
chogan@hoganthompson.com
James A. Schuelke
Texas Bar No. 24075037
jschuelke@hoganthompson.com
Samantha L. Thompson
Texas Bar No. 24102568
sthompson@hoganthompson.com
1001 Fannin Street, Suite 4775
Houston, Texas 77002
Telephone: (713) 671-5630
Facsimile: (713) 671-5632

***Counsel for Defendant Ovintiv USA, Inc.***

**CERTIFICATE OF SERVICE**

On April 27, 2026, the above document was served on all counsel of record for the parties in accordance with the Federal Rules of Civil Procedure.

*/s/ Christopher M. Hogan*
Christopher M. Hogan

# TAB 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **MCCULLY-CHAPMAN EXPLORATION, INC.,** *Plaintiff,* | § | |
| **v.** | § | **MO:24-CV-00018-DC** |
| **OVINTIV USA, INC.,** *Defendant.* | § | |

**FINAL JUDGMENT**

Pursuant to the Court's Findings of Fact and Conclusions of Law (Doc. 135) entered on March 18, 2026, final judgment is entered in favor of Defendant Ovintiv USA Inc. and against Plaintiff McCully-Chapman Exploration, Inc. on all claims. Plaintiff McCully-Chapman Exploration, Inc. shall take nothing on its claims.

It is so **ORDERED**.

SIGNED this 21st day of March, 2026.

DAVID COUNTS
UNITED STATES DISTRICT JUDGE

# TAB 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **MCCULLY-CHAPMAN EXPLORATION, INC.,** *Plaintiff,* | § | |
| | § | |
| **v.** | § | **MO:24-CV-00018-DC** |
| | § | |
| **OVINTIV USA, INC.,** *Defendant.* | § | |

**FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

**FINDINGS OF FACT**

***The Parties***

1. McCully-Chapman Exploration, Inc. ("McCully") and Ovintiv USA, Inc. ("Ovintiv") are the "Parties" to this lawsuit. Doc. 92-1 ¶ 1.

2. McCully is a corporation organized under the laws of the State of Texas with its principal place of business in Houston, Texas. *Id.* ¶ 2.

3. Ovintiv is a corporation organized under the laws of the State of Delaware with its principal place of business in Denver, Colorado. *Id.* ¶ 3.

4. Ovintiv was previously named Encana Oil & Gas (USA) Inc. ("Encana"). In January 2020, Encana renamed itself Ovintiv. *Id.* ¶ 4.

5. Ovintiv is a successor-by-merger of Athlon Holdings LP and Athlon Energy Inc. (collectively, "Athlon"). The Athlon merger closed in 2015. *Id.* ¶ 5.

6. McCully experienced a change of ownership and management in 2022, when Spearpoint Resources ("Spearpoint") acquired 100% of the equity interests in McCully from Cheryl Mellenthin. *Id.* ¶ 6.

***The Neal Wells and the Parties' Interests in Section 46***

7. Ovintiv drilled the following horizontal wells through Section 46:

| WELL NAME | API | SPUD DATE | PRODUCING STATUS | BALLOT |
|---|---|---|---|---|
| NEAL 34E 4HE | 4246141759 | 8/5/2021 | ACTIVE | June 2021 |
| NEAL 34F 8HE | 4246141764 | 8/8/2021 | ACTIVE | June 2021 |
| NEAL 34G 10HD | 4246141766 | 8/9/2021 | ACTIVE | June 2021 |
| NEAL 34X 15HD | 4246141921 | Original: 8/11/2021 | ACTIVE | June 2021 |
| NEAL 39A 1HD | 4246141275 | 9/21/2019 | ACTIVE | September 2019 |
| NEAL 39A 2HF | 4246141276 | 9/20/2019 | ACTIVE | September 2019 |
| NEAL 39B 6HC | 4246141280 | 9/15/2019 | ACTIVE | September 2019 |
| NEAL 39B 7HF | 4246141281 | 9/16/2019 | ACTIVE | September 2019 |
| NEAL 39B 10HE | 4246141284 | 9/16/2019 | ACTIVE | September 2019 |
| NEAL 39C 11HF | 4246141285 | 9/24/2019 | ACTIVE | September 2019 |
| NEAL 39C 14HE | 4246141288 | 9/21/2019 | ACTIVE | September 2019 |
| NEAL 34F 6HD | 4246141762 | 8/7/2021 | ACTIVE | No |
| NEAL 34X 14HE | 4246141770 | 8/10/2021 | ACTIVE | No |
| NEAL 39A N 5HE | 4246141378 | 11/22/2019 | ACTIVE | No |
| NEAL 39A 4HJ | 4246141278 | 9/19/2019 | ACTIVE | September 2019 |
| NEAL 39B 9HJ | 4246141283 | 9/6/2019 | ACTIVE | September 2019 |
| NEAL 39C 13HJ | 4246141287 | 9/22/2019 | ACTIVE | September 2019 |

*See id.* ¶ 25 (corrected).

8. Ovintiv owns working interests in Sections 2, 34, 39, and Section 46, Block 40, T5S, T&P, RR Co. Survey, A-1280, Upton County, Texas ("Section 46"). *See id.*

9. McCully owns working interests in Section 46, but its working interests are limited to certain depths. *See id.* ¶¶ 7–12, 15–18. McCully does not own an interest in Sections 2, 34, or 39. *Id.* ¶ 29.

10. Ovintiv, relying on title opinions obtained in the ordinary course of business, has never credited McCully with any working interest in the following wells: Neal 34E 2HF, Neal 34E 3HL, Neal 34F 5HM, Neal 34F 7HJ, Neal 34G 11HF, Neal 34G 9HL, Neal 34GG 12HM, Neal 34X 13HJ, Neal 39A 3HL, and Neal 39C 12HL. *See id.* ¶¶ 25, 43, 45. These wells are not at issue here.

11. The Neal Wells at issue in this case were all drilled through Section 46 from surface locations on neighboring lands, which the Parties refer to as "Section 34" and "Section 39." *Id.* ¶ 27. The Neal Wells all have perforations within and produce from Sections 34, 39, and 46. Some of the wells also have perforations within and produce from Section 2. *Id.*

12. The Joint Operating Agreement at issue (the "JOA") is dated May 1, 1982. Ex. D-1. Both McCully and Ovintiv are successor parties to the JOA. *Id.* ¶ 31. McCully is a successor-in-interest to original JOA party Axel Johnson Exploration and Production Company. *Id.* Ovintiv is successor-in-interest to original JOA party Saxon Oil Company. *Id.*

13. The JOA is written on a form operating agreement prepared and promulgated by the American Association of Petroleum Landmen (the "AAPL") in or around 1977. *See* Ex. D-1. The original parties to the JOA did not modify the AAPL's model form in any material manner.

14. Ovintiv is the Operator under the JOA, and McCully is the Non-Operator. Doc. 92-1 ¶ 32.

15. As is customary, the JOA contains "non-consent penalty" provisions. These provisions apply when one party exercises the right not to participate in a drilling operation.

The non-consenting party declines to contribute any upfront costs and thereby avoids the risk of a potential failed operation, but it also gives up the right to share in proceeds from the well until the participating parties recoup a pre-set multiple of certain costs. The non-consent provisions incentivize the parties to share the costs and risks of development activities, while leaving each party free to opt out of operations it perceives to be ill-advised or insufficiently lucrative. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 665 (Tex. 2005) ("If all working interest owners shared equally in production revenues from subsequent projects, whether they consented or not . . . the incentives would strongly favor not consenting because, [in the absence of the "penalties"], a non-consenting party would be able to reap the rewards of new operations without incurring any expense.").

16. The JOA "Contract Area" includes Section 46 from the surface to the base of the Dean formation. Doc. 92-1 ¶ 35. The Contract Area does not encompass Sections 2, 34, or 39. *See id.* The Contract Area includes other, non-contiguous tracts of land not at issue here.

17. The JOA does not apply to wells that have perforations only in the Wolfcamp formation (which is deeper than the Dean formation), including the Neal 39A 4HJ, Neal 39B 9HJ, and Neal 39C 13HJ Wells. *Id.* ¶¶ 34, 43–45. Ovintiv is not applying the non-consent penalties to these so-called "Wolfcamp Wells," as they are not directly at issue. *See id.*

18. The parties have sometimes referred to all of the above-listed horizontal wells drilled across Section 46 as the Neal Wells or the Neal Horizontal Wells. For clarity, the term "Neal Wells" is used herein to refer only to those wells (1) producing from the Contract

Area (*i.e.*, not the Wolfcamp Wells); (2) for which McCully has asserted a claim; and (3) in which McCully has a recognized working interest.

19. The JOA's Preamble includes a broad purpose: to "explore and develop" the parties' interests in the Contract Area "for the production of oil and gas." Ex. D-1 at Preamble. The Neal Wells develop, traverse, and produce minerals from the Contract Area.

20. McCully does not dispute the reasonableness of the actual costs incurred by Ovintiv and other participants to drill, complete, equip, and operate the Neal Wells. Doc. 92-1 ¶ 30.

21. Each party is "responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area." Ex. D-1 art. VII.A.

22. The JOA expressly applies to "any well on the Contract Area." Ex. D-1 art. VI.B. The Neal Wells are "wells," and at least part of those wells are "on" the Contract Area. The JOA uses the term "well" repeatedly, without modifiers. *See generally id.*

23. The JOA provides that parties own their share of oil and gas "from the Contract Area," *id.* art. III.B, and are liable for their share of the "costs of developing and operating the Contract Area." *Id.* art. VII.A; *see also id.* art. VII.C (providing that parties are proportionately responsible for "expenses incurred in the development and operation of the Contract Area").

24. The Neal Wells are allocation wells, which means that Ovintiv allocates all costs, production, and revenues associated with the Neal Wells to the various interest owners based on those owners' relative ownership in the minerals traversed by the wells.

More specifically, Ovintiv calculates a "tract participation factor" for each tract, which is the ratio of the productive portion of the well's lateral located on each tract to the total length of the well's productive lateral, measured from its first to its last take point. *See* Tr. Day 1 at 233:15–34:3; 256:16–57:20. An interest owner's share of the well's costs and revenues is calculated by multiplying the party's ownership interests in each tract by that tract's participation factor. *See id.* McCully does not dispute this allocation method and has not disputed the reasonableness of the costs allocated to its interests in the Neal Wells. *See* Doc. 92-1 ¶ 30. The allocation method is Ovintiv's way of calculating both (1) the "costs of developing and operating the Contract Area" and (2) the Parties' proportionate shares of production from the Contract Area. *See* Ex. D-1 arts. III.B, VII.A, VII.C.

25. The phrase "solely within the Contract Area" does not appear within the JOA, and the JOA does not include any other language limiting the type of well that the Operator can drill. *See id.* The JOA does not include any language restricting the Operator's use of new technologies or drilling techniques. *See id.* The JOA expressly grants the Operator authority to "conduct and direct and have full control over all operations on the Contract Area as permitted and required by, and within the limits of, this agreement." *Id.* art. V.A.

***The 2019 and 2021 Proposals for the Neal Wells***

26. Ovintiv proposed each of the Neal Wells to McCully under the JOA. Exs. D-3.2 & D-4.2. McCully had the opportunity to consent to the Neal Wells under the JOA, but it instead chose to non-consent.

27. In a September 17, 2019, letter to McCully, Ovintiv proposed the "drilling and completion" of certain Neal Wells, specifically the "Neal 39" wells, which were drilled from surface locations on Section 39. Ex. D-2.

28. The September 17, 2019, proposal letter's attachments included Authorizations for Expenditure ("AFEs") estimating the costs of the proposed wells and "preliminary well plats" showing the approximate locations of the planned wells. The proposal packet: (a) stated explicitly that it was being sent "pursuant to" the JOA, Ex. D-2.1; (b) identified the applicable JOA by its effective date, *id.*; (c) stated that the applicable JOA covered only Section 46, *id.*; (d) disclosed that the proposed wells would produce not only from Section 46 but also from other lands, including Sections 39 and 2, *id.*; *see also* Tr. Day 1 at 121:21– 22:1; 123:6–10; and (e) stated explicitly that Ovintiv would apply the JOA's non-consent penalties if McCully elected to non-consent, Ex. D-3.2.

29. The exact wells proposed in the 2019 Well Proposal include the: Neal 39A 1HD, Neal 39A 2HF, Neal 39A 4HJ, Neal 39A 5HE, Neal 39B 6HC, Neal 39B 7HF, Neal 39B 9HJ, Neal 39B 10HE, Neal 39C 11HF, Neal 39C 13HJ, and Neal 39C 14HE. Ex. P-200 & Ex. D-3.

