No. 26-50318

---

In the United States Court of Appeals for the Fifth Circuit

---

McCully-Chapman Exploration, Incorporated,
Plaintiff — Appellant/Cross-Appellee,

v.

Ovintiv USA, Incorporated,

Defendant-Appellee/Cross-Appellant.

---

Appeal from the United States District Court for the
Western District of Texas; No. 7:14-CV-18

---

# *Amicus* Brief of the Texas Alliance of Energy Producers Supporting Plaintiff — Appellant/Cross-Appellee

---

Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 893-9440

Counsel for *Amicus Curiae*
Texas Alliance of Energy Producers

## Certificate of Interested Persons

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| *Amicus Curiae* | Texas Alliance of Energy Producers |
| Counsel | Flores Law PLLC<br>Chad Flores |

/s/ Chad Flores
Chad Flores

## Table of Contents

Certificate of Interested Persons .......... ii

Table of Contents .......... iii

Table of Authorities .......... iv

*Amicus Curiae* Texas Alliance of Energy Producers .......... vi

Argument .......... 1

I. A rule that could unsettle legacy JOAs should come from existing Texas law or the Supreme Court of Texas—not novel federal innovations. .......... 2

A. The lower court's rule unsettles important industry norms. .......... 2

B. If *Hill* does not resolve the question, certification should. .......... 3

II. Legacy JOAs should govern whole wells, not isolated well segments. .......... 4

A. Partial coverage cannot govern one integrated well. .......... 5

1. Production can be allocated; control cannot. .......... 5

2. One well cannot answer conflicting commands. .......... 6

B. AAPL form evolution confirms the whole-well construction. .......... 7

C. Cotenancy supplies a reliable default. .......... 10

Certificate of Compliance .......... 13

## Table of Authorities

### Cases

*Browning Oil Co. v. Luecke*,
38 S.W.3d 625 (Tex. App.—Austin 2000, pet. denied) ................................ 5

*Cox v. Davison*,
397 S.W.2d 200 (Tex. 1965)................................................................... 10, 11

*French v. Occidental Permian Ltd.*,
440 S.W.3d 1 (Tex. 2014) .......................................................................... 2

*Hill v. Heritage Resources, Inc.*,
964 S.W.2d 89 (Tex. App.—El Paso 1997, pet. denied) .............................1, 3

*Jackson v. Johns-Manville Sales Corp.*,
781 F.2d 394 (5th Cir. 1986) (en banc). ...................................................... 4

*Lightning Oil Co. v. Anadarko E&P Onshore, LLC*,
520 S.W.3d 39 (Tex. 2017)......................................................................... 7

*MIECO L.L.C. v. Targa Gas Marketing L.L.C.*,
183 F.4th 410 (5th Cir. 2026) ..................................................................... 4

*Reeder v. Wood County Energy, LLC*,
395 S.W.3d 789 (Tex. 2012)........................................................................ 8

*Springer Ranch, Ltd. v. Jones*,
421 S.W.3d 273 (Tex. App.—San Antonio 2013, no pet.).............................. 5

*Tawes v. Barnes*,
340 S.W.3d 419 (Tex. 2011) ........................................................................ 6

*Weatherly v. Pershing, L.L.C.*,
945 F.3d 915 (5th Cir. 2019)........................................................................ 4

## Rules

Fed. R. App. P. 29 .................................................................................................. vii

## Additional Authorities

*See* Jeff Weems, *The New AAPL JOA Form*,
Landman, Nov./Dec. 2017 (2017) ............................................................. 8, 9

## *Amicus Curiae* Texas Alliance of Energy Producers

*Identity*. The Texas Alliance of Energy Producers is a Texas-based trade association representing the oil and gas industry, with a particular focus on independent producers and associated businesses. The Alliance represents industry interests before state and federal policymakers and regulators and works to promote a stable business environment for energy development. Created in 2000 through the merger of the North Texas Oil & Gas Association and the West Central Texas Oil & Gas Association, the Alliance has a combined membership of more than 2,100 members. It is the largest state independent oil and gas association in the nation.

*Interest*. The Alliance has a substantial interest in the predictable construction of joint operating agreements governing Texas oil-and-gas development. Its members operate, invest, and allocate risk through agreements like the AAPL model form at issue here. This appeal will affect operators and non-operators alike by defining when an existing JOA governs an operation, what rights and obligations accompany that coverage, and when parties must negotiate a broader arrangement. Those industry-wide consequences make the Alliance well positioned to address the practical and contractual considerations beyond the interests of the parties to this appeal. The brief itself focuses on those broader consequences.