30. Each proposed well is accompanied by the well name, the "Pad" (if multiple wells share an approximate surface location), the "Target" (target geological formation), the "SHL" (surface hole location—where the well is spudded), the "BHL" (bottom hole location—the anticipated location of the bottom of the wellbore), and the "Avg. Est. TVD" (estimated total vertical depth). Ex. P-200.

31. McCully's Vice President, Lois Krenek, initialed next to each well in the "Elect to Non-Consent" column on the attached ballot and then returned the ballot to Ovintiv. Doc. 92-1 ¶ 38. McCully concedes that Ms. Krenek had authority to sign documents for the company and that her signature on the non-consent elections was valid and binding. *See* Tr. Day 1 at 127:21–28:13; 128:22–29:4.

32. Neither Ms. Krenek nor any other McCully representative ever objected to the application of the JOA or its non-consent penalties to the Neal 39 Wells until after Spearpoint acquired McCully. *See* Doc. 92-1 ¶ 47; Tr. Day 1 at 129:12–30:1; 195:10–15.

33. In a letter to McCully dated June 23, 2021, Ovintiv proposed the "drilling and completion" of certain additional Neal Wells, specifically the "Neal 34" wells, which were drilled from surface locations on Section 34. Ex. D-11.1; Doc. 92-1 ¶ 39.

34. Like the Neal 39 proposal packet, Ovintiv's June 23, 2021, proposal letter included attachments that contained AFEs estimating the costs of the proposed wells and "preliminary well plats" showing the approximate locations of the planned wells. *See* Ex. D-11. The proposal packet also: (a) stated explicitly that it was being sent "pursuant to" the JOA, Ex. D-4.1; (b) identified the applicable JOA by its effective date, *id.*; (c) stated that the applicable JOA covered only Section 46, *id.*; (d) disclosed that the proposed wells would produce not only from Section 46 but also from other lands, including Sections 34, 39 and 2, *id.*; *see also* Tr. Day 1 at 121:21–22:1; 123:6–10; and (e) stated explicitly that Ovintiv would apply the JOA's non-consent penalties if McCully elected to non-consent, Ex. D-4.2.

35. The exact wells proposed in the 2021 well proposal include the: Neal 34D 1HD, Neal 34E 4HE, Neal 34E 5HD, Neal 34F 8HE, Neal 34G 10HD, Neal 34GG 12HE, and Neal 34X 15HD. Exs. P-219 & D-4.

36. Like the 2019 proposal, each proposed well in the 2021 proposal includes the well name, the pad, the target formation, SHL, BHL, and TVD. Ex. P-219.

37. McCully's representative, Ms. Krenek, again initialed next to each well in the "Elect to Non-Consent" column on the attached ballot and then returned the ballot to Ovintiv. Ex. D-4.3; Doc. 92-1 ¶ 40. McCully concedes that Ms. Krenek had authority to sign documents for the company and that her signature on the non-consent elections was valid and binding. *See* Tr. Day 1 at 127:21–28:13; 128:22–29:4. Neither Ms. Krenek nor any other McCully representative ever objected to application of the JOA or its non-consent penalties to the Neal 34 wells until after Spearpoint acquired McCully. *See* Doc. 92-1 ¶ 47; Tr. Day 1 at 129:12–30:1; 195:10–15.

38. The 2019 and 2021 proposals provided McCully notice of all the Neal Wells that would traverse interests owned by McCully. Ovintiv did not provide well proposals to McCully for several other wells because McCully did not own an interest in those wells.

39. Again, there is no evidence that anyone at McCully objected to the JOA's application to the Neal Wells prior to its acquisition by Spearpoint. *See* Tr. Day 1 at 195:10–15.

***Gerald Bullock's Recommendations***

40. After receiving both the 2019 and 2021 Neal Well proposals, Ms. Krenek consulted Gerald Bullock, a petroleum geologist and reservoir engineer who had worked for

McCully for approximately 30 years. Doc. 92-1 ¶ 42; Tr. Day 1 at 168:19–69:14. Mr. Bullock conducted well proposal analysis for McCully, meaning that he determined whether certain well proposals would be profitable and provided recommendations on whether to participate or non-consent. *Id.* at 169:6–8. Mr. Bullock advised McCully on well proposals until the company was sold to Spearpoint. *Id.* at 169:14.

41. In 2019 and 2021, Mr. Bullock was the only McCully representative with oil and gas expertise and was therefore the only person able to evaluate the Ovintiv well proposals. *Id.* at 187:1–13; 188:24–89:10. Mr. Bullock testified that, during that period, McCully followed his recommendations every time; effectively, Mr. Bullock's "recommendation was the decision." *Id.* at 174:11–14; 186:22–25.

42. When he made recommendations that McCully non-consent the Neal Wells, Mr. Bullock knew that Ovintiv would apply the JOA's non-consent penalties because of McCully's elections. *Id.* at 187:14–22 (Mr. Bullock confirming he "fully expected that [Ovintiv] was going to apply JOA nonconsent penalties, just as it says in the election letters."); 194:1–5; 206:9–14.

43. From his experience in the industry, Mr. Bullock was aware that operators sometimes proposed multi-section wells under JOAs that covered only a portion of the drill tract, *id.* at 190:16–25, but had never questioned the appropriateness of this practice, *id.* at 191:7–16.

44. Mr. Bullock recommended that McCully non-consent to the Neal Wells and accept the non-consent penalties. Ex. D-6; Tr. Day 1 at 187:14–22; 194:1–5; 206:9–14.

45. He did not review the JOA itself before making his recommendation. Tr. Day 1 at 176:8-9; 177:3–7; 183:25–184:14.

46. But he agreed that, from the information included in the Neal Well proposal packets, *id.* at 194:19–22, he knew at the time of his recommendations that: (a) Ovintiv was applying a JOA entered in 1982, *id.* at 194:6–10; (b) the JOA covered only Section 46, *id.* at 194:11–14; and (c) Ovintiv was proposing multi-section horizontal allocation wells that extended beyond the JOA's Contract Area, *id.* at 194:15–18.

47. In both 2019 and 2021, Mr. Bullock recommended to Ms. Krenek that McCully non-consent to the proposed wells because he anticipated mixed results and believed the drilling to be experimental. Exs. D-5 & D-6. Further, Mr. Bullock suggested that McCully could "back into" any "good" wells under the non-consent penalties. Ex. D-6. Again, Mr. Bullock fully understood and acknowledged that Ovintiv would apply the JOA's non-consent penalties as a result of McCully's non-consent elections—just as Ovintiv stated it would in its well proposals.

***Non-Consent Penalties***

48. McCully did not contribute to the upfront costs of any of the Neal Wells. *See* Doc. 92-1 ¶ 46.

49. Ovintiv is currently applying non-consent penalties to McCully's interests in the Neal Wells, *see id.* ¶ 45, except for two that have already reached payout after recoupment of the non-consent penalties. Tr. Day 1 at 256:7–10. The non-consent penalties are calculated based on the same allocation method described above, based on McCully's ownership interest and tract allocation factor. *See supra* ¶ 24. Ovintiv retains the revenues

attributable to McCully's interest until they reach a multiple of certain costs attributable to McCully's interest in each well. Ovintiv does not recoup all the costs of the entire well from McCully's fractional share of the revenue.

50. Apart from the well proposal letters and election ballots, McCully and Ovintiv did not communicate with one another about non-consent penalties, payout calculations, or non-consent penalty application to the Neal Wells from 2019 through 2022. *See* Doc. 92-1 ¶ 47.

51. McCully never objected to application of non-consent penalties until after its change in ownership and until after all the Neal Wells were drilled and completed.

***The Renamed Wells***

52. After Ovintiv sent the well proposal letters to McCully, Ovintiv changed the names of certain wells—Neal 34GG 12HE became Neal 34X 14HE; Neal 34E 5HD became Neal 34F 6HD; and Neal 39A 5HE became 39A N5HE—due to changes in drilling plans, which necessitated slight changes in the wells' surface hole locations. Tr. Day 1 at 271:1–7.

a. **Neal 39A 5HE, completed as 39A N5HE**: Lindsey Greene, an Ovintiv land professional, explained that after a spudder hole[1] was placed in the original location for Neal 39A 5HE, complications on a different well necessitated a small change in surface hole location, resulting in its name change to 39A N5HE. The original 39A 5HE was drilled to about 550 feet. *Id.* at 307:1–3.

[1] Spudder holes are preliminary and drilled by smaller spudder rigs, before the "big rig" is brought in to drill the well to its total depth. A spudder hole is only a few hundred feet deep and does not come close to the objective formation. *See* Tr. Day 1 at 271:12–19.

The change in the surface hole location helped to keep operations efficient. The first and last take points, target formation, and working interest ownership remained unchanged from Ovintiv's original well proposal, to which McCully non-consented. *Id.* at 271:4–7; 271:12–19; 272:9–13; 274:3–4. 1 There was also a difference in the "Avg. Est. TVD" and the as-completed TVD, which were 8,720 feet and 8,592 feet respectively. Ex. P-219; Tr. Day 1 at 307:1-9.

b. **Neal 34E 5HD, completed as Neal 34F 6HD**: Similarly, complications on an unrelated well caused Ovintiv to shift this well's surface hole to a slightly different location on an adjacent drilling pad to maintain efficient operations. Otherwise, the proposed and as-drilled wells follow each other closely, and all material factors remained the same. Tr. Day 1 at 278:8–14; 279:18–20.

c. **Neal 34GG 12HE, completed as Neal 34X 14HE**: Again, unrelated drilling complications caused Ovintiv to "flop" the "surface hole locations between two wells," leading to a change in the well's name. *Id.* at 280:16–24. Despite this change, the as-completed plat for this well follows the proposed plat. *Id.* at 280:25–281:9. The Neal 34GG 12HE was never drilled. *Id.* at 280:16–24.

53. These slight deviations did not change the renamed wells' target objectives or economic projections and are not uncommon in the industry. Industry custom and practice is that operators need not re-ballot such wells because small changes in surface hole location are not material and would not cause a reasonable non-operator to change its election. *See id.* at 275:13–20; 275:24–76:2; 276:11–17.

## CONCLUSIONS OF LAW

### Contract Interpretation

1. The Court first addresses McCully's request for declaratory judgment that the Section 46 JOA does not apply to the Neal Wells and that, as a result, Ovintiv's charging of non-consent penalties to McCully is improper. *See* Doc. 29 at 9–10.

2. Under the Declaratory Judgment Act, "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *See* 28 U.S.C. § 2201; *see also Rowan Cos. v. Griffin*, 876 F.2d 26, 27 (5th Cir. 1989) (discussing 28 U.S.C. § 2201). A court may declare such rights when there is an actual controversy between the parties, "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Rowan*, 876 F.2d at 28 (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). An actual controversy is presented when it can be presently litigated, "and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop." *Id.* (quoting *Brown & Root, Inc. v. Big Rock Corp.*, 383 F.2d 662, 665 (5th Cir. 1967)).

3. The parties agree that Texas law governs the claims in this lawsuit. In construing a JOA, the ordinary principles of contract interpretation apply. *See ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 312 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("In interpreting a joint operating agreement, we apply principles of contract law." (quoting *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)). The "primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (internal citations omitted). To

that end, courts must "consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* (emphasis in original) (citations omitted). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Id.* (internal citations omitted).

4. This question—whether the JOA applies to the allocation wells drilled through and on Section 46—is answered by the plain text of the JOA: the JOA is the Parties' "agreement to explore and develop" the Contract Area (Preamble); the JOA sets the performance standard for "all operations on the Contract Area" (Art. V.A) (emphasis added); and the JOA makes McCully "liable . . . for its proportionate share of the costs of developing and operating the Contract Area" (Art. VII). In short, the JOA applies to the Neal Wells because they develop and are on the Contract Area.

5. McCully argues that the JOA governs operations on Section 46 only if the well is fully encompassed within its bounds. It argues that the JOA ceases to apply altogether if a well's productive lateral crosses outside the Contract Area. *See* Tr. Day 1 at 99:22–23 (Mr. Foran testifying that the JOA "would go away" if a well has even one perforation beyond the Contract Area). This interpretation is not supported by the JOA's language.

6. Under Texas law, a horizontal well is located "on" every tract on which a productive portion of the well is located. *Springer Ranch, Ltd. v. Jones*, 421 S.W.3d 273, 284 (Tex. App.—San Antonio 2013, no pet.) (concluding that a well may be "situated 'on' more than one 'surface estate'" and that the "only plausible construction" of an allocation

agreement was that "royalties must be allocated on the basis that the productive portions of the [] well are situated on both [parties'] properties.").