*Authority*. Federal Rule of Appellate Procedure 29(a)(2) authorizes this brief's filing because all parties have consented to it.

*Authorship*. No party or party's counsel authored this brief in whole or in part. *See* Fed. R. App. P. 29(a)(4)(e)(i).

*Funding*. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(e)(ii). No person other than *amicus* contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(e)(iii).

## Argument

Industry stability is at stake in this appeal. The district court's partial-coverage rule could unsettle how legacy JOAs are administered across modern horizontal development, including payment interests, accounting, voting, and operating authority. If *Hill* (Tex. App.—El Paso 1997) does not already resolve the issue, Texas's highest court should decide whether legacy JOAs acquire this new reach.

On the merits, three important industry perspectives corroborate McCully's position that, because the JOA governs only a "well on the Contract Area," a horizontal well extending beyond that is not one. *See* Appellant's Br. 31–39. First, industry experience confirms that the district court's segment rule lacks a coherent answer to basic operating questions: Even if production can be allocated, clear *control* of one well cannot. The district court deferred those problems to the next case, but operators and non-operators alike must confront them now. Second, AAPL's own form revisions confirm that broader operations required broader language—not automatic segment coverage. Important guidance documents that industry participants relied upon in real time noticed these key changes. Third, industry perspective confirms that whole-well construction neither obstructs development nor favors either side. Cotenancy already supplies a perfectly workable default, so there is no need to stretch a legacy JOA merely to permit drilling and cost recovery.

Stability favors the familiar framework: JOA rights where agreed, cotenancy beyond them. Any new rule should come from the Supreme Court of Texas.

## I. A rule that could unsettle legacy JOAs should come from existing Texas law or the Supreme Court of Texas—not novel federal innovations.

### A. The lower court's rule unsettles important industry norms.

The disputed language belongs to a standard operating form, not a bespoke agreement whose interpretation ends with these parties. Producers using materially identical terms need a consistent understanding of their effect. *French v. Occidental Permian Ltd.*, 440 S.W.3d 1, 8 (Tex. 2014), rightly recognizes that consistent interpretation of oil-and-gas instruments is important to industry stability.

The district court's rule could change not just how much an operator withholds, but who receives revenues. Article III.B allocates costs and production according to Exhibit A while disclaiming an assignment or cross-assignment of the underlying interests. Contractual production shares therefore need not track record title. Where they differ, extending a legacy JOA to part of a cross-boundary well can change both the payment shares and the persons entitled to receive them.

That consequence reaches wells already administered on a record-title basis. Under the lower court's new construction, production attributable to acreage within a legacy Contract Area becomes subject to the JOA's contractual allocation. Such an operator could face claims from contractual interest holders absent from its revenue

deck—the schedule identifying recipients and payment shares—including holders with no corresponding record-title interest. Previously distributed revenues could become the subject of competing claims. The issue is not just whether a non-operator owes *more*. It is whether an operator has paid the *wrong persons* under the newly applicable contractual allocation.

Future investments require the same clarity *before* drilling. Producers must know whether an existing agreement governs the proposed well or whether broader coverage must be negotiated. They must also know which owners can make decisions affecting the whole operation. Those questions determine the arrangements needed before capital is committed. Resolving them only after production begins leaves both operators and non-operators exposed to terms they did not account for.

### B. If *Hill* does not resolve the question, certification should.

Those consequences make the source of any new rule especially important. If the principle of *Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89, 113 (Tex. App.—El Paso 1997, pet. denied), governs as the Alliance submits, the judgment should be reversed on that basis. Otherwise, if this Court doubts that *Hill* controls, the Court should avoid the role of innovator and send the issue to the Supreme Court of Texas.

A federal decision narrowing *Hill* would bind no Texas court, leaving the same standardized agreements subject to one rule in diversity litigation and an open question in state court. So if Texas law is to recognize partial-well JOA coverage as a new category, the Supreme Court of Texas should make that change. That course also respects the Erie obligation not to "adopt innovative theories of state law." *Weatherly v. Pershing, L.L.C.*, 945 F.3d 915, 920 (5th Cir. 2019); *Jackson v. Johns-Manville Sales Corp.*, 781 F.2d 394, 397 (5th Cir. 1986) (en banc).

*MIECO L.L.C. v. Targa Gas Marketing L.L.C.*, 183 F.4th 410, 415 (5th Cir. 2026), shows the proper course. There, a party and an amicus explained how the Court's construction of a standard-form gas contract could unsettle industry expectations. Rather than settle a disputed question of Texas law itself, the Court certified it. The same restraint is warranted here if *Hill* does not already control.