7. The JOA does not apply to wells that do not produce from the Contract Area (nor does either party contest this). It follows that the JOA applies to wells to the extent they develop and produce from the Contract Area. In those cases, the JOA applies to the portions of horizontal wells that fall within its Contract Area, which is Section 46. *See Crawley Petroleum Corp. v. Gastar Expl. Inc.*, No. CIV-17-1365-SLP, 2020 WL 2545327, at *5 (W.D. Okla. May 19, 2020) (recognizing that a JOA controlled the proposal and drilling of any horizontal well with respect to its producing portion within the JOA's unit area).

8. This dispute is not governed by *Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89 (Tex. App.—El Paso 1997, pet. denied). In *Hill*, the parties' 1982 Form 610 JOA did not merely require that operations occur on the Contract Area; it expressly defined the Contract Area to a maximum depth of 20,000 feet. *Id.* at 107. The operator nevertheless drilled to approximately 22,000 feet. *Id.* Because the wellbore extended beyond the JOA's explicit, negotiated depth boundary, the court held the well was not drilled "within the Contract Area" as the contract defined it, and the operator could not impose non-consent penalties. *Id.* at 113.

9. The circumstances here are materially different. This JOA contains no express vertical depth limitation and no express horizontal boundary requirement that the entire wellbore remain within Contract Area boundaries. Instead, the JOA uses general language—such as requiring that "operations [be] on the Contract Area." That distinction is critical because McCully invokes *Hill* only by assuming the very construction issue presented here:

that "on" (and related, broad language) necessarily means "entirely within" at every point along the wellbore. But *Hill* did not interpret general "on" language in the absence of a boundary clause; it enforced a clear, express boundary the parties wrote into their agreement. *Hill* therefore does not answer the interpretive question. And because the operative portion of the wells at issue—the portion drilled and completed in the Contract Area—is technically "on the Contract Area," *Hill* provides no basis to treat these wells as outside the JOA's scope.

10. McCully's interpretation that the JOA applies only to wells that fall completely within the Contract Area would require the JOA to expressly preclude or limit wells located partially outside the Contract Area—but no such limitations exist. *See* Ex. D-1. Instead, the language is broad.

11. Nor is this Court permitted to read additional limiting language into the JOA. Caselaw is clear that reading, for example, "solely within" or other words of limitation into the JOA to limit the JOA's application to only wells that are entirely within the Contract Area would "impermissibly add words of limitation to modify the [JOA's] terms," which is not permitted. *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 691 (Tex. 2022). The Court will not do so here.

***The JOA Applies to Horizontal Wells that Traverse the Contract Area***

12. There is no direct evidence of whether the original parties to the JOA contemplated the use of horizontal wells to develop the Contract Area. But this lack of evidence does not prevent the JOA's application to the Neal Wells. *See Browning Oil Co., Inc. v. Luecke*, 38 S.W.3d 625, 638 (Tex. App.—Austin 2000, pet. denied) ("Although the parties

executed the leases and amendments prior to the surge of horizontal drilling and *likely did not contemplate the possibility of horizontal wells, no language specifically limits the applicability of the [] provisions to vertical wells*.") (emphasis added). Moreover, the same Operator who entered the JOA in 1982 also entered into three oil and gas leases in 1980–82 that use the same language found in this JOA, including "well," "drilling," "operating," and "production." Exs. D-12, D-13, & D-14. McCully agrees that these same words, when used in those leases, do apply to the Neal Wells. Tr. Day 1 at 338:11–40:17; 343:22–44:23.

13. McCully does not contend that the JOA prohibits horizontal drilling. McCully believes that the JOA allows and applies to horizontal drilling, including allocation wells. *See, e.g.*, Tr. Day 1 at 19:15–20 (opening statements); 56:13–21; 99:16–100:9. In its view, those wells must, however, be fully encompassed within a JOA's contract area.

14. Similarly, McCully agrees that the JOA permits Ovintiv, as Operator, to "drill wells using new technology that may not be around—or may not have been around in the early [1980s]." *Id.* at 56:23–57:2. Horizontal drilling certainly became more prevalent after the JOA was drafted and executed, but the JOA's provisions grant broad discretion to the Operator, and there is no evidence that either the AAPL drafting committee or the original parties to the JOA had any intent to exclude or prohibit the use of horizontal drilling.

***The JOA is Not Inoperable When Applied to the Neal Wells***

15. At trial, McCully sought to characterize the JOA as "inoperable" if applied to the portion of each Neal Well producing from the Contract Area, but the evidence did not support this characterization.

16. McCully pointed to the following JOA provisions as supposedly inoperable or "rendered meaningless" by applying the JOA to the portion of the Neal Wells producing from the Contract Area: Article III.B as it pertains to ownership of equipment; Articles V.B.1 and V.B.2, as they pertain to removal of the Operator and election of a successor; Article VI.B, as it pertains to sidetracking a well; Article VI.D, as it relates to the right of Non-Operators to access the Contract Area; and Article VI.E, as it pertains to plugging wells.

17. None of these provisions is actually implicated by the dispute before the Court. McCully has never asserted an equipment ownership claim; sought to remove Ovintiv as Operator of the Contract Area; requested an inspection of the Neal Wells; or asked to sidetrack, plug, or assume operation of any Neal Well. Tr. Day 1 at 105:22–106:4; 110:11–15; 110:21–11:5; 112:11–18; 265:19–22. So even if the provisions McCully highlights might raise interpretive issues for wells that produce both from the Contract Area and from other lands, those issues must be resolved in the context of an actual, fact-bound dispute—not in the abstract.

18. Moreover, McCully's contention that applying the JOA to the Neal Wells would render certain provisions "meaningless" misconstrues contract analysis. Texas courts try to harmonize the provisions of a contract to avoid rendering any of them meaningless. *See, e.g., Capio Funding, LLC v. Rural/Metro Operating Co., LLC*, 35 F.4th 353, 356 (5th Cir. 2022). But a provision is only rendered "meaningless" by an interpretation that results in the provision never having effect. Even if McCully were correct that certain provisions of the JOA did not apply to multi-section horizontal wells, those provisions would not be

meaningless because they would still have undisputed application to wells producing entirely from within the Contract Area.

19. Further, McCully failed to show that any of the referenced provisions was "inoperable" or incapable of being applied to the Neal Wells.

20. The Court does not endeavor to answer how every such hypothetical would be resolved, but it need not.

**Breach of Contract: The Renamed Wells**

21. Ovintiv did not breach the JOA when it applied non-consent penalties to the Neal Wells. Nothing in the JOA required Ovintiv to submit wells for re-approval merely because the well was renamed or because minor adjustments were made to surface locations that did not alter the well's objective formation. *See* Ex. D-1.

22. The most relevant provision concerning the renamed wells is Article VI(B). It requires any party desiring to drill a well on the Contract Area to "give the other parties written notice of the proposed operation, specifying the work to be performed, the location, the proposed depth, objective formation, and the estimated costs of the operation." *Id.* art. VI.B.

23. Article VI(B) does not expressly address re-balloting or specify when post-proposal changes require a fresh proposal and election. *Id.* art. VI.B. The Court therefore does not read the JOA to require perfect identity between a proposed well and the well ultimately drilled. Instead, the relevant inquiry is whether the as-drilled well remained in reasonable, material conformity with the proposal such that the non-operator received the notice Article VI(B) was designed to provide.

24. *Key Operating & Production Co., LLC v. White Capital Group, LLC*—a case McCully relies on—illustrates the difference between a material deviation and a nonmaterial one. No. 6:21-CV-03555, 2023 WL 349837, at *1 (W.D. La. Jan. 21, 2023). There, the court did not treat the mere existence of differences between the proposed and drilled wells as dispositive. Instead, it examined whether those differences were material, relying on expert testimony that the two drilling paths diverged in consequential respects, including their surface locations, target sand intercepts, and overall risk profiles. *Id.* at *5.

25. This case is different. A change that alters the essential economics or drilling objective of the proposed operation—such as a materially different well path, target, or risk profile—may require a new proposal. But no such changes are presented here.

26. As the party alleging breach, the burden is on McCully to prove that the plans for the wells materially changed. It failed to carry that burden.

27. The JOA does not require a ballot to identify a well by name or API number—much less mandate re-balloting if those identifiers later change. Tr. Day 1 at 317:7–18; *see* Ex. D-1. And although the proposing party must provide a well's location, the JOA does not prescribe any heightened level of precision for that description or address immaterial deviations between a proposed and completed well. Ex. D-1.

28. Ovintiv's proposal packets provided more detail than the JOA demands. They identified the pad, the target formation, the average estimated total vertical depth, the surface hole location, and bottomhole location. Exs. P-200 & P-219. Had Ovintiv limited itself to the contractual minimum, McCully would have had even less basis to complain of the minor adjustments to the renamed wells' locations. Tr. Day 1 at 294:1–9.

29. The evidence showed that no material changes were made to the renamed wells. Greene testified that they underwent only superficial changes to their surface hole locations, which did not impact their target formations, McCully's working interest, or the wells' overall recoveries. *Id.* at 275:13-20.

30. The well proposed in 2019 as Neal 39A 5HE and ultimately completed as Neal 39A N5HE serves as a good example. McCully focuses on the changed well name and API number. But the evidence reflects that API numbers are regulatory identifiers tied to the permitting process, and that once drilling activity has begun, even modest modifications may warrant a new API number. *Id.* at 367:3–368:2. The change in name and API number therefore does not itself establish that a materially different well was drilled.

31. And, again, the JOA does not require that a proposal include an API number—or even a well name—and it does not require re-balloting merely because a well is renamed or assigned a new API number. *Id.* at 317:7–18; 368:3–8, 14–19.

32. Nor is McCully's comparison between the Neal 39A 5HE's reported depth of 550 feet and the Neal 39A N5HE's as-completed TVD of 8,592 feet an apples-to-apples one. *See id.* at 307:1–5, 7–9, 21–25. The record shows the 39A 5HE was never completed. Greene testified it "was not fully drilled," that the pad was moved "for drilling efficiencies," and that the 5HE was "not completed." *Id.* at 289:3–10. Only the first several hundred feet were drilled, and the well never reached the horizontal portion, had no productive take points, and never produced. *Id.* at 293:8–14. The 550-foot figure thus reflects an aborted surface-hole effort, not a completed wellbore reflecting a different drilling objective.

33. Nor does any difference between the proposed and as-completed vertical depth suggest a material change. The 2019 proposal listed an "Avg. Est. TVD" of 8,720 feet, while the as-completed TVD was 8,592 feet—a difference of 128 feet. Ex. P-219. That modest variance is fully consistent with the proposal's use of an estimate and does not imply a changed target or otherwise material deviation.

34. More important factors remained constant. The testimony was that key items—including the take points, working interests, and target formation—did not change. Tr. Day 1 at 271:4–7. McCully's allocation factor likewise remained the same. *Id.* at 274:3–4. Even the final well designation—39A N5HE—is closely aligned with the original proposal name—39A 5HE—further underscoring that McCully had notice of what was being proposed and drilled.

35. The same reasoning applies to the Neal 34E 5HD, completed as Neal 34F 6HD, and Neal 34GG 12HE, completed as Neal 34X 14HE wells. For the former, while the surface location changed slightly, the proposed and as-drilled wells follow each other closely, the important factors that would alter a reasonable non-operator's decision to opt-in remained the same, and only one well was fully drilled. *Id.* at 279:18–20. For the latter, like the previous two wells, the as-completed plat for this well "pretty much follow[ed] the proposal that McCully-Chapman received spot-on." *Id.* at 280:16–24.

36. Unlike in *Key Operating*, McCully did not present persuasive expert testimony to establish that the changes were material. Its expert, Mr. Huddleston, first saw the as-drilled plats at trial, had not previously analyzed the differences between them, and focused primarily on the changes to the well names and API numbers. *Id.* at 318:4–21. There was no

testimony that risk profiles or any of the other factors identified in *Key Operating* had materially diverged. And in *Key Operating*, by contrast, "the bottomhole location [was] the *only* aspect of the two drilling paths that did not change" between the proposed and drilled wells. 2023 WL 349837, at *5.

37. Other wells that McCully does not object to maintained both their original names and API numbers yet had greater divergences between their as-proposed and as-drilled plats than the renamed wells. Tr. Day 1 at 281:19–23. Generally, operators and their teams do a good job of making sure that drilled wells match their proposal plats. *Id.* at 274:18–23. But even the most skilled teams cannot stay 100% on path during the drilling process. *Id.* This means that non-material deviations from the proposal plat are not only common but expected—"no as-complete matches fully to the proposal plat." *Id.* at 274:22–23.

38. On this record, the differences between the proposed and as-drilled Neal Wells were not material. Ovintiv therefore was not required to restart the proposal process or obtain fresh elections before applying the JOA's non-consent provisions to those wells.