## II. Legacy JOAs should govern whole wells, not isolated well segments.

If the Court reaches the merits, the Alliance's industry experience points to the same conclusion as the text: segment-by-segment coverage cannot coherently govern one integrated well. That conclusion carries particular force from an association whose members routinely operate, invest, and allocate risk under these agreements. Their experience gives special force to three key parts of the analysis: allocating production does not allocate control; AAPL broadened the form when

broader operations required broader contractual coverage; and Texas cotenancy already permits development when no broader agreement exists.

### A. Partial coverage cannot govern one integrated well.

The district court largely answered an accounting question—how to allocate costs and production across the lateral—without resolving the operational consequences of applying one JOA to only part of a single well. That leaves operators and non-operators to administer an arrangement whose rules for control, access, liability, voting, and later operations remain uncertain.

#### 1. Production can be allocated; control cannot.

Ovintiv divides costs and revenues by tract ownership and productive lateral length. ROA.2313. That calculation does not determine who directs the well, replaces the operator, or authorizes later work. Those are separate contractual functions. A percentage can allocate the proceeds of a decision; it cannot establish who has authority to make it.

The allocation cases do not bridge that gap. *Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 646–47 (Tex. App.—Austin 2000, pet. denied), required royalties based on production attributable to the lessors' tracts after invalid pooling. *Springer Ranch, Ltd. v. Jones*, 421 S.W.3d 273, 285–86 (Tex. App.—San Antonio 2013, no pet.), allocated royalties under a sharing agreement according to productive portions of the lateral. Neither decision combines separate JOAs' voting rules or assigns

authority over an integrated well. Dividing production answers an accounting question, not the operating question this appeal presents.

### 2. One well cannot answer conflicting commands.

Operator removal exposes the problem. Ovintiv's expert acknowledged that an operator cannot be removed from only the middle segment of a horizontal well; owners throughout the well would have to act jointly. He likewise acknowledged that a sidetrack would require a proposal to participants across the well. ROA.2874–2875. Asked where this JOA supplies a framework for those joint decisions, he answered: "Nothing in the JOA form itself." ROA.2872.

That omission changes the rights the parties negotiated. Article V.B measures removal and successor-selection rights by the interests in Exhibit A. ROA.2919. Requiring approval from owners outside the agreement adds a condition to those rights. Letting one agreement's vote control the whole well extends its effect beyond its parties. Neither result follows from a production-allocation percentage.

Nor can owners simply enforce an adjacent tract's JOA. *Tawes v. Barnes*, 340 S.W.3d 419, 425–27 (Tex. 2011), requires a clear intent to confer third-party-beneficiary rights. A shared wellbore does not supply that intent. Parties can negotiate coordinated agreements, but the need for coordination is not itself an agreement to coordinate.

The same problem reaches surface access and liability protection. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 46–51 (Tex. 2017), distinguishes mineral ownership from control of the surrounding subsurface. A production percentage therefore cannot itself establish access to facilities elsewhere along the well. And segment coverage leaves unresolved whether Article V.A protects conduct at an off-tract wellhead and how Article VI.D's access and information rights and Article VII.B's security rights reach off-tract facilities. These are all about the agreement's reach, not difficulties an allocation formula can solve.

These are not isolated drafting puzzles. The same mismatch reaches ballots, audits, accounting, and later operations: each depends on knowing which parties and which agreement govern the well. Treating one JOA as governing only a slice of an integrated operation therefore creates administrative questions for the same reason it creates governance questions. The agreement supplies rules for an operating relationship, not merely a formula for dividing production.

### B. AAPL form evolution confirms the whole-well construction.

The district court treated a well's passage through the Contract Area as enough to trigger partial JOA coverage. The preexisting form and industry commentary point the other way: the Contract Area defined the undertaking

governed by the agreement, and broader operations called for broader contractual coverage. AAPL's later revisions confirm that understanding.

Texas courts construing model forms consider form evolution over time and the commentary surrounding the changes. *See, e.g.*, *Reeder v. Wood County Energy, LLC*, 395 S.W.3d 789, 794–95 (Tex. 2012). That tool should be used here.

AAPL later changed the precise language disputed here. The 1977 form authorizes proposals for "any well on the Contract Area"; the 2015 form instead refers to "any well under this agreement." *See* Jeff Weems, *The New AAPL JOA Form*, Landman, Nov./Dec. 2017, at 47, 53, *available at* https://perma.cc/BP3L-QU2S. AAPL thus replaced a geographic limitation with language allowing a broader contractual undertaking.