**Extra-Contractual Claims**

39. The JOA governs this dispute. And because the JOA applies to this dispute, McCully's extra-contractual claims for money had and received (Count III of the First Amended Complaint) and for an equitable co-tenancy accounting (Count V) fail as a matter of law.

40. Money had and received "is a claim rooted in quasi-contract and unjust enrichment." *Villarreal v. First Presidio Bank*, 744 F. App'x 204, 206 (5th Cir. 2018); *Stonebridge*

*Life Ins. v. Pitts*, 236 S.W.3d 201, 203 n.1 (Tex. 2007). Where "a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory." *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) (internal citations omitted).

41. McCully's request for an equitable accounting against Ovintiv is likewise barred. Under Texas law, the duty of a producing co-tenant to account to a nonconsenting or nonproducing co-tenant is a default rule that applies only in the absence of an agreement: "Absent an agreement, the common law . . . requires a producing co-tenant to account to the nonconsenting or nonproducing co-tenant for its pro rata share of production, net of necessary and reasonable expenses incurred in producing and marketing the same." *In re Eagleridge Operating LLC*, 642 S.W.3d 518, 521 (Tex. 2022); *see also Cimarex Energy Co. v. Anadarko Petroleum Corp.*, 574 S.W.3d 73, 96 (Tex. App.—El Paso 2019, pet. denied) (explaining that "in the absence of a joint operating agreement," a co-tenant must account for minerals taken minus reasonable production and marketing costs).

42. McCully's claim under Texas Natural Resources Code §§ 91.402 and 91.404 likewise fails. Those provisions provide a remedy for the nonpayment of proceeds that are due to a payee. But under the Court's conclusions above, the JOA governs the Neal Wells, and Ovintiv properly applied the JOA's non-consent provisions to McCully's interests in those wells. McCully therefore did not prove that Ovintiv failed to pay proceeds that were then due and payable to McCully under Chapter 91.

43. In light of that conclusion, the Court need not address any alternative arguments regarding § 91.402(b).

44. A JOA is designed to modify the default, common law regime by enabling co-tenants to exercise operating rights efficiently and to allocate the risks and costs of drilling. *In re Eagleridge Operating*, 642 S.W.3d at 522 (quoting *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 344 n.1 (Tex. 2006)). Such agreements do more than apportion costs—they also allocate shared liabilities and provide contractual remedies if a party defaults. *Cimarex*, 574 S.W.3d at 97; *Seagull Energy*, 207 S.W.3d at 344 n.1.

45. Accordingly, because the JOA is valid, enforceable, and governs the parties' relationship here, it forecloses McCully's extra-contractual claims.

## DEFENSES

46. Even if the Court were to accept McCully's narrower reading of the JOA, its position would still fail under quasi-estoppel.

***Quasi-Estoppel***

47. Quasi-estoppel bars McCully's claim that the JOA does not apply to the Neal Wells.

48. The doctrine bars a party from asserting, to another's disadvantage, a right inconsistent with a position to which it previously acquiesced or from which it accepted a benefit. *Lopez v. Munoz, Hockema & Reed, LLP*, 22 S.W.3d 857, 864 (Tex. 2000); *Stable Energy, LP v. Newberry*, 999 S.W.2d 538, 548 (Tex. App.—Austin 1999, pet. denied); *Forest Springs Hosp. v. Ill. New Car & Truck Dealers Ass'n Emps. Ins. Trust*, 812 F. Supp. 729, 733 (S.D. Tex. 1993). The doctrine requires (1) a previous action and (2) a subsequent inconsistent action which is sought to be estopped. *Mulvey v. Mobil Producing Texas & New Mexico Inc.*, 147 S.W.3d 594, 607 (Tex. App.—Corpus-Christi Edinburg 2004, pet. denied). The subsequent action is

estopped because of its relation to the first. One cannot accept the benefits of a transaction or acquiesce to something and then adopt an inconsistent position to avoid the corresponding obligations or effects. *See, e.g., Stable Energy*, 999 S.W.2d at 548 (holding that parties who sought approval to act as successor operator under a JOA could not later contend they were not bound by that same agreement).

49. That is what McCully attempts here. Twice, McCully received Neal Well proposals sent pursuant to the JOA and expressly stating that a decision not to participate would subject its interest to the JOA's non-consent penalties. McCully did not object that the JOA was inapplicable. Exs. D-3.2 & D-4.2. Instead, it elected non-consent under that framework and then remained silent for years while Ovintiv undertook the risks and burdens of development. Tr. Day 1 at 262:6–22, 268:8–12, 268:21–69:7. McCully contributed no capital, assumed no drilling risk, and preserved the possibility of later sharing in the wells' success if development proved profitable. *See* Ex. D-6; Tr. Day 1 at 262:6–22, 268:8–12, 268:21–69:7; 337:2-23. The fact that Ovintiv also paid items associated with production, including ad valorem taxes, that McCully never paid only further confirms the parties' course of performance. Having acquiesced in that framework for years, McCully cannot now reverse course and deny that the JOA applied to the Neal Wells now that they have proved profitable. That would be unconscionable.

***Waiver and Ratification***

50. Neither waiver nor ratification bars McCully's interpretation of the JOA.

51. Waiver requires: "(1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish

the right, or intentional conduct inconsistent with the right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). Ovintiv bears the burden of proving each element. That relinquishment must be "unequivocally inconsistent" with claiming the right. *Van Indep. Sch. Dist. v. McCarty*, 165 S.W.3d 351, 353 (Tex. 2005) (internal citations omitted) (requiring conduct be "unequivocally inconsistent with claiming a known right").

52. "Ratification is the adoption or confirmation by a person with knowledge of all material facts of a prior act which did not then legally bind him and which he had the right to repudiate." *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 196 (Tex. 2021). The elements of ratification are: (1) approval by act, word, or conduct; (2) with full knowledge of the facts of an earlier act; and (3) with the intention of giving validity to the prior act. *Lawrence v. Reyna Realty Grp.*, 434 S.W.3d 667, 674 (Tex. App.—Houston [1st Dist.] 2014, no pet.). For implied ratification, "a party's subjective state of mind is immaterial." *BPX*, 629 S.W.3d at 197. Courts "instead look to objective evidence of intent, such as the party's conduct." *Id.* (internal citation omitted). Those actions must "clearly evidenc[e] an intention to ratify." *Id.* (internal citation omitted).

53. On this record, Ovintiv has not carried its burden to show that McCully's actions meet the high bar of being "*unequivocally*," intentionally inconsistent with a known right.

## CONCLUSION

For the aforementioned reasons, McCully's requests for relief are **DENIED** in full.

It is so **ORDERED**.

SIGNED this 18th day of March, 2026.

DAVID COUNTS
UNITED STATES DISTRICT JUDGE



26-50318.2336

# TAB 5

Exhibit "A"

A.A.P.L. FORM 610 - 1977

# MODEL FORM OPERATING AGREEMENT

## OPERATING AGREEMENT

DATED

May 1, 19 82.

OPERATOR SAXON OIL COMPANY

CONTRACT AREA 1981-1, 1981-2 and 1981-3 Programs

COUNTY OR PARISH OF Reagan / Martin Dawson / Upton STATE OF Texas

COPYRIGHT 1977 — ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM LANDMEN
APPROVED FORM A.A.P.L. NO. 610 - 1977 REVISED
MAY BE ORDERED DIRECTLY FROM THE PUBLISHER
KRAFTBILT PRODUCTS, BOX 800, TULSA, OK 74101

"JOINT LOSS"

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

# OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between SAXON OIL COMPANY ______________________________, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided:

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I. DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II. EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

- [X] A. Exhibit "A", shall include the following information:
  - (1) Identification of lands subject to agreement,
  - (2) Restrictions, if any, as to depths or formations,
  - (3) Percentages or fractional interests of parties to this agreement,
  - (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
  - (5) Addresses of parties for notice purposes.
- [ ] B. Exhibit "B", Form of Lease.
- [X] C. Exhibit "C", Accounting Procedure.
- [X] D. Exhibit "D", Insurance.
- [ ] E. Exhibit "E", Gas Balancing Agreement.
- [ ] F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.

If any provision of any exhibit, except Exhibit "E", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.



3

## ARTICLE III.
## INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

~~If any party owns an unleased oil and gas interest in the Contract Area, that interest shall be~~ treated for the purpose of this agreement and during the term hereof as ~~if it were a~~ leased interest under the form of oil and gas lease attached as Exhibit ~~"B". As~~ to such interest, the owner shall receive royalty on production as ~~prescribed in~~ the form of oil and gas lease attached hereto as Exhibit "B". Such party ~~shall,~~ however, be subject to all of the provisions of this agreement relating to lessees ~~to the extent that it owns the lessee interest.~~ (See Article XV. D)

**B. Interest of Parties in Costs and Production:**

Exhibit "A" lists all of the parties and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and material acquired in operations on the Contract Area shall be owned by the parties as their interests are shown in Exhibit "A". All production of oil and gas from the Contract Area, subject to the payment of lessor's royalties ~~which will be borne by the Joint Account~~ shall also be owned by the parties in the same manner during the term hereof; provided, however, this shall not be deemed an assignment or cross-assignment of interests covered hereby.

## ARTICLE IV.
## ~~TITLES~~
## LOSS OF TITLE OF LEASE

**A. Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including Federal Lease Status Reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐ Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C," and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

☒ Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with leases or oil and gas interests contributed by such party. The Operator shall be responsible for the preparation and recording of Pooling Designations or Declarations as well as the conduct of hearings before Governmental Agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to participate in the drilling of the well.

**B. Loss of Title:**

~~1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through~~ failure of title, which loss results in a reduction of interest from that ~~shown on Exhibit "A"~~, this agreement, nevertheless, shall continue in force ~~as to all remaining~~ oil and gas leases and interests, and

(a) The party ~~whose oil and~~ gas lease or interest is affected by the title failure shall bear alone ~~the entire loss and it shall not be entitled to recover from Operator or the other parties any development~~



4

~~or operating costs which it may have theretofore paid, but there shall be no monetary liability on its~~ part to the other parties hereto for drilling, development, operating or other similar costs by reason of such title failure; and

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the interest lost, and

(c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interests (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well, and

(d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded; and

(e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties in the same proportions in which they shared in such prior production; and

(f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest claimed by any party hereto, it being the intention of the parties ~~hereto that each shall defend title to its interest and bear all expenses in connection therewith.~~

~~2. Loss by Non-Payment or Erroneous Payment of Amount Due. If, through mistake or oversight,~~ any rental, shut-in well payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or ~~becoming a party to this agreement.~~

3. Other Losses: All losses incurred, of title or losses of lease by expiration or otherwise ~~other than those set forth in Articles IV.B.1 and IV.B.2 above, shall not be considered failure of title but~~ shall be joint losses and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of the Contract Area.

## ARTICLE V.
## OPERATOR

### A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR:

SAXON OIL COMPANY shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.



5

B. **Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, ~~no longer owns an interest in the Contract Area~~ or is no longer capable of serving as Operator, it shall cease to be Operator without any action by Non-Operator, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall be selected by the Parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. If the Operator that is removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of the Operator that was removed.

C. **Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed, shall be determined by Operator, and all such employees shall be the employees of Operator.

D. **Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

A. **Initial Well:**

~~On or before the _______ day of _______________, 19___, Operator shall commence the drill-~~ ing of a well for oil and gas at the following location:

and shall thereafter continue the drilling of the well with due diligence to

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, it shall first secure the consent of all parties ~~and shall plug and abandon same as provided in Article VI.E.1. hereof.~~



6

B. Subsequent Operations:

1. Proposed Operations: Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to forty-eight (48) hours, ~~exclusive of Saturday, Sunday or legal holidays.~~ Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

2. Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. or VI.E.1. elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within sixty (60) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period where the drilling rig is on location, as the case may be) actually commence work on the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of (a) the total interest of the parties approving such operation, and (b) its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours ~~(exclusive of Saturday, Sunday or legal holidays)~~ after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A", or (b) carry its proportionate part of Non-Consenting Parties' interest. The proposing party, at its election, may withdraw such proposal if there is insufficient participation, and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a producer of oil and or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting production taxes, royalty, overriding royalty and other interests existing on the effective date hereof, payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) 200% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of the operation; and

all

velo (b) 300 % of that portion of the costs and expenses of drilling reworking, deepening, or plugging prod, testing and completing, after deducting any cash contributions received under Article VIII C., and sitior.