Jeff Weems—a member of the AAPL task force that was charged with rewriting the 2015 Model Form Operating Agreement—explains impact of changing "any well on the Contract Area" to "any well under this agreement." *Id.* Those revisions address operations extending to leases and interests outside the Contract Area, including production-sharing agreements and allocation wells. Weems thus told the industry that "this change permits application of the terms of the JOA to these more expansive operations":

> **ARTICLE III: INTERESTS OF PARTIES**
>
> As a general comment before discussing several specific changes in Article III, practitioners should note that in the 2015 Model Form JOA, many of the references to "operations on the Contract Area" have been changed to read "operations conducted under this agreement."[13] This change, albeit subtle, acknowledges the emergence and frequency of situations in which operations
>
> extend to leases and interests outside of the contract area, such as operations involving production sharing agreements and allocation wells. In order to give the parties to the 2015 Model Form JOA as much flexibility as possible, this change permits application of the terms of the JOA to these more expansive operations.

*Id.* at 47.

That history supports the whole-well construction McCaully advocates. AAPL accommodated cross-boundary operations by broadening the contractual language for agreements under the new form. It did not preserve the geographic limitation and prescribe separate coverage for each segment of a well. The revision treats the scope of the agreed operation—not a well's mere intersection with covered acreage—as the basis for applying the agreement. The 2015 revision shows how to expand the bargain; it is not a reason to expand the 1977 bargain by interpretation.

That is why broader development ordinarily calls for a broader arrangement. If an operator can obtain the old JOA's non-consent benefits merely by routing a larger well through its Contract Area, there is less reason to negotiate terms governing the larger operation. McCully's construction preserves the distinction between the contractual undertaking and development outside it. The decision below instead creates partial contractual coverage without an agreement coordinating the whole well.

### C. Cotenancy supplies a reliable default.

The district court's construction assumes that rejecting partial JOA coverage leaves a gap in the parties' relationship. Industry practice and Texas law supplied a familiar answer long before this case: when the JOA does not govern the broader well, cotenancy rules permit development and cost recovery. What falls away is only the additional contractual non-consent premium.

Cotenancy is not a gap in Texas oil-and-gas law. It is the longstanding baseline that lets development proceed without forcing unwilling owners into another party's investment timetable. *See, e.g.*, *Cox v. Davison*, 397 S.W.2d 200, 201–03 (Tex. 1965). The operator may drill without obtaining the other cotenants' consent and may recover 100% of their proportionate reasonable costs from production before paying

them net proceeds. The nonparticipating owner, in turn, need not fund the operator's drilling decision in advance or accept a contractual penalty for declining.

That tradeoff gives both sides something substantial: operational freedom for the developer and freedom from compelled investment for the nonparticipant. Texas has already struck that "balance of equities." *Cox*, 397 S.W.2d at 203. McCully asks only that this familiar rule govern unless the parties actually agreed to replace it.

That distinction matters especially in modern horizontal development. A large operator may schedule multiple wells on its own capital plan and drilling calendar; a smaller working-interest owner may not be able to approve the same investment on the same timetable. Cotenancy lets the operator proceed without waiting while allowing the nonparticipant to bear its costs from production instead. Treating an old JOA as automatically governing a much broader well changes that balance without a new agreement: the nonparticipant must either fund the broader project on the operator's timetable or accept the old agreement's non-consent penalty. McCully's construction preserves development without turning a legacy JOA into a compulsory financing mechanism for a different project.

A JOA changes that balance by agreement. This one provides proposal and election procedures and access to operational information, including drilling reports, well logs, and core samples. ROA.2920, 2922. Those rights accompany the

negotiated non-consent premium. An operator may bargain for that different allocation of risk and return. But the property right to develop does not itself supply the additional contractual return. Enforcing the JOA's limits preserves both sides of the distinction: development under cotenancy law and a premium only under an applicable agreement.

## Conclusion

Texas Alliance of Energy Producers respectfully requests certification of the JOA-coverage question to the Supreme Court of Texas. The industry needs a resolute construction that respects existing contractual boundaries while preserving the parties' ability to negotiate broader operations. McCully's construction serves those interests; automatic segment-by-segment application does not.

Respectfully submitted,

/s/ Chad Flores
Chad Flores
chad@chadflores.law
Texas Bar No. 24059759
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 893-9440

Counsel for *Amicus Curiae*
Texas Alliance of Energy Producers

## Certificate of Compliance

This filing complies with the type-volume limitations of the Federal Rules of Appellate Procedure because it contains no more than 2,575 not-exempted words.

This filing complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32 and Fifth Circuit Rule 32 because it has been prepared in a proportionally spaced typeface in 14-point font using Microsoft Word for Mac Version 16.113.3.

/s/ Chad Flores
Chad Flores