7

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

400 % of that portion of the cost of newly acquired equipment in the well (to and including the well-head connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Gas production attributable to any Non-Consenting Party's relinquished interest upon such Party's election, shall be sold to its purchaser, if available, under the terms of its existing gas sales contract. Such Non-Consenting Party shall direct its purchaser to remit the proceeds receivable from such sale direct to the Consenting Parties until the amounts provided for in this Article are recovered from the Non-Consenting Party's relinquished interest. If such Non-Consenting Party has not contracted for sale of its gas at the time such gas is available for delivery, or has not made the election as provided above, the Consenting Parties shall own and be entitled to receive and sell such Non-Consenting Party's share of gas as hereinabove provided during the recoupment period.

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production.

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the Party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased, in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure, attached hereto.

~~Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.~~ (See Article XV. A.)

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) when Option 2, Article VII.D.1., has been selected, or (b) to the reworking, deepening and plugging back of such initial well, if such well is or thereafter shall prove to be a dry hole or non-commercial well, after having been drilled to the depth specified in Article VI.A.

C. Right to Take Production in Kind:

Each party shall have the right to take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any-



8

party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment direct from the purchaser thereof for its share of all production.

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year. Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate commerce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale.

~~In the event one or more parties' separate disposition of its share of the gas causes split-stream de-~~liveries to separate pipelines and/or deliveries which on a day-to-day basis ~~for any reason~~ are not exactly equal to a party's respective proportionate share ~~of total gas~~ sales to be allocated to it, the balancing or accounting between the ~~respective~~ accounts of the parties shall be in accordance with any Gas Balancing ~~Agreement~~ between the parties hereto, whether such Agreement is attached as ~~Exhibit "E", or is a separate Agreement.~~

D. Access to Contract Area and Information:

Each party shall have access to the Contract Area at all reasonable times, at its sole risk to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that requests the information.

E. Abandonment of Wells:

1. Abandonment of Dry Holes: Except for any well drilled pursuant to Article VI.B.2., any well which has been drilled under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday or legal holidays) after receipt of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling of such well. Any party who objects to the plugging and abandoning such well shall have the right to take over the well and conduct further operations in search of oil and/or gas subject to the provisions of Article VI.B.

2. Abandonment of Wells that have Produced: Except for any well which has been drilled or reworked pursuant to Article VI.B.2 hereof for which the Consenting Parties have not been fully reimbursed as therein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within thirty (30) days after receipt of notice of the proposed abandonment of such well, all parties do not agree to the abandonment of any well, those wishing to continue its operation shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, quality, or fitness for use of the equipment and material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or intervals of the formation or formations then open to production, for a term of one year and so long thereafter as oil and/or gas is produced from the interval or inter-



7

as provided herein in Article III.A.

vals of the formation or formations covered thereby, ~~such lease to be on the form attached as Exhibit "B".~~ The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentages of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interest in the remaining portion of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well.

## ARTICLE VII.
## EXPENDITURES AND LIABILITY OF PARTIES

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

**B. Liens and Payment Defaults:**

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in the Accounting Procedure attached hereto as Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the State, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest has been paid. Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

**C. Payments and Accounting:**

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in the Accounting Procedure attached hereto as Exhibit "C". Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D. Limitation of Expenditures:

1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this Agreement, it being understood that the consent to the drilling or deepening shall include:

☐ Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including necessary tankage and/or surface facilities.

☒ Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its authorized depth, and all tests have been completed, Operator shall give immediate notice to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight (48) hours ~~(exclusive of Saturday, Sunday and legal holidays)~~ in which to elect to participate in the setting of casing and the completion attempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, including necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties, elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less than all parties.

2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or plugged back pursuant to the provisions of Article VI.B.2. of this agreement, it being understood that the consent to the reworking or plugging back of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage and/or surface facilities.

3. Other Operations: Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of TWENTY THOUSAND AND NO/100 -------- Dollars ($ 20,000.00 ) except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares "Authority for Expenditures" for its own use, Operator, upon request, shall furnish copies of its "Authority for Expenditures" for any single project costing in excess of TEN THOUSAND AND NO/100 --------------- Dollars ($ 10,000.00 ).

E. Royalties, Overriding Royalties and Other Payments:

Each party shall pay or deliver, or cause to be paid or delivered, all royalties to the extent of its lease burdens due on its share of production and shall hold the other parties free from any liability therefor. If the interest of any party in any oil and gas lease covered by this agreement is subject to any royalty, overriding royalty, production payment, or other charge over and above the aforesaid royalty, such party shall assume and alone bear all such obligations and shall account for or cause to be accounted for, such interest to the owners thereof.

No party shall ever be responsible, on any price basis higher than the price received by such party, to any other party's lessor or royalty owner; and if any such other party's lessor or royalty owner should demand and receive settlements on a higher price basis, the party contributing such lease shall bear the royalty burden insofar as such higher price is concerned.

F. Rentals, Shut-in Well Payments and Minimum Royalties:

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production of a producing gas well, at least five (5) days (excluding Saturday, Sunday and holidays), or at the earliest opportunity permitted by circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments

of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV B.3.

G. Taxes:

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. Operator shall bill other parties for their proportionate share of all tax payments in the manner provided in Exhibit "C".

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

Each party shall pay or cause to be paid all production, severance, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

H. Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the Workmen's Compensation Law of the State where the operations are being conducted; ~~provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be an amount equivalent to the premium which would have been paid had such insurance been obtained.~~ Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the Workmen's Compensation Law of the State where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event Automobile Public Liability Insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's fully owned automotive equipment.

ARTICLE VIII.
ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it. If the interest of the assigning party includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not desiring to surrender an oil and gas lease covering such oil and gas interest for ~~a term of one year and so long thereafter as oil and/or gas is produced from the land covered thereby~~ as provided herein in Article III.A., ~~such lease to be on the form attached hereto as Exhibit "B"~~. Upon such assignment, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the acreage assigned and the operation of any well thereon, and the assigning party shall have no further interest in the lease assigned and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The parties assignee shall pay to the party assignor the reasonable salvage value of the latter's interest in any wells and equipment on the assigned acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment is in favor of more than one party, the assigned interest shall

be shared by the parties assignee in the proportions that the interest of each bears to the interest of all parties assignee.

Any assignment or surrender made under this provision shall not reduce or change the assignor's or surrendering parties' interest, as it was immediately before the assignment, in the balance of the Contract Area; and the acreage assigned or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement

**B. Renewal or Extension of Leases:**

If any party secures a renewal of any oil and gas lease subject to this Agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall apply also and in like manner to extensions of oil and gas leases.

**C. Acreage or Cash Contributions:**

~~While this agreement is in force, if any party contracts for a contribution of cash toward the drilling~~ of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. If all parties hereto are Drilling Parties and accept such tender, such acreage shall become a part of the Contract Area and be governed by the provisions of this agreement. If less than all parties hereto are Drilling Parties and accept such tender, such acreage shall not become a part of the Contract Area. Each party shall promptly notify all other parties of all acreage or money contributions it may obtain in support of any well or ~~any other operation on the Contract Area.~~ (See Article XV. C.)

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Subsequently Created Interest:**

Notwithstanding the provisions of Article VIII.E. and VIII.G., if any party hereto shall, subsequent to execution of this agreement, create an overriding royalty, production payment, or net proceeds interest, which such interests are hereinafter referred to as "subsequently created interest", such subsequently created interest shall be specifically made subject to all of the terms and provisions of this agreement, as follows:

1. If non-consent operations are conducted pursuant to any provision of this agreement, and the party conducting such operations becomes entitled to receive the production attributable to the interest out of which the subsequently created interest is derived, such party shall receive same free and clear of such subsequently created interest. The party creating same shall bear and pay all such subsequently created interests and shall indemnify and hold the other parties hereto free and harmless from any, and all liability resulting therefrom.



13

2. If the owner of the interest from which the subsequently created interest is derived (1) fails to pay, when due, its share of expenses chargeable hereunder, or (2) elects to abandon a well under provisions of Article VI.E. hereof, or (3) elects to surrender a lease under provisions of Article VIII.A. hereof, the subsequently created interest shall be chargeable with the pro rata portion of all expenses hereunder in the same manner as if such interest were a working interest. For purposes of collecting such chargeable expenses, the party or parties who receive assignments as a result of (2) or (3) above shall have the right to enforce all provisions of Article VII.B. hereof against such subsequently created interest.

E. **Maintenance of Uniform Interest:**

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all leases and equipment and production; or

2. an equal undivided interest in all leases and equipment and production in the Contract Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the right of the other parties.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interests within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

F. **Waiver of Right to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

~~G. **Preferential Right to Purchase:**~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and~~ interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent ~~company, or to any company in which any one party owns a majority of the stock~~.

## ARTICLE IX.
## INTERNAL REVENUE CODE ELECTION

This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association for profit between or among the parties hereto. Notwithstanding any provisions herein that the rights and liabilities hereunder are several and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for Federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No



17

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from Operations hereunder can be adequately determined without the computation of partnership taxable income.

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single damage claim or suit arising from operations hereunder if the expenditure does not exceed -------TEN THOUSAND------------------------------- Dollars ($ 10,000.00 ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expense of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, the party shall immediately notify Operator, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties, and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by United States mail or Western Union telegram, postage or charges prepaid, or by teletype, and addressed to the party to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the United States mail or with the Western Union Telegraph Company, with postage or charges prepaid, or when sent by teletype. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subjected hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease, or oil and gas interest contributed by any other party beyond the term of this agreement.

☒ Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise, and/or so long as oil and/or gas production continues from any lease or oil and gas interest.



15

MC Exploration_000022
26-000928

☐ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of ________ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling or reworking a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling or reworking operations are commenced within ________ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the committed acreage is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B. Governing Law:**

The essential validity of this agreement and all matters pertaining thereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state where most of the land in the Contract Area is located shall govern.

## ARTICLE XV.
## OTHER PROVISIONS

A. No well drilled or completed by less than all parties pursuant to the provisions of Article VI.B.2. hereof shall be completed as a gas well in the same formation as any other gas well then producing, or capable of producing, gas in commercial quantities from the contract area; provided that if any regulatory body having jurisdiction should establish or prescribe a smaller drilling unit, less than all of the parties may complete such a gas well pursuant to the provisions of Article VI.B.2. hereof so long as its completion does not result in a well density in the same formation greater than that established or prescribed by the aforesaid regulatory body. No well drilled or completed by less than all of the parties pursuant to the provisions of Article VI.B.2 hereof shall be completed as an oil well in the same formation as any other oil well then producing from the contract area if, as a result of the completion of said well, there would exist on the contract area a well density in the same formation of more than one producing oil well to eighty (80) acres; provided that if any regulatory body having jurisdiction should establish or prescribe a smaller drilling unit, less than all of the parties may complete such an oil well pursuant to the provisions of Article VI.B.2. hereof so long as its completion does not result in a well density in the same formation greater than that established or provided by the aforesaid regulatory body.

B. Non-Operators hereby designate and authorize Operator of any wells subject to this agreement to make all filings with the Railroad Commission of Texas and the Federal Energy Regulatory Commission (hereinafter referred to as the "FERC") which the Operator determines to be appropriate in order to qualify for eligibility for and collection of the prices established by the Natural Gas Policy Act of 1978 (hereinafter referred to as the "NGPA"). This designation and authorization is expressly intended to include the filing of all statements required by Part 273 of the Regulations implementing the NGPA for interim collection pending the outcome of jurisdictional agency determinations, all in accordance with Section 273.103(b) of such Regulations as amended by FERC Order Number 36 (June 19, 1979).



16

ARTICLE XV.

OTHER PROVISIONS

Continued

C. If as a result of any operation conducted on the subject premises, any party should be entitled to receive an acreage or cash contribution, the party becoming entitled to the acreage or cash contribution shall notify the other parties of all of the terms and conditions of such contribution. The parties so notified shall have ten (10) days after being furnished with all pertinent details to notify the other party whether or not it or they wish to acquire an interest therein equal to its or their interest in the subject premises by assuming a like proportionate part of the obligation of the acquiring party with respect thereto. If the parties entitled to participate elect not to participate, the acquisition shall be for the sole account of the acquiring party. If the parties entitled to participate elect to participate, it or they shall be entitled to do so upon assumption of their proportionate part of the burdens of the acquisition.

D. If it develops that any interest owned and contributed by a party hereto is an unleased interest in the oil and gas rights, then such unleased interest shall be treated for all purposes of this Agreement as if it were an oil and gas lease covering such unleased interest on a form providing for the usual and customary one-eighth (1/8th) royalty and containing the usual and customary "lesser interest clause". This Agreement shall in no way affect the right of the owner of any such unleased interest to receive an amount or share of production equivalent to the royalty which would be payable if such unleased interest were subject to an oil and gas lease as provided in the preceding sentence. Where any provision of this Agreement shall operate to require an assignment from any party contributing an unleased mineral interest, such provision shall be construed (insofar as such unleased mineral interest is concerned) as requiring instead the execution and delivery by such party of an oil and gas lease, for a primary term of one (1) year from the date of its delivery and so long thereafter as oil or gas is produced, which lease shall reserve unto the Lessor a one-eight (1/8th) royalty and contain the usual "lesser interest clause".

## Exhibit "A"

Attached hereto and amde a part of the Operating Agreement by and between SAXON OIL COMPANY, as Operator, and AXEL JOHNSON EXPLORATION AND PRODUCTION CORPORATION, as Non-Operator, dated May 1, 1982.

---

### (A) LANDS SUBJECT TO CONTRACT

1981-1

Prospect No.

1. Texon Prospect (TX-767)
Section 28, Block 1, University Lands, Reagan County, Texas.

2. Sprayberry Section 14 Prospect (TX-670)
N/2 and SW/4 of Section 14, Block 2, University Lands, Reagan County, Texas.

3. East Hazel Prospect (TX-742)
NE/4 and NW/4 of Section 7, Block 1, GC&SF RR Co. Survey, Upton County, Texas, limited in depth to the base of the Dean formation.

4. EXT North Prospect (TX-732)
Labors 1, 3, 8 and 10, League 260, BCSL, Martin County, Texas and Labor 7, League 261, BCSL, Dawson and Martin Counties, Texas.

1981-2

Prospect No.

1. Leo Prospect (TX-758)
Section 6, Block 6, GC&SF RR Co. Survey, Upton County, Texas.

2. S. W. Sulphur Draw Prospect (TX-801)
S/2 of Section 6, Block 36, T3N, T&P RR Co. Survey; S/2 and NE/4 of Section 7, Block 36, T3N, T&P RR Co. Survey, Martin County, Texas.

3. South Ackerly Prospect (TX-793)
Section 1, Block 35, T3N, T&P RR Co. Survey, Dawson County, Texas.

1981-3

Prospect No.

1. Sprayberry 33 Prospect (TX-693)
Section 33, Block 9, University Lands, Reagan County, Texas.

2. Sprayberry 28 Prospect (TX-692)
S/2 of Section 28, Block 9, University Lands, Reagan County, Texas.

3. North Hazel 46 Prospect (TX-731)
Section 46, Block 40, T5S, T&P RR Co. Survey, Upton County, Texas, limited in depth to the base of the Dean formation.

ELA Received From Parsley ; 19

4. North Hazel 45 Prospect (TX-731)
E/2 of Section 45, Block 40, T5S, T&P RR Co. Survey, Upton County, Texas, limited in depth to the base of the Dean formation.

5. North EXT Prospect (TX-732)
Labors 2 and 9, League 260, BCSL, Martin County, Texas and Labor 5, League 261, BCSL, Martin County, Texas.

6. East Hazel Prospect (TX-742)
SE/4 and SW/4 of Section 7, Block 1, GC&SF RR Co. Survey, Upton County, Texas, limited in depth to the base of the Dean formation.

7. Sprayberry 27 Prospect (TX-691)
S/2 of Section 27, Block 9, University Lands, Reagan County, Texas.

(B) PERCENTAGE OF INTEREST OF PARTIES TO THIS AGREEMENT:

Saxon Oil Company 87.4%
717 North Harwood
Suite 1300
Diamond Shamrock Tower
Dallas, Texas 75201

Axel Johnson Exploration and Production Corporation
525 North Belt East 12.6%
Suite 240
Houston, Texas 77060

# TAB 6

22. In addition to the Saxon Leases and the Mecca Leases, Ovintiv executed two "Amendment, Extension, Ratification and Revivor of Oil and Gas Leases" instruments with the successors of the lessors of L1, who at that time collectively owned 75% of the minerals in Section 46 (subject to any prior valid and subsisting leases) (the "Neal 2018 Instruments"), as follows:

    a. Amendment, Extension, Ratification and Revivor of Oil and Gas Leases dated July 24, 2018, from Robert Luther Neal, Individually and as Trustee of the Robert L. Neal Management Trust and Neal Brusenhan Properties, LP, recorded in Volume 1035, Page 257, covering all of Section 46; and

    b. Amendment, Extension, Ratification and Revivor of Oil and Gas Leases dated July 24, 2018, from Jessie Frances Neal, recorded in Volume 1037, Page 612, covering all of Section 46.

23. McCully-Chapman is not a signatory to any of the Neal 2018 Instruments.

## III. THE NEAL HORIZONTAL WELLS

24. At issue in this lawsuit are a number of horizontal wells called the "Neal Wells" or the "Neal Horizontal Wells" that were drilled in 2019, 2020, and 2021.

25. With respect to the horizontal wells that Ovintiv drilled through Section 46, the Parties agree as follows (out of an abundance of caution, this is not a stipulation or agreement that the 34G 11HF or the 34X 13HJ are subject to this lawsuit):

| **Well Name** | **API** | **Spud Date** | **Completion Date** | **First Prod Date** *(First day of month of 1st Production)* | **True Vertical Depth** | **Upper Perf** *(Used to calc lateral length)* | **Lower Perf** *(Used to calc lateral length)* | **Lateral Length** *(Lower Perf minus Upper Perf)* | **Formation** | **Location in Section 46** | **PRODUCING STATUS** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NEAL 34E 4HE | 4246141759 | 8/5/2021 | 2/16/2022 | 3/1/2022 | 8,590 | 8,612 | 23,746 | 15,109 | SPRABERRY | E2 | ACTIVE |
| NEAL 34F 8HE | 4246141764 | 8/8/2021 | 2/16/2022 | 3/1/2022 | 8,561 | 8,570 | 23,652 | 15,052 | SPRABERRY | E2 | ACTIVE |
| NEAL 34G 10HD | 4246141766 | 8/9/2021 | 2/16/2022 | 3/1/2022 | 8,362 | 8,435 | 21,354 | 12,896 | SPRABERRY | E2 | ACTIVE |
| NEAL 34X 15HD | 4246141921 | Original: 8/11/2021<br>Re-Spud: 12/1/2021 | 2/17/2022 | 2/1/2022 | 8,374 | 8,348 | 21,329 | 12,957 | SPRABERRY | E2 | ACTIVE |
| NEAL 39A 1HD | 4246141275 | 9/21/2019 | 1/29/2020 | 3/1/2020 | 8,396 | 8,426 | 18,450 | 10,014 | SPRABERRY | W2 | ACTIVE |
| NEAL 39A 2HF | 4246141276 | 9/20/2019 | 1/30/2020 | 2/1/2020 | 8,962 | 9,002 | 19,806 | 10,796 | SPRABERRY | W2 | ACTIVE |
| NEAL 39B 6HC | 4246141280 | 9/15/2019 | 2/11/2020 | 3/1/2020 | 8,188 | 8,345 | 18,852 | 10,502 | SPRABERRY | W2 | ACTIVE |
| NEAL 39B 7HF | 4246141281 | 9/16/2019 | 2/11/2020 | 2/1/2020 | 8,963 | 8,988 | 19,828 | 10,832 | SPRABERRY | W2 | ACTIVE |
| NEAL 39B 10HE | 4246141284 | 9/16/2019 | 2/10/2020 | 2/1/2020 | 8,716 | 8,917 | 19,493 | 10,571 | SPRABERRY | W2 | ACTIVE |
| NEAL 39C 11HF | 4246141285 | 9/24/2019 | 1/30/2020 | 2/1/2020 | 8,965 | 8,947 | 19,769 | 10,807 | SPRABERRY | W2 | ACTIVE |
| NEAL 39C 14HE | 4246141288 | 9/21/2019 | 1/29/2020 | 2/1/2020 | 8,723 | 8,696 | 19,536 | 10,825 | SPRABERRY | W2 | ACTIVE |
| NEAL 34E 2HF | 4246141757 | 8/4/2021 | 2/15/2022 | 3/1/2022 | 9,039 | 9,030 | 24,082 | 15,019 | SPRABERRY | E2 | ACTIVE |
| NEAL 34F 7HJ | 4246141763 | 8/7/2021 | 2/16/2022 | 2/1/2022 | 9,249 | 9,507 | 24,289 | 14,773 | WOLFCAMP | E2 | ACTIVE |
| NEAL 34G 11HF* | 4246141767 | 8/9/2021 | 2/15/2022 | 3/1/2022 | 8,990 | 8,967 | 21,854 | 12,859 | SPRABERRY | E2 | ACTIVE |
| NEAL 34X 13HJ* | 4246141769 | 8/10/2021 | 2/17/2022 | 3/1/2022 | 9,251 | 9,322 | 22,235 | 12,904 | WOLFCAMP | E2 | ACTIVE |
| NEAL 34F 6HD | 4246141762 | 8/7/2021 | 2/17/2022 | 4/1/2022 | 8,373 | 8,424 | 23,440 | 14,994 | SPRABERRY | E2 | ACTIVE |
| NEAL 34X 14HE | 4246141770 | 8/10/2021 | 2/17/2022 | 2/1/2022 | 8,566 | 8,625 | 21,511 | 12,864 | SPRABERRY | E2 | ACTIVE |
| NEAL 39A N 5HE | 4246141378 | 11/22/2019 | 2/11/2020 | 2/1/2020 | 8,713 | 8,710 | 19,509 | 10,787 | SPRABERRY | W2 | ACTIVE |
| NEAL 39A 4HJ | 4246141278 | 9/19/2019 | 1/28/2020 | 2/1/2020 | 9,300 | 9,319 | 20,188 | 10,856 | WOLFCAMP | W2 | ACTIVE |
| NEAL 39B 9HJ | 4246141283 | 9/6/2019 | 2/9/2020 | 2/1/2020 | 9,290 | 9,540 | 20,175 | 10,629 | WOLFCAMP | W2 | ACTIVE |
| NEAL 39C 13HJ | 4246141287 | 9/22/2019 | 1/26/2020 | 1/1/2020 | 9,295 | 8,696 | 19,536 | 10,796 | WOLFCAMP | W2 | ACTIVE |
| NEAL 34E 3HL | 4246141758 | DRILLED DEEPER THAN 9,450 FEET - NO INTEREST CLAIMED CLAIMED BY McCULLY-CHAPMAN IN THIS LITIGATION | | | | | | | | | |
| NEAL 34F 5HM | 4246141761 | DRILLED DEEPER THAN 9,450 FEET - NO INTEREST CLAIMED CLAIMED BY McCULLY-CHAPMAN IN THIS LITIGATION | | | | | | | | | |
| NEAL 34G 9HL | 4246141765 | DRILLED DEEPER THAN 9,450 FEET - NO INTEREST CLAIMED CLAIMED BY McCULLY-CHAPMAN IN THIS LITIGATION | | | | | | | | | |
| NEAL 34GG 12HM | 4246141768 | DRILLED DEEPER THAN 9,450 FEET - NO INTEREST CLAIMED CLAIMED BY McCULLY-CHAPMAN IN THIS LITIGATION | | | | | | | | | |
| NEAL 39A 3HL | 4246141277 | DRILLED DEEPER THAN 9,450 FEET - NO INTEREST CLAIMED CLAIMED BY McCULLY-CHAPMAN IN THIS LITIGATION | | | | | | | | | |
| NEAL 39C 12HL | 4246141286 | DRILLED DEEPER THAN 9,450 FEET - NO INTEREST CLAIMED CLAIMED BY McCULLY-CHAPMAN IN THIS LITIGATION | | | | | | | | | |
| NEAL 34D 1HD | 4246141756 | WELL WAS NEVER DRILLED PAST 449 FEET - NO INTEREST CLAIMED BY McCULLY-CHAPMAN IN THIS LITIGATION | | | | | | | | | |
| NEAL 34E 5HD | 4246141760 | WELL WAS NEVER DRILLED PAST 449 FEET - NO INTEREST CLAIMED BY McCULLY-CHAPMAN IN THIS LITIGATION | | | | | | | | | |
| NEAL 34E 5HE | 4246141279 | WELL WAS NEVER DRILLED PAST 550 FEET - NO INTEREST CLAIMED BY McCULLY-CHAPMAN IN THIS LITIGATION | | | | | | | | | |

26. Ovintiv agrees that McCully-Chapman owns an interest (the amount is disputed) in the following Neal Horizontal Wells: the Neal 39A 1HD, Neal 39A N 5HE, Neal 39B 10HE, Neal 39B 6HC, and Neal 39C 14HE.

27. The Neal Horizontal Wells were all drilled from surface locations located on neighboring lands that the Parties refer to as “Section 34” or “Section 39.” The Neal Horizontal Wells have perforations within and all produce from Section 34, Section 39, and Section 46, and some of the wells also have perforations within and produce from lands the Parties refer to as “Section 2.”

28. Ovintiv owns working interests in Section 34, Section 39, Section 46, and Section 2.

29. McCully-Chapman does not own an interest in Section 34, Section 39, or Section 2.

30. McCully-Chapman does not currently dispute the reasonableness of the costs incurred by Ovintiv and other participants to drill, complete, equip, and operate the Neal Horizontal Wells. Outside of the Parties’ disputes regarding non-consent penalties and ownership interests, the Parties do not otherwise dispute the share of costs and revenues attributable to McCully-Chapman in the Neal Horizontal Wells.

## IV. THE JOINT OPERATING AGREEMENT

31. The Joint Operating Agreement at issue in this litigation (“JOA”) is dated May 1, 1982, and both McCully-Chapman and Ovintiv are successor parties to the JOA. A true and correct copy of the JOA is Joint Exhibit 1. McCully-Chapman is a successor in interest to original JOA party Axel Johnson Exploration and Production Company. Ovintiv is successor in interest to original JOA party Saxon Oil Company.

32. Ovintiv is Operator under the JOA, and McCully-Chapman is Non-Operator.

33. The JOA applied to the parties’ interests in the Brusenhan No. 3 well.

34. The JOA does not apply to wells with all perforations in the Wolfcamp formation.

35. The JOA expressly references Section 46 (from the surface to the base of Dean formation) in its Exhibit A defining the “Contract Area.” The Exhibit A does not reference Section 34, Section 39, or Section 2.

36. Ovintiv is the successor-in-interest to all previous operators of the Brusenhan Wells. Ovintiv is also successor-in-interest to the previous operators of the Neal Vertical Wells (defined below).

## V. WELL PROPOSALS AND NONCONSENT PENALTIES

37. In a letter dated September 17, 2019 sent by Ovintiv to McCully-Chapman, Ovintiv proposed the “drilling and completion” of certain Neal Horizontal Wells. A true and correct copy of Ovintiv’s letter with an election ballot, well plats, and Authorizations for Expenditure is the Parties’ Joint Exhibit [*Forthcoming*].

38. McCully-Chapman's representative Lois Krenek, initialed next to each well in the "Elect to Non-Consent" column on the ballot attached to the September 17, 2019 letter, and returned the ballot to Ovintiv. A true and correct copy of this returned ballot is the Parties' Joint Exhibit [*Forthcoming*].

39. In a letter dated June 23, 2021 sent by Ovintiv to McCully-Chapman, Ovintiv proposed the "drilling and completion" of certain additional Neal Horizontal Wells. A true and correct copy of Ovintiv's letter with an election ballot, well plats, and Authorizations for Expenditure is the Parties' Joint Exhibit [*Forthcoming*].

40. McCully-Chapman's representative Lois Krenek, initialed next to each well in the "Elect to Non-Consent" column on the ballot attached to the June 23, 2021 letter, and returned the ballot to Ovintiv. A true and correct copy of this returned ballot is the Parties' Joint Exhibit [*Forthcoming*].

41. There were no other well election letters or ballots sent to McCully-Chapman for any Neal Horizontal Wells other than the two referenced in the preceding paragraphs.

42. After McCully-Chapman received each of the Neal Horizontal Well proposals, Lois Krenek consulted an independent geological consultant engaged by McCully-Chapman (Gerald Bullock), before returning McCully-Chapman's ballots.

43. The perforations of the Neal 39A 4HJ, Neal 39B 9HJ, and Neal 39C 13HJ are all located in the Wolfcamp formation and therefore these "Wolfcamp Wells" are not subject to the JOA.

44. Ovintiv is treating McCully-Chapman as a co-tenant with no joint operating agreement applicable to the Wolfcamp Wells (Neal 39A 4HJ, Neal 39B 9HJ, and Neal 39C 13HJ) and has put or will put McCully-Chapman in pay after 100% of the costs of drilling, completing, equipping, and operating those wells are or were recouped.

45. Ovintiv currently is applying non-consent penalties to McCully-Chapman's interest for all of the Neal Horizontal Wells, except for (i) the Wolfcamp Wells; and (ii) those wells for which Ovintiv does not credit McCully-Chapman with an interest.

46. McCully-Chapman did not pay cash out of pocket for any of the drilling or completion costs incurred for the Neal Horizontal Wells. The Parties agree that this was not a breach of the JOA (if applicable) nor a breach of Texas co-tenancy law (if the JOA is not applicable). (McCully-Chapman contends that it contributed its acreage toward these wells and that its share of actual costs has been, or is being, recouped out of its share of production from the Neal Horizontal Wells.)

47. Apart from the well proposal letters and election ballots, McCully-Chapman and Ovintiv did not communicate with one another about non-consent penalties, payout calculations, or non-consent penalty application to the Neal Horizontal Wells from 2019–2022.

# TAB 7

encana

Owen McMillan
*Senior Land Negotiator*
720-876-5838 Direct
Owen.McMillan@encana.com

RECEIVED
SEP 25 2019
BY:____________

September 17, 2019

McCully-Chapman Exploration
P.O. Box 421
Sealy, Texas 77474

RE: Encana Oil & Gas (USA) Inc.
Well Package Proposal – Neal 46 P39 Wells
Sections 39, 46, Block 40, T5S,
Section 2, BFM Survey, Abstract No. 1598, Upton County, Texas

| | |
|---|---|
| NEAL 39A 1HD | NEAL 39A 2HF |
| NEAL 39B 9HJ | NEAL 39B 10HE |
| NEAL 39A 4HJ | NEAL 39C 11HF |
| NEAL 39A 5HE | NEAL 39B 6HC |
| NEAL 39C 13HJ | NEAL 39B 7HF |
| NEAL 39C 14HE | |

Dear Ms. Krenek,

Pursuant to the terms of that Joint Operating Agreement dated May 1, 1982, covering all of section 46, Block 40 T5S (the "JOA") Encana Oil & Gas (USA), Inc., ("Encana"), current operator under the JOA, hereby proposes the drilling and completion of the above mentioned wells. The wells will be drilled to the approximate depths according to the chart below, testing and developing zones within the Middle Spraberry, Jo Mill, Lower Spraberry, and Wolfcamp formations. Below are estimated and average target locations for each well being proposed:

| | WELL | Target | Avg. Est. TVD | SHL | BHL |
|---|---|---|---|---|---|
| NEAL 46 P39E PAD 1 | Neal 39A 1HD | Jo Mill (D) | 8465 | 1623' FNL & 471' FWL | 100' FSL & 330' FWL |
| | Neal 39A 2HF | LLSB (F) | 8965 | 1623' FNL & 496' FWL | 100' FSL & 330' FWL |
| | Neal 39A 4HJ | WCA (J) | 9300 | 1623' FNL & 547' FWL | 100' FSL & 660' FWL |
| | Neal 39A 5HE | ULSB (E) | 8720 | 1623' FNL & 571' FWL | 100' FSL & 660' FWL |
| NEAL 46 P39E PAD 2 | Neal 39B 6HC | MSB (C) | 8200 | 1623' FNL & 1047' FWL | 100' FSL & 990' FWL |
| | Neal 39B 7HF | LLSB (F) | 8965 | 1623' FNL & 1071' FWL | 100' FSL & 990' FWL |
| | Neal 39B 9HJ | WCA (J) | 9300 | 1623' FNL & 1121' FWL | 100' FSL & 1320' FWL |
| | Neal 39B 10HE | ULSB (E) | 8720 | 1623' FNL & 1146' FWL | 100' FSL & 1320' FWL |
| NEAL 46 P39F PAD 3 | Neal 39C 11HF | LLSB (F) | 8965 | 1623' FNL & 1833' FWL | 100' FSL & 1650' FWL |
| | Neal 39C 13HJ | WCA (J) | 9300 | 1623' FNL & 1908' FWL | 100' FSL & 1980' FWL |
| | Neal 39C 14HE | ULSB (E) | 8720 | 1623' FNL & 1933' FWL | 100' FSL & 1980' FWL |

Estimates for the cost to drill and complete each well are outlined below and summarized in the enclosed AFEs. Preliminary plats of the wells are enclosed for your review.

Drilling is expected to begin late September. Please make an election for each well, sign in the space provided below, and return one copy of same along with the executed AFEs and your insurance elections to my attention at the address set forth below. If you should choose to participate, please include a copy of



Plaintiff's Exhibits
P-202

Owen McMillan
*Senior Land Negotiator*
720-876-5838 Direct
Owen.McMillan@encana.com

your well data requirement sheet and certificate of insurance, if you maintain your own. If you choose not to participate, your interest will be subject to the appropriate non-consent penalties outlined in the JOAs.

Regards,

Owen McMillan
Senior Land Negotiator
Encana Oil and Gas (USA) Inc.

Owen McMillan
*Senior Land Negotiator*
720-876-5838 Direct
Owen.McMillan@encana.com

**Participation**

By checking the appropriate box below, McCully-Chapman elects to participate in or non-consent to the drilling and completion of the following wells:

| Elect to Participate | Elect to Non-Consent | Well Name | Target | Est. WI | Well Cost | Share of Cost |
|---|---|---|---|---|---|---|
| | lk | Neal 39A 1HD | Jo Mill (D) | 3.58953979% | $ 8,639,925.00 | $310,133.55 |
| | lk | Neal 39A 2HF | LLSB (F) | 0.39657669% | $ 8,519,925.00 | $ 33,788.04 |
| | lk | Neal 39A 4HJ | WCA (J) | 0.39435589% | $ 8,439,925.00 | $ 33,283.34 |
| | lk | Neal 39A 5HE | ULSB (E) | 3.56931015% | $ 8,519,925.00 | $304,102.55 |
| | lk | Neal 39B 6HC | MSB (C) | 3.58980636% | $ 8,519,925.00 | $305,848.81 |
| | lk | Neal 39B 7HF | LLSB (F) | 0.39660901% | $ 8,519,925.00 | $ 33,790.79 |
| | lk | Neal 39B 9HJ | WCA (J) | 0.39438808% | $ 8,439,925.00 | $ 33,286.06 |
| | lk | Neal 39B 10HE | ULSB (E) | 3.56957717% | $ 8,519,925.00 | $304,125.30 |
| | lk | Neal 39C 11HF | LLSB (F) | 0.39663761% | $ 8,550,221.00 | $ 33,913.39 |
| | lk | Neal 39C 13HJ | WCA (J) | 0.39441878% | $ 8,470,221.00 | $ 33,408.14 |
| | lk | Neal 39C 14HE | ULSB (E) | 3.56985459% | $ 8,550,221.00 | $305,230.46 |

**McCully-Chapman Exploration**

Lois Krenek, Vice President
By: Lois Krenek

10-16-19
Date:

# TAB 8

A. There's no restrictions in the agreement. In fact, I think in my opinion, the recital or preamble of the operating agreement says the parties have reached an agreement to develop and produce the lands comprised of the contract area. And that does not prohibit you from developing those leases and lands by adding additional lands outside the contract area to assist in those developments.

MR. BRISTER: Sure. And I'm sorry, but I'll object as nonresponsive.

THE COURT: Sustained.

BY MR. BRISTER:

Q. Sir, my question is a little bit more specific. Do you contend that this agreement reflects an agreement to jointly develop section 39?

A. It is an agreement that addresses the development of section 39.

Q. Okay.

A. I mean section 46. Excuse me.

Q. Right. 46, but not 39. Right?

A. It's not mentioned.

Q. Okay. And it also doesn't mention 34? Section 34?

A. No, it does not.

Q. Okay. So it can't be said to be an agreement

to develop section 34 or 39. Right?

A. I would agree with that, yes.

Q. Okay. Your -- I'm sorry. Scratch that. You're familiar with Article 6B of this JOA form?

A. Yes.

Q. And Article 6B is how you get nonconsent penalties. Is that right, sir?

A. Yes. That's where the nonconsent provisions are where a party can elect not to participate in a proposed subsequent operation.

Q. Right. And Article 6A talks about what kind of proposals you can make. I'm sorry, sir. Let me take that all back. That's not right. Article 6B1 talks about what kind of proposals you can make. Is that right?

A. Yes.

Q. Okay. And it uses the phrase -- and if you want to open it, that's fine. I think it's language I would imagine you're familiar with. But it says that it allows proposals for, quote, a well on the contract area? Right?

A. Yes.

Q. Okay. And I think you'd agree with me it doesn't say part of a well on the contract area, or portion of a well. Right?

A. It requires the location of the well. And if the location is outside of section 46, then that needs to be included in the proposal letter. But again, there's nothing that says that the location of the surface -- the surface location has to be in section 46.

Q. Okay. So did Ovintiv propose portions of wells, or all of wells with regards to the Neal horizontals?

A. They proposed the entire well.

Q. But that -- but how does that work when you said this JOA only covers the portion in section 46?

A. Because when allocation wells are drilled, as I stated earlier, there are usually multiple tracts of land involved with the horizontal lateral and where the lateral will have take points and where it will produce. And in this case, section 46 is part of the Neal wells. And so insofar as the length of the lateral, the linear feet of the lateral underlying section 46 would pay its share of costs and receive its share of production based upon the linear feet and the lateral in 46 in relation to the total length of the lateral from the initial take point to the final take point.

Q. Okay. So let me pull up some demonstratives,

What about this? And what if it just barely clips into section 46 now? They do get that far. Now, does it -- does the section 46 JOA apply?

A. It depends.

Q. I think you're going to tell me it depends if there's a take point in there. Right?

A. Yes.

Q. Okay. Let's say that there's one take point just over the boundary into section 46. Does the section 46 JOA apply?

A. It would as to those parties that are subject to the section 46 JOA.

Q. Okay. Let's do one last one. And I'm -- this is something you may laugh at. Because I have to be honest with you. I laughed at it. So I hope you do. But can you see my wild futuristic -- what I'm trying the hope the industry catches on with a snake curve well. I'm joking about that. But can you see this well that goes back and forth, back and forth, and then just at the end, it clips section 46?

A. Yes.

MR. HOGAN: Your Honor, I'm just going to renew my objection.

THE COURT: Overruled.

BY MR. BRISTER:

Q. Okay. In this instance, I want you to assume that there's take points there. Is this a well that's covered by the intention of the section 46 JOA?

A. It would still -- the 46 -- section 46 JOA would still apply, but the allocation of costs and production to the section 46 owners would be miniscule. It would be very, very, very small.

Q. Okay. But that would be a very expensive well, wouldn't you assume?

A. Well, proportionate -- yeah, it would be.

Q. So can I ask you something? Is going through section 46 with a take point -- is it fair to call that your minimum criteria to getting your section 46 JOA to apply?

A. I think that the -- the section 46 JOA has to apply where that section 46 lies between the initial take point and the final take point.

Q. Right. So if I'm understanding you, yes, your minimum criteria to getting the JOA to apply is you need a take point in section 46. Right?

A. Yes.

Q. Okay. In going through and forming your opinions, did you speak to any of the original parties that signed this JOA?

Q. And I don't think I saw an update for that, so I want to ask you -- I don't see anything in here mentioning a review of any JOA form covering any part of the Neal wells, except for the 1982 JOA at issue in this case. Is that right?

A. The '77 form in this case. And I think as far as I know, it's the only operating agreement involved with the Neal wells.

Q. Okay. If I -- if you were to learn that there were some other JOAs that covered other portions of these allocation wells, as Ovintiv calls them, would that factor into your opinion at all?

A. It would just mean that the parties under those JOAs would have to make their decisions jointly and respond jointly to Ovintiv when the wells were proposed.

Q. Do you see anything in this, as you call it, a 1977 JOA that's at issue in this case -- do you see anything in there giving any framework for how the parties along the entire wellbore might jointly make the decisions, as you mentioned?

A. Nothing in the JOA form itself.

Q. So since you haven't reviewed those other JOA forms, if they exist, you don't have any opinions on whether they're capable of doing -- working together.

Right?

A. You know, I can't really respond to that because I don't know which forms were used or what modifications --

Q. Okay. And --

A. -- may have been made to them.

Q. Okay. And Mr. Roach, if they did make some other modifications and those sorts of things, that might be something you need to look at in determining whether they're compatible. Right?

A. Well, they wouldn't necessarily be compatible. It would -- it just would show that there's a JOA and that the tract of land that is subject to a different JOA -- that those parties are going to have to work together to decide what they're going to do and how they're going to respond to the Ovintiv well proposal.

Q. Okay. And Mr. Roach, I understand you're not an in-house landman. I have a question about what you believe an in-house landman would do. Should a prudent landman in-house review other JOAs along the wellbore to see if they're compatible or how the votes would be done jointly?

MR. HOGAN: And that, Your Honor, I will object to to the extent it calls for speculation and to the -- yes. Actually, just speculation. And also, I

guess, relevance. Because as Mr. Brister put it, he's not an in-house landman.

THE COURT: Sustained.

BY MR. BRISTER:

Q. Okay. In your experience, is it possible to remove an operator from only the middle segment of a horizontal wellbore?

A. No. I think that it would still require all of the owners in the well to jointly make those -- those elections.

Q. Okay. Some of these Neal horizontal wells go through section 46 and a little bit further on to the next section. Is that your understanding?

A. I believe that's correct.

Q. Okay. Is it -- how would it work if McCully-Chapman wanted to make a proposal to deepen just the middle portion of the horizontal wellbore? Would they need to work with the owners of section 34 and the section 2 on that?

A. I don't think you can deepen a horizontal well.

Q. Okay. What about sidetracking just the middle segment in section 46? Would they need to try to go to work out something with the owners in section 34 and section 2?

A. If -- you know, sidetracking is highly unusual in a horizontal well. In fact, when the 2015 revision committee was drafting the forms, we -- our committee -- there were 10 of us on the committee. Most of them were attorneys -- said you can't sidetrack a horizontal well.

Q. Okay.

A. It was after the fact we learned that no, you can. And I have actually see one or two occasions or heard of one or two where horizontal wells were sidetracked. But it would be a -- have to be proposed to all parties who had participated in the drilling of well originally.

Q. Not just in section 46, but in all the sections. Right?

A. Yes.

Q. Okay. And I notice that your report doesn't mention anything about payout statements in your documents considered. Is that correct? You did not review payout statements?

A. No. That's part of the operating agreement that payout statements will be provided. So I tend to assume they were provided.

Q. How often are you supposed to provide those?

A. Well, the JOAs all state monthly. But when a

well -- when an operator knows a well is either not going to pay out or it's never going to pay out the penalties, sometimes operators will go to quarterly or semi-annual payments -- or payout statements. And in fact, in wells they know are never going to pay out, they may just do an annual payout statement.

Q. Understood. Okay. Got it. Are you familiar with COPAS accounting procedures?

A. Yes.

Q. That's something usually attached to the back of every JOA as Exhibit C. Right?

A. Yes.

Q. And there's one here. Would you agree with in that?

A. Yes.

Q. I believe -- I mean, you probably answered this. But since you didn't review any other JOAs along the Neal horizontals, you also did not review any of the other accounting procedures from the other JOAs. Right?

A. No, I did not.

Q. Okay. I'd like to talk about a few things. Give me just a second. I can probably scratch off some questions here, sir, so let me just kind of skip through a few things. One of the things you said

# TAB 9

BY MR. EASON:

Q. The 2019 well ballot. You just told me you didn't write it, so you can't speak to the intent. Is that fair?

A. Fair.

Q. Okay. But you would also agree, though, that there are wells on that ballot that today, Ovintiv believes and agrees are not subject to the JOA.

A. Correct.

Q. And Ovintiv is not using this well ballot to argue that those Wolfcamp wells are subject to the JOA. Correct?

A. Not for the Wolfcamp wells.

Q. Okay. So it's a selective -- Ovintiv is selecting some wells that they want to use this well ballot for to ratify the JOA, but they don't want to use it for the Wolfcamp wells. Is that accurate?

A. That is because they were not covered under the initial JOA.

Q. Understood. My question is is the way that I characterized that accurate?

A. Repeat that?

Q. Sure. Ovintiv wants to treat some wells on these ballots as being ratified as under the JOA, but not the Wolfcamp wells. Correct?

A. The Wolfcamp wells are not part of the JOA. Correct.

Q. Right. And that interpretation on behalf of Ovintiv is selective. Right?

A. I don't think that I would agree with that.

Q. Okay. Has -- before this lawsuit was filed, did anyone at Ovintiv tell McCully that it was choosing -- it was selecting some of the wells on the well ballot to be drilled under the JOA, but not others?

A. No. Everything was under the JOA on the ballots.

Q. Right. And just to go back to my point, Ovintiv was never intending to expand the scope of the JOA by sending these well ballots because Ovintiv believed that these wells were already subject to the JOA.

A. That is correct. Yes, sir.

Q. Okay. Thank you. On Exhibit 202 --

THE COURT: Plaintiff's. Right?

MR. EASON: I'm sorry, Your Honor. Plaintiff's Exhibit 202.

THE COURT: Thank you.

BY MR. EASON:

Q. And if you'd go to the page that says MC

lateral goes through -- what portion of the well goes through that tract. And that is how we bill people, and that is how revenues are paid.

Q. Okay.

A. I'm sorry. I don't know how to better explain it.

Q. Thank you. That's very helpful. Ovintiv is not segregating the costs that are incurred just within each section. They're bundling it all together and then charging a percentage of that cost. Right?

A. That is correct, yes.

Q. Okay. And I think in this case, I've seen your attorneys say that separating those costs out would require extensive expert work. Would you agree with that statement, or would you disagree with that statement?

A. It would take accounting time to go through and pull those costs out.

Q. Right. And accounting time Ovintiv has not done. Right?

A. We have not been requested to do that, and we have not done that.

Q. You are aware -- how long have you worked -- I know you work in Colorado, but how long have you managed Texas assets?

Q. And these three are the Wolfcamp wells that Ovintiv reversed the nonconsent penalties and agreed to just treat them -- treat McCully-Chapman as a cotenant in those wells. Right?

A. That is correct. Even though they elected to go nonconsent, we agreed they should have never been proposed, so we moved them to cotenants.

Q. Right. So is two of the wells -- and I'm not going to ask for specific names. But two of these three wells are currently -- Ovintiv's currently paying McCully-Chapman for McCully's share of production from two of these three wells. Right?

A. I believe that is correct, yes.

Q. And I thought I heard your counsel say that maybe one of these was back in pay. Is one of them in pay now, or was he referring to another well?

A. Of these wells in group 2, only two of them have paid out at cotenant.

Q. And those payments are rolling in monthly. Right?

A. I believe that they are. We are sending payment.

Q. And Ovintiv is still paying on these same working interest and net revenue interest numbers that we see here. Right?

A. We are paying on these numbers, which are now inaccurate.

Q. Right. And Ovintiv is not changing these pending the litigation. Correct?

A. We were waiting until trial litigation was over. Yes.

Q. Okay. But today, you don't know what Ovintiv intends to do after the litigation with respect to these interest percentages.

A. I don't want to speculate.

Q. Okay. Let's go back to the well ballots, if you could. And it's P200 and P219. I want to talk about some of the well ballot complaints that we've touched on briefly today. Okay?

A. All right. I'm on 200.

Q. You agree, generally, that in order to be able to charge nonconsent penalties, you have to propose a well to a nonoperator. Correct?

A. Per the JOA, yes. That is correct.

Q. And are you -- you're in P200, which is the Neal 39 well. Do you see that?

A. Yes, sir.

Q. And I'm going to ask a very specific question: Do you see anywhere on here 39AN5HE? Those words.

A. I do not.

# TAB 10

outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VI.

## DRILLING AND DEVELOPMENT

**A. Initial Well:**

On or before the ________ day of ________________________,______, Operator shall commence the drilling of the Initial Well at the following location (if a Horizontal Well, surface and Terminus/Termini of the Lateral(s)): and shall thereafter continue the drilling of the well (horizontally if a Horizontal Well) with due diligence to The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.G. as to termination of operations and Article XI as to occurrence of force majeure.

**B. Subsequent Operations:**

1. Proposed Operations: If any party hereto should desire to drill any well under this agreement other than the Initial Well, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give a written proposal of the operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement (and to all other parties in the case of a proposal for Sidetracking or Deepening as to a Vertical Well) specifying: (a) as relating to a Vertical Well, (1) that the proposed operation is a Vertical Well operation; (2) drilling and Completion plans specifying the proposed: (i) depth, (ii) surface and, if deviated, bottom hole locations, (iii) objective Zone, (iv) utilization and scheduling of rig(s) (drilling and Completion), and (v) stimulation operations, staging and sizing; and (3) estimated drilling and Completion costs as set forth in an AFE; or (b) as relating to a Horizontal Well, (1) that the proposed operation is a Horizontal Well operation; (2) include drilling and Completion plans specifying the proposed: (i) Total Measured Depth(s), (ii) surface hole location(s), (iii) Terminus/Termini, (iv) Displacement(s), (v) utilization and scheduling of rig(s) (Spudder Rig, drilling and Completion), and (vi) stimulation operations, staging and sizing; and (3) estimated drilling and Completion costs as set forth in an AFE. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.7.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Consenting Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2. Operations by Less Than All Parties:

(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period.
If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